**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LEVEL THE PLAYING FIELD, PETER ACKERMAN, GREEN PARTY OF THE UNITED STATES, and LIBERTARIAN NATIONAL COMMITTEE, INC.<br><br>                        Plaintiffs,<br><br>           v.<br><br>FEDERAL ELECTION COMMISSION<br><br>                      Defendant. | Civil Action No.:  <u>15-cv-1397 (TSC)</u> |

## <u>MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs Level the Playing Field, Peter Ackerman, the Green Party of the United States, and the Libertarian National Committee Inc., by their undersigned counsel, hereby move this Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment holding that the Federal Election Commission's dismissals of Plaintiffs' administrative complaints and denial of Plaintiff Level the Playing Field's petition to open a rulemaking to revise the Commission's debate staging regulations are contrary to law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

Support for this motion is set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment; Plaintiffs' Statement of Material Facts as to which Plaintiffs contend there is no genuine issue; the Declaration of Alexandra A.E. Shapiro, dated April 6, 2016; and the administrative record, portions of which shall be submitted by the parties in a joint appendix pursuant to Local Civil Rule 7(n).  Plaintiff's requested relief is set forth in the accompanying Proposed Order.

Pursuant to Local Rule 7(f), an oral hearing is requested.

Dated: April 6, 2016
      New York, New York

                        Respectfully submitted,

                        _/s/ Alexandra A.E. Shapiro
                        Alexandra A.E. Shapiro (D.C. Bar No. 438461)
                        Chetan A. Patil (D.C. Bar No. 999948)
                        SHAPIRO ARATO LLP
                        500 Fifth Avenue
                        40th Floor
                        New York, New York 10110
                        Phone:  (212) 257-4880
                        Fax:  (212) 202-6417

                        *Attorneys for Plaintiffs Level the Playing Field,*
                        *Peter Ackerman, Green Party of the United States,*
                        *and Libertarian National Committee, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEVEL THE PLAYING FIELD, PETER ACKERMAN, GREEN PARTY OF THE UNITED STATES, and LIBERTARIAN NATIONAL COMMITTEE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION<br><br>Defendant. | Civil Action No.:  15-cv-1397 (TSC)   |

**PLAINTIFFS LEVEL THE PLAYING FIELD, PETER ACKERMAN, GREEN PARTY OF THE UNITED STATES, AND LIBERTARIAN NATIONAL COMMITTEE, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ...................................................................................................................... 5

I.     THE PARTIES ............................................................................................................... 5

II.    THE STATUTORY AND REGULATORY FRAMEWORK .......................................... 6

III.   THE CPD ..................................................................................................................... 7

       A.     The CPD's Origins ........................................................................................... 8

       B.     The CPD As Debate Sponsor ........................................................................... 9

       C.     The CPD's Selection Criteria ......................................................................... 10

IV.   THE FEC'S HISTORY OF PROTECTING THE CPD ............................................ 11

V.    PLAINTIFFS' ADMINISTRATIVE COMPLAINTS ................................................ 13

       A.     Procedural History ......................................................................................... 13

       B.     The Allegations Of The Administrative Complaints ........................................ 14

            1.     The CPD's partisan bias ..................................................................... 14

            2.     The CPD's polling criterion ................................................................ 16

            3.     The CPD's violations of FECA ........................................................... 19

       C.     The FEC's Dismissals ..................................................................................... 21

VI.   PETITION FOR RULEMAKING ............................................................................... 23

ARGUMENT ........................................................................................................................ 26

I.     STANDARD OF REVIEW ....................................................................................... 26

II.    THE FEC'S DISMISSALS OF THE ADMINISTRATIVE COMPLAINTS WERE
ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION ......................... 29

       A.     The FEC's Determination That The CPD Does Not Endorse, Support, Or Oppose
Political Parties Was Contrary To Law ............................................................ 29

i

       1.       The FEC's interpretation of the debate staging regulations is plainly erroneous and inconsistent with FECA ..................................................... 29

       2.       The FEC did not give Plaintiffs' allegations a hard look .......................... 33

    B.     The FEC's Conclusion That The CPD's Polling Criterion Was "Objective" Was Arbitrary and Capricious ................................................................................... 37

III.    THE FEC'S REFUSAL TO OPEN A RULEMAKING WAS ARBITRARY AND CAPRICIOUS ........................................................................................................... 40

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. FEC*, 177 F. Supp. 2d 48
(D.D.C. 2001), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003) ................................................................ 31

*\*Am. Horse Prot. Ass'n Inc. v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987) ................................. 27, 43, 44

*\*Antosh v. FEC*, 599 F. Supp. 850 (D.D.C. 1984) ............................................................. 27, 35, 36

*AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959 (D.C. Cir. 2001) ...................................... 27, 39

*Auer v. Robbins*, 519 U.S. 452 (1997) ......................................................................................... 30

*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945) ........................................................ 30

*Braniff Airways, Inc. v. Civil Aeornautics Bd.*, 379 F.2d 453 (D.C. Cir. 1967) .......................... 27

*\*Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000) ...................................................... passim

*Cent. Fla. Enters., Inc. v. FCC*, 598 F.2d 37 (D.C. Cir. 1978) ..................................................... 28

*Christensen v. Harris Cnty.*, 529 U.S. 576 (2000) ....................................................................... 30

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) ............................................ 30

*City of Williams v. Dombeck*, 151 F. Supp. 2d 9 (D.D.C. 2001) .................................................. 26

*Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151 (D.C. Cir. 2015)..... 23

*Common Cause v. FEC*, 906 F.2d 705 (D.C. Cir. 1990) ............................................................... 39

*Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326 (2013) ............................................................... 30

*Dialysis Clinic, Inc. v. Leavitt*, 518 F. Supp. 2d 197 (D.D.C. 2007) ........................................... 31

*EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) ................................................................. 27

*\*FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27 (1981) ..................... 6, 23, 32, 33

*Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002),
*modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) .............................................................. 41, 44

*Fuller v. Winter*, 538 F. Supp. 2d 179 (D.D.C. 2008) .................................................................. 35

*Greater Boston Television v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ............................................. 27

*Hagelin v. FEC*, 411 F.3d 237 (D.C. Cir. 2005) .......................................................................... 28

*Huerta v. Ducote*, 792 F.3d 144 (D.D.C. 2015).............................................................. 31

*McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) .......................................................... 6, 20

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................ 26, 37, 42

*Nader v. FEC*, 823 F. Supp. 2d 53 (D.D.C. 2011), *aff'd* 725 F.3d 226 (D.C. Cir. 2013) ........... 36

*Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031 (D.C. Cir. 1979) .................................. 28

*Orloski v. FEC*, 795 F.2d 156 (D.C. Cir. 1986)............................................................... 26

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015)..................................................... 30

*Pub. Citizen v. Heckler*, 653 F. Supp. 1229 (D.D.C. 1986)................................................ 42

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ................................................................. 26

*Sierra Club v. Thomas*, 105 F.3d 248, 251 (6th Cir. 1997), *vacated on other grounds*
    *sub nom.*, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) .............................. 28

*Summer Hill Nursing Home LLC v. Johnson*, 603 F. Supp. 2d 35 (D.D.C. 2009) ...................... 39

*Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261 (1968) ............................................ 27

*WildEarth Guardians v. EPA*, 751 F.3d 649 (D.C. Cir. 2014) ................................................. 27

*WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C. Cir. 1981)....................................................... 27, 28, 41

*Zemeka v. Holder*, 963 F. Supp. 2d 22 (D.D.C. 2013) ...................................................... 26

**Statutes, Rules, and Other Authorities**

11 C.F.R. § 100.52 ....................................................................................................... 7

11 C.F.R. § 109.21 ..................................................................................................... 33

*11 C.F.R. § 110.13 ....................................................................................... 7, 29, 31, 41

11 C.F.R. § 114.4 ................................................................................................. 6, 7, 32

5 U.S.C. § 706 ........................................................................................................... 27

52 U.S.C. § 30101 .............................................................................................. 6, 32, 33

52 U.S.C. § 30103 ..................................................................................................... 20

52 U.S.C. § 30104 ................................................................................................... 6, 20

52 U.S.C. § 30106 ........................................................................................... 6, 22

52 U.S.C. § 30109 ........................................................................................... 7, 26

52 U.S.C. § 30116 ............................................................................................... 20

52 U.S.C. § 30118 .......................................................................................... 6, 20

FEC Advisory Opinion 1993-18 (Dec. 9, 1993) ................................................. 32

FEC Advisory Opinion 2007-34 (Dec. 17, 2007) ............................................... 32

Fed. R. Civ. P. 56 .............................................................................................. 26

First General Counsel's Report, MUR 5207 (Commission on Presidential Debates)
    (Aug. 2, 2002) ............................................................................................ 13

First General Counsel's Report, MUR 5395 (Dow Jones) (Jan. 13, 2005) .............................. 7, 37

First General Counsel's Report, MUR 5414 (Commission on Presidential Debates)
    (Dec. 7, 2004) ......................................................................................... 13, 36

First General Counsel's Report, MUR 5530 (Commission on Presidential Debates)
    (May 4, 2005) ............................................................................................. 13

First General Counsel's Report, MURs 4451 and 4473
    (Commission on Presidential Debates) (Feb. 6 1998) ............................................. 11

First General Counsel's Report, MURs 4987, 5004, and 5021
    (Commission on Presidential Debates) (July 13, 2000) ................................. 11, 12, 29

Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734
    (Dec. 27, 1979) ........................................................................................ 6, 33

Merriam-Webster's *Collegiate Dictionary* (11th ed. 2014) ....................................... 31

**INTRODUCTION**

The American electorate is dissatisfied with the current political system, and for good reason. The 2016 presidential election campaign illustrates just how dysfunctional our democracy has become. It is almost certain that the next President will be someone most of our country's 320 million citizens did not favor, and in fact dislike. If the leading Republican candidate continues at his current pace, he will be nominated even though he will have received only 10-15 million votes during the primaries, largely from a narrow slice of the electorate who are far out of the mainstream. If he is not nominated, it will likely be because party elites have somehow hijacked the democratic process even more. The likely Democratic nominee has a viable challenge from a candidate who is really an independent, but admits he had to run as a Democrat because of the same systemic biases against independents implicated in this lawsuit.[1] Most voters view both major party front-runners unfavorably.[2] Most voters also wish that they could vote for an independent candidate for president, but there is no viable alternative to the nominees that emerge from the two parties' primaries. The reason is that the parties that have delivered these unpopular candidates have rigged the election system in favor of themselves, and have thereby ensured that the only way to mount a serious candidacy for president is through their deeply flawed nomination process.

This case concerns an institution the parties have deployed to exclude competition from independent candidates – the Commission on Presidential Debates.[3] No one can win the

---

[1] The term "independent" herein also refers to political parties other than the Democratic and Republican Parties.

[2] *See* Anthony Salvanto, *et al.*, *Donald Trump and Hillary Clinton viewed unfavorably by majority – CBS/NYT poll*, CBS News (Mar. 21, 2016 7:19 p.m.), http://www.cbsnews.com/news/donald-trump-and-hillary-clinton-viewed-unfavorably-by-majority-cbsnyt-poll/.

[3] "CPD" refers to the Commission on Presidential Debates; "DNC" to the Democratic National Committee; "RNC" to the Republican National Committee; "FEC" to the Federal Election Commission; "FECA" to the Federal Election Campaign Act; "LPF" to Plaintiff Level the Playing Field; "Green Party" to Plaintiff Green Party of the United States; "Libertarian Party" to Plaintiff Libertarian National Committee, Inc. and the United States Libertarian Party; and "Shapiro Decl." to the Declaration of Alexandra A.E. Shapiro submitted in support of this motion.

presidency without participating in the general election debates.  For nearly 30 years, the CPD has decided who may participate in those debates and has used that power to perpetuate the interests of the Democratic and Republican Parties.  The CPD's directors are a coterie of unelected and unaccountable political insiders, most of whom have extensive ties to the two major parties.  The CPD is led by a former chairman of the RNC and a former press secretary to President Bill Clinton and director of communications for the DNC.  It is funded with millions of dollars from large, politically influential corporations, which have spent years buying access and influence in the two-party duopoly, and share the parties' interest in excluding independents.

For years, the CPD has been violating FECA and FEC regulations limiting debate-sponsoring organizations' ability to use corporate funds to finance their activities.  To accept corporate contributions and expenditures, a debate staging organization must be "nonpartisan," meaning it may not "endorse, support, or oppose" political candidates or parties, and it must use pre-established objective criteria to determine which candidates may participate.  The specific, detailed, and extensive evidence Plaintiffs presented in their administrative complaints shows that the CPD does not remotely meet these requirements.  Nevertheless, the FEC refused to enforce the law and ignored virtually all of this evidence in conclusorily dismissing the complaints even though there is plainly reason to believe that the CPD is violating FECA.

*First*, the CPD is *bipartisan*, not nonpartisan, because it is biased in favor of the two major parties and actively works to shield them from competition with independent candidates. The CPD was founded for the bipartisan purpose of sponsoring presidential debates "between the nominees of the two political parties."  (AR2250).  It is and has always been run by two prominent partisan co-chairmen – one from each major party – and its board of directors has always been stocked with partisan political insiders and donors.  Many of the CPD's leaders

2

engage in partisan activities on behalf of major party presidential candidates.  The CPD allows this to happen, as it has no institutionalized procedures to limit partisan conflicts of interest.

*Second*, the CPD also violates the debate staging regulations because it fails to use pre-established objective criteria for selecting debate participants.  By law, objective criteria cannot be designed to ensure the selection of pre-chosen candidates, and a debate staging organization cannot use a criterion that only the Democratic and Republican candidates can realistically satisfy.  But that is precisely what the CPD has done.

The CPD requires a candidate to poll at 15% in an average of five unspecified national polls taken in mid-September.  This level of support is virtually impossible for an independent candidate who is not a self-funded billionaire to achieve.  Candidates who do not participate in the major party primaries lack access to free media coverage and must rely instead on paid media to garner the necessary name recognition to satisfy the rule.  Studies show that to gain sufficient name recognition to poll at 15%, an independent candidate would have to spend over $250 million.  This is an unheard-of amount of money for an independent candidate to raise, especially before appearing in any televised debates.  As Senator Bernie Sanders has explained:  "In terms of media coverage, you have to run with the Democratic Party;" the major networks "would not have [him] on [their] program[s]" if he ran as an independent; and in order "[to] run as an independent, you need – you could be a billionaire . . . . If you're a billionaire, you can do that."[4]

And even if it were possible for an independent candidate to raise this amount of money, it would not matter because the CPD's polling criterion works to the systematic disadvantage of non-major-party candidates.  Polls often drastically undercount the true level of support of independent candidates, who frequently tap into new segments of the electorate.  Moreover,

---

[4] *See* Brianna Ehley, *Sanders says he ran as a Democrat for 'media coverage'*, Politico (Mar. 14, 2016), http://www.politico.com/blogs/2016-dem-primary-live-updates-and-results/2016/03/bernie-sanders-independent-media-coverage-220747?lo=ap_b1.

polling in three-way races suffers from heightened volatility and increased error rates, which will disproportionately harm the candidate in third place – almost always, the independent candidate.

Despite these allegations and the detailed evidence substantiating them, the FEC – itself by statute a bipartisan organization – simply turned a blind eye, as it has in the past, to protect the CPD and the major parties.  The FEC relied on an interpretation of its debate staging regulation that is at odds with the text of the regulation and inconsistent with FECA.  The FEC ignored virtually all of Plaintiffs' allegations that the CPD is biased in favor of the two major parties.  Its cursory analysis of Plaintiffs' detailed evidence that the polling criterion disproportionately disadvantages independent candidates was conclusory and illogical, and failed to actually consider Plaintiffs' allegations.  This was arbitrary, capricious, and contrary to law.

The FEC also arbitrarily denied LPF's related petition for rulemaking, even though all 1,260 commenters (except the CPD) supported opening a rulemaking.  The FEC's current regulation is intended to ensure that debates are nonpartisan and educational, and not abused by corporate donors to give favored candidates an improper advantage.  But that regulation has failed to prevent the partisan CPD and its corporate sponsors, who are heavily invested in the two-party system, from rigging the process to promote the Republican and Democratic nominees while excluding independent candidates from the debates.  Thus, the central theme of the petition was that staging organizations should not be permitted to rely exclusively on polling thresholds to select candidates, since this criterion could be used as a "pretext for corrupt political discrimination" and to allow the "kind of partisan rigging that the debate regulations prohibit."

The FEC fundamentally misinterpreted the petition.  It ignored the petition's discussion of the link between corporate corruption and efforts to exclude independent candidates from the debates, and proceeded as if the sole point of the petition was to increase the opportunity for

4

independent candidates to participate in the debates.  The FEC also ignored that a debate sponsor could adopt alternative rules that would not render debates unwieldy by "opening the floodgates" to additional candidates.  For example, LPF sought to revise the rules to allow only one additional candidate who won a signature drive competition, and some commenters proposed a different revision that would have resulted in inviting only two additional candidates in 2012.  The FEC unlawfully failed to adequately consider the petition's actual arguments.

This year's presidential election demonstrates just how damaging the FEC's inaction is for our democracy.  The FEC has a critical role to play in ensuring that campaigns and elections are conducted free of corruption.  Particularly at this important juncture for our democracy, it should not be permitted to simply rubber-stamp the rigged and corrupt process that has prevented American voters from hearing from the third alternative most of them prefer.  This Court should not sanction the FEC's dereliction of duty and should grant summary judgment for Plaintiffs.

## BACKGROUND

## I.    THE PARTIES

Plaintiffs are three political organizations and a voter who seek to break the two major parties' stranglehold on the presidential debates.  LPF is a nonpartisan, nonprofit corporation whose purpose is to promote reforms that allow for greater competition and choice in federal elections.  (AR2019).  The Green Party has nominated candidates in every presidential election since 2000, and will do so again in 2016.  (AR4003-05).  The Libertarian Party is the third largest party in the U.S. and has nominated presidential candidates in every election since 1972 and will do so again in 2016.  (AR4781-83).  Finally, Dr. Peter Ackerman is a citizen and voter who is committed to reforming politics and elections in the United States.  (AR2020).

Defendant FEC is a federal agency charged with the administration and civil enforcement

5

of FECA.  The FEC is comprised of six commissioners, no more than three of whom "may be affiliated with the same political party." 52 U.S.C. § 30106(a)(1).  Because of this structure, the Supreme Court has described the FEC as "inherently bipartisan." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (hereinafter "*DSCC*").

## II.     THE STATUTORY AND REGULATORY FRAMEWORK

The fundamental purpose of FECA is to "limit *quid pro quo* corruption and its appearance." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1444 (2014).  In furtherance of this goal, FECA limits corporate involvement in federal elections.  Corporations are prohibited from making a broad variety of contributions or expenditures "in connection with" any federal election.  *See* 52 U.S.C. § 30118(a); *see also* 52 U.S.C. § 30101(8)(A)(i) (defining contribution to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person"); § 30101(9)(A)(i) (defining expenditure as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person").  It simultaneously requires political committees to disclose the vast majority of all political contributions and expenditures.  *See* 52 U.S.C. § 30104.

FECA provides a safe harbor that exempts "nonpartisan activity designed to encourage individuals to vote or to register to vote" from the definition of "expenditure."  § 30101(9)(B)(ii). The FEC has recognized that, pursuant to this exemption, corporations may provide funding for candidate debates under certain limited conditions.  *See* Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734, 76,734 (Dec. 27, 1979); *see also* 11 C.F.R. § 114.4(f). In order to fall within this exemption for "nonpartisan activity," a valid debate staging organization must be a non-profit organization that does not "endorse, support, or oppose political candidates or political parties."  11 C.F.R. § 110.13(a).  Moreover, the organization

6

must use "pre-established objective criteria to determine which candidates may participate in a debate," and may not "use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." § 110.13(c).  These objective criteria "must be free of content bias, and not geared to the selection of *certain pre-chosen participants*."  First General Counsel's Report at 7, MUR 5395 (Dow Jones) (Jan. 13, 2005) (Shapiro Decl. Ex. 1) (emphasis added).  "[R]easonableness is implied" in objectivity, and a criterion that "only the Democratic and Republican nominees could reasonably achieve" is not objective.  *Buchanan v. FEC*, 112 F. Supp. 2d 58, 74 (D.D.C. 2000).

If a debate staging organization does not satisfy these requirements, it cannot use corporate money to pay for candidate debates.  § 114.4(f); *see also* 11 C.F.R. § 100.52(d)(1) ("Unless specifically exempted . . . the provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services is a contribution.").  Moreover, if a debate staging organization does not satisfy these requirements, it must register as a political committee and disclose its contributors and expenditures.

FECA permits any person who believes a violation of the Act has occurred to file an administrative complaint with the FEC.  52 U.S.C. § 30109(a)(1).  To institute an investigation, the FEC need only find by a majority vote that there is "reason to believe" that the party named in the complaint "has committed, or is about to commit, a violation" of FECA.  § 30109(a)(2).

## III.   THE CPD

The CPD is a non-profit corporation organized under the laws of the District of Columbia.  (AR2144; AR2882 ¶ 3).  It has used corporate money to stage every general election presidential debate since 1988, including the four debates in 2012.  (AR2883 ¶¶ 4-5).  Because FECA prohibits corporate funding of debates outside the strictures of § 110.13, the CPD's failure

to comply with § 110.13 violates FECA.

### A.     The CPD's Origins

The CPD was created in the mid-1980s by the then-chairmen of the RNC and the DNC,

Frank Fahrenkopf, Jr. and Paul G. Kirk, Jr.  The Democratic and Republican Parties had grown

increasingly dissatisfied with the non-partisan League of Women Voters, which had sponsored

general election debates in 1976, 1980, and 1984, and had refused to acquiesce to the two

parties' demands.  (AR2206; AR2210-11; AR2227-28; AR2240).  Accordingly, in 1985,

Fahrenkopf and Kirk entered into a Memorandum of Agreement on Presidential Candidate Joint

Appearances to create an alternative to the League.  (AR2244).  The agreement explicitly

proclaimed that in order "to better fulfill *our parties'* responsibilities for educating and informing

the American public and to *strengthen the role of political parties* in the electoral process, it is

our conclusion that future joint appearances should be principally and jointly *sponsored and*

*conducted by the Republican and Democratic National Committees*."  (*Id.* (emphases added)).

The parties announced the creation of the CPD in a joint press release, which described

the CPD as a "bipartisan . . . organization formed to implement joint sponsorship of general

election presidential and vice-presidential debates . . . by the national Republican and

Democratic committees between their respective nominees."  (AR2249).  The release stated:

"We have no doubt that with the help of the [CPD] we can forge a permanent framework on

which all future presidential debates between the nominees of the two political parties will be

based."  (AR2250).  Both Fahrenkopf and Kirk openly proclaimed that the CPD would further

the two major parties' interests.  Fahrenkopf said that the CPD "was not likely to look with favor

on including third-party candidates in the debates," and Kirk indicated that "he personally

believed the [CPD] should exclude third-party candidates from the debates."  (AR2252).

8

### B.      The CPD As Debate Sponsor

Throughout its existence, the CPD has always been led by two chairmen, one Republican and one Democrat.  Fahrenkopf, the former RNC chair, has always been the Republican co-chair. (AR2360; AR2885-86 ¶ 11).  Kirk, the former DNC chair, was the Democratic co-chair until 2009.  (AR2885-86 ¶ 11).  He was replaced by Michael D. McCurry, a longtime Democratic partisan and former press secretary to President Bill Clinton.  (AR2360; AR2363).  The CPD also has always filled its board of directors with Democratic and Republican partisans, including former Senators, former aides to high-ranking Republican and Democratic politicians, and major political donors.  (AR2360; AR2882 ¶ 2; AR2222-23; AR2400).[5]

Unsurprisingly, the CPD has hewn closely to Fahrenkopf and Kirk's vision of the organization as an instrument of the major parties and their candidates.  In each election in which the CPD has sponsored a debate, the CPD has without fail acquiesced to the demands of the major parties regarding every material aspect of the debates, and has never refused any request agreed to by the major parties.  (*See* Pls.' Statement of Material Facts ("PSMF") ¶¶ 72-73).

The CPD has also capitulated to the major party candidates' wishes about who participates in the debates.  In 1992, using different criteria, the CPD initially concluded that independent candidate Ross Perot should be invited to the first general election presidential debate, but that his inclusion in subsequent debates would be subject to further review. (AR2288-89).  However, the campaigns of President George H.W. Bush and Bill Clinton each

---

[5] The CPD announced six new board members in April 2014, most of whom are similar political partisans, including a former Republican governor, a former Republican Senator, two former Democratic U.S. House members, and a former cabinet official in several Democratic administrations.  (AR2411).  One of the new board members, Olympia Snowe, donated to Jeb Bush's presidential campaign.  *See* List of Olympia Snowe Individual Contributions, retrieved on March 28, 2016 from FEC's website using Transaction Query By Individual Contributor, http://www.fec.gov/finance/disclosure/norindsea.shtml.  Another, Leon Panetta, publicly endorsed Hillary Clinton's 2016 presidential campaign.  *See* Lucy McCalmont, *Leon Panetta goes all in for Hillary Clinton*, Politico (Oct. 14, 2014), http://www.politico.com/story/2014/10/leon-panetta-hillary-clinton-111892.  Since the commencement of this action, Panetta has been removed from the CPD's website.  *See Commission Leadership*, Commission on Presidential Debates, http://www.debates.org/index.php?page=commission-leadership (last visited Apr. 5, 2016).

believed Perot's inclusion would help them, so they jointly instructed the CPD to include Perot

in all three debates.  (AR2303-04).  The CPD yielded to the campaigns' demands.  It did the

same in 1996, excluding Perot at the joint request of the Clinton and Dole campaigns.  (*See*

PSMF ¶¶ 79-84).

### C.        The CPD's Selection Criteria

The CPD purports to decide who participates in its debates based on pre-established,

objective criteria.  In every year since 2000, it has included only candidates who:  (1) are

constitutionally eligible to hold office, (2) appear on enough state ballots to secure an Electoral

College majority, and (3) have "a level of support of at least 15% . . . of the national electorate as

determined by five selected national public opinion polling organizations, using the average of

those organizations' most recent publicly-reported results at the time of the determination."

(*E.g.*, AR2917-18).[6]  The CPD states that it will use polls conducted "after Labor Day but

sufficiently in advance of the first-scheduled debate to allow for orderly planning," rather than

announcing in advance any specific date for determining whether the 15% polling rule is

satisfied.  (*E.g.*, AR2918).  The CPD also does not announce what polls it purports to rely on,

either in advance of or even after it makes its determination.  (*E.g.*, *id.*).[7]  As a consequence, the

CPD is free to choose polls that are most likely to exclude any independent candidates.

In every election since 2000, the CPD has purported to rely on Dr. Frank Newport, the

Editor-In-Chief of the Gallup polling organization, in applying its polling criterion.  (AR3044, ¶

7).  Gallup has been one of the five selected national public opinion polls the CPD has used to

---

[6] After the filing of Plaintiffs' administrative complaints, the CPD announced that its 2016 debate selection criteria would be the same again.  *See Commission on Presidential Debates Announces 2016 Nonpartisan Candidate Selection Criteria; Forms Working Group on Format*, Commission on Presidential Debates (Oct. 29, 2015), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=58&cntnt01origid=93&cntnt01detailtemplate=newspage&cntnt01returnid=80.

[7] It has publicly disclosed these polls in connection with FEC administrative proceedings.  (*E.g.*, AR3045 ¶¶ 9-13).

make its 15% determination in each such election.  (AR3045, ¶¶ 9-13).

## IV.    THE FEC'S HISTORY OF PROTECTING THE CPD

The CPD and its biased polling rule have been the subject of several administrative

complaints since 1996.  The first argued that the CPD's selection criteria for the 1996 election,

which differed from its current criteria, were not objective and that the CPD was not nonpartisan

due to its bipartisan origin.  *See* First General Counsel's Report, MURs 4451 and 4473 at 10-13,

25-26 (Commission on Presidential Debates) (Feb. 6 1998) (Shapiro Decl. Ex. 3).  The FEC's

General Counsel agreed, concluding that there was reason to believe the allegations that the CPD

was violating FECA.  *Id.* at 35-36.  The Commission refused to act.

In 2000, after the CPD first announced its 15% polling rule, several parties submitted

administrative complaints against the CPD.  The complainants argued that the CPD was not

nonpartisan because it was created by the two parties, and that its polling criterion was not

objective.  *See* First General Counsel's Report, MURs 4987, 5004, and 5021 at 8-11

(Commission on Presidential Debates) (July 13, 2000) (Shapiro Decl. Ex. 4).  The FEC

dismissed the complaints, reasoning that the CPD did not violate § 110.13 because:

> [the Complainants] have not provided evidence that the CPD is *controlled by* the
> DNC or the RNC.  There is no evidence that any officer or member of the DNC or
> RNC is *involved in the operation* of the CPD.  Moreover, there does not appear to
> be any evidence that the DNC and the RNC had *input into* the development of the
> CPD's candidate selection criteria for the 2000 presidential election cycle.  Thus,
> it appears that the CPD satisfies the requirement of a staging organization that it
> not endorse, support or oppose political candidates or political parties.

Shapiro Decl. Ex. 4 at 15 (emphases added).  As to the polling criterion, the FEC relied on its

earlier dismissals of the 1996 complaints, stating only that the 2000 criteria were "even more

objective than the 1996 criteria."  *Id.* at 16-17.

Several complainants sued, challenging the dismissal as contrary to law.  *See Buchanan*,

112 F. Supp. 2d at 62.  They argued the FEC had imposed the wrong standard under § 110.13(a) by requiring a showing that the CPD was controlled by the DNC or RNC, and not that it merely endorsed, supported, or opposed the major parties.  *See* Shapiro Decl. Ex. 5 at 13-14.  In response, the FEC maintained that its "control" standard was not an interpretation of § 110.13(a), but merely a response to a "specific contention" that "the CPD was created to give the two major parties 'control over' the presidential debates."  *See* Shapiro Decl. Ex. 6 at 5-6.  This Court agreed, finding that the FEC's statement was "geared toward refuting the specific contention made in plaintiffs' administrative complaint that the CPD was created to give the two major parties 'control over' the presidential debates."  *See Buchanan*, 112 F. Supp. 2d at 71 n.8.

The *Buchanan* Court ultimately upheld the FEC's decision.  The Court agreed that the argument that the CPD's partisan origins violated § 110.13(a) "makes sense" and that the evidence supporting that claim was "not insubstantial."  *Id.* at 72.  However, the Court concluded that "in the absence of any contemporaneous evidence of influence by the major parties," the complainants' "evidence of possible past influence [was] insufficient to justify disbelieving the CPD's sworn statement . . . that the CPD's 2000 debate criteria were neither influenced by the two major parties nor designed to keep minor parties out of the debates."  *Id.* at 72-73.  The Court also upheld the FEC's conclusion that the polling criterion did not violate § 110.13(c) because the complainants had failed to present "evidence to suggest that these problems [with polling] would systematically work to minor-party candidates' disadvantage."  *Id.* at 75.

In the years since, *Buchanan* has become a talisman for the FEC and the CPD.  Though the FEC claimed in *Buchanan* that its "control" standard was only a response to a "specific contention," it has repeatedly, and without analysis of the particular allegations at issue, relied on this very same "control" standard to dismiss subsequent complaints against the CPD:

12

> While the complainant argues that the CPD is a partisan organization, he has provided no evidence that the CPD is *controlled by* the DNC or the RNC.  There is no evidence that any officer or member of the DNC or the RNC is involved in the operation of the CPD.  Moreover, there does not appear to be any evidence that the DNC and the RNC had input into the development of the CPD's candidate selection criteria for the 2000 presidential election cycle.  *Thus, it appears that the CPD satisfies the requirement of a staging organization that it does not endorse, support or oppose political candidates or political parties.*

First General Counsel's Report, MUR 5207 at 9 (Commission on Presidential Debates) (Aug. 2, 2002) (Shapiro Decl. Ex. 7) (emphases added); *see also* First General Counsel's Report, MUR 5414 at 12 (Commission on Presidential Debates) (Dec. 7, 2004) (Shapiro Decl. Ex. 8) (dismissal was warranted because there was no "specific or credible evidence that the major parties played a controlling role in excluding debate participants or that the CPD acted upon their instruction").

The FEC also has relied on *Buchanan*'s treatment of the CPD's polling criterion to summarily dismiss subsequent allegations regarding the polling rule.  Although this Court made clear that evidence that the polling criterion "would systematically work to minor-party candidates' disadvantage" would present a different case than the allegations at issue in *Buchanan*, *see* 112 F. Supp. 2d at 75, the FEC has relied on its dismissals of the 1996 complaint and/or *Buchanan* to dismiss subsequent administrative complaints against the CPD, without even considering the particular evidence regarding polling.  *See* Shapiro Decl. Ex. 7 at 9-11; Shapiro Decl. Ex. 8 at 13; First General Counsel's Report, MUR 5530 at 5-6 (Commission on Presidential Debates) (May 4, 2005) (Shapiro Decl. Ex. 9).

## V.     PLAINTIFFS' ADMINISTRATIVE COMPLAINTS

### A.     Procedural History

On September 11, 2014, LPF and Dr. Ackerman filed an administrative complaint against the CPD, its executive director Janet Brown, and the 11 directors who participated in adopting the CPD's rules for the 2012 presidential election:  Fahrenkopf, McCurry, Howard G. Buffett,

John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, Newton N. Minow, Richard

D. Parsons, Dorothy Ridings, and Alan K. Simpson.  (AR2001-75).  The FEC designated this

administrative complaint MUR 6869.  (Answer (Dkt. No. 27) ¶ 88).  On June 16, 2015 and June

18, 2015 respectively, the Green Party and the Libertarian Party requested to join MUR 6869 as

complainants.  (AR4001; AR4778).  These requests raised no new allegations and instead

incorporated wholesale the allegations in MUR 6869.  (AR4001; AR4778).  The FEC denied the

requests, and instead treated them as the filing of a new administrative complaint.  (Pls.' Second

Am. Compl. ("SAC") (Dkt. No. 25) ¶ 98; Answer ¶ 98).  The FEC designated this new

complaint MUR 6942.  (SAC ¶ 98; Answer ¶ 98).

### B.    The Allegations Of The Administrative Complaints

The administrative complaints in MURs 6869 and 6942 alleged that the CPD and the 12

directors violated the FEC's debate staging regulations and FECA, in connection with the 2012

general election debates, because (1) the CPD is not a nonpartisan organization and it endorses,

supports, or opposes political parties, and (2) the CPD's 15% polling criterion is not objective.

(AR2001-75; AR4001-05; AR4778-83).  Plaintiffs' allegations differed from the prior

administrative complaints regarding the CPD, including in *Buchanan*, in significant ways.

### 1.    The CPD's partisan bias

Plaintiffs presented the contemporaneous evidence of partisan bias by the CPD that this

Court found lacking in *Buchanan*.  The administrative complaints discussed the CPD's partisan

founding and also detailed how the CPD's leadership currently engages in partisan activity to

endorse and support the major parties and their candidates.  Fahrenkopf and McCurry recently

have each given tens of thousands of dollars to the Republican and Democratic Parties and their

candidates.  (AR2370).  Fahrenkopf donated more than $23,000 between 2008 and 2012, and

14

$35,000 in the 2012-14 election cycle to the Republican Party and its candidates.  (AR2370; AR2373-80).  Similarly, McCurry donated almost $85,000 to Democrats between 2008 and 2012, including $7,500 to Hillary Clinton, and has donated to her 2016 presidential campaign. (AR2370).[8]  Moreover, as high-powered lobbyists, Fahrenkopf and McCurry oversaw hundreds of thousands of dollars' of contributions to Democratic and Republican candidates, including from corporations sponsoring the CPD's debates.  (AR2370; AR2385; AR2388-89).

Several of the CPD's other directors are also deeply involved in partisan activity for major party candidates.  Several directors have contributed tens of thousands of dollars or more to the major parties and their candidates.  (*E.g.*, AR2370; AR2403-05; AR2407-08).  Parsons and his wife donated more than $100,000 to Republican candidates and committees between 2008 and 2012, including $25,000 in 2008 to John McCain's Victory Committee.  (AR2370).  Howard Buffett contributed to Barack Obama's 2008 presidential campaign in the *very same month* that Obama appeared in the CPD's "nonpartisan" debates.  (AR2403).[9]

Moreover, CPD directors have not been shy about their partisan biases.  In 2011, Fahrenkopf authored an op-ed advocating the appointment of a new Republican Party chairman who could win the trust of "*our* major-donor base" and rebuild "*our* great party."  (AR2382-83 (emphases added)).  Similarly, in an April 2015 television interview, Fahrenkopf admitted that the CPD has "a system, and we, you know . . . primarily go with the two leading candidates . . . the two political party candidates."  (AR3099).  A former director who was involved in the CPD's 2012 debates, Alan Simpson, has publicly stated that the "purpose" of the CPD "is to try

---

[8] *See* List of Michael McCurry Individual Contributions, retrieved on March 28, 2016 from FEC's website, *supra*.
[9] In the current election cycle, CPD directors Parsons, Hernandez, and Danforth have donated to presidential candidates from the major parties.  Parsons donated $2,700 to Bush and Clinton.  *See* List of Richard Parsons Individual Contributions, retrieved on March 28, 2016 from FEC's website, *supra* (New York resident).  Hernandez donated $2,700 to the Clinton campaign.  (*See* SAC ¶ 44c; Answer ¶ 44).  Danforth donated $2,700 to John Kasich's presidential campaign and served on a host committee for a fundraising event for Jeb Bush's super PAC.  (*See* SAC ¶ 44b; Answer ¶ 44); *see also* Maeve Reston, *Jeb Bush heads to California fundraisers, some hosted by former Romney donors*, CNN (Jan. 14, 2015), http://www.cnn.com/2015/01/13/politics/jeb-bush-california-fundraisers/.

to preserve the two-party system," and that independent candidates should "not be included in the debates" because they "mess things up."  *See* George Farah, *No Debate:  How the Republican and Democratic Parties Secretly Control the Presidential Debates* 41 (2004).

The CPD effectively encourages its directors to maintain and foster these partisan ties because it has no oversight mechanisms to curb partisan influence.  The organization's conflict of interest rules do not address partisan political activities *at all*.  (AR2768-71).  The board meets as infrequently as once per year, and board members devote little if any time to the organization.  (AR2232).  The CPD's IRS filings report that its board members spend one hour per week on the CPD.  (AR2442-51).  Moreover, it has no institutionalized process for nominating or selecting its members (AR2232-33; AR2752-53 §§ 2-3), permitting its chairmen to pack the board with directors likely to acquiesce to their partisan approach to the debates.  The CPD board also has been a revolving door for its partisan directors.  (AR2483; AR2420-21).

### 2.     The CPD's polling criterion

Plaintiffs submitted new, detailed evidence that the CPD's polling criterion is not objective because it is designed to, and does, systematically exclude independent candidates.

*First*, it is not reasonably possible for third-party and independent candidates to satisfy the 15% threshold.  According to the expert analysis of Dr. Clifford Young, a candidate seeking to achieve 15% voter support must first obtain, at a bare minimum, name recognition of 60%, and more likely, 80% or more, to have any realistic chance at achieving 15% voter support nationally.  (AR2493 ¶ 10; AR2504-05 ¶¶ 29-30, 32).

In practice, reaching that level of name recognition is substantially harder for independents than for major party candidates.  Because of their partisan affiliation, major party candidates have a default level of support from committed partisans who support candidates

automatically based on party identity.  (AR2500-51 ¶ 21).  Major party candidates also benefit

from substantial media coverage by participating in the primaries.  For example, by running in

the 2012 Republican primaries, Rick Santorum and Herman Cain were able to significantly raise

their name recognition quickly and relatively cheaply.  Santorum was able to boost his name

recognition from 47% among Republican voters in May 2011 to 85% among all Americans by

February 2012, at a cost of only around $13.1 million (AR2528; AR2534; AR2536); Cain was

able to boost his name recognition from just 21% among Republican voters in March 2011 to

78% in October 2011 for just $16 million.  (AR2538; AR2542).

Independent candidates have no analogous mechanism for generating name recognition.

As NBC's Chuck Todd has admitted, these candidates "typically don't get the media attention –

and thus name ID – that Democrats and Republicans get."  (PSMF ¶ 98); *see also* Ehley, *supra*

n.4 (Senator Sanders: "[i]n terms of media coverage, you have to run with the Democratic

Party").  In order to build sufficient name recognition then, such candidates must rely on paid

media to reach voters.  According to veteran pollster and campaign strategist Douglas Schoen, an

independent candidate seeking to generate the 60-80% name recognition would have to spend

somewhere between *$113 million and $150 million* to generate and broadcast the necessary

media content to satisfy the CPD's rule.  (AR2564).  And that is only for media coverage –

adding other ordinary campaign costs (such as staff, consultants, travel, etc.) would require an

independent candidate to spend *over $250 million* to potentially satisfy the rule.  (AR2567-70).

No third-party or independent candidate has, or could, raise this kind of money.  A

potential candidate would have to successfully solicit hundreds of thousands of donors, all *before*

the vast majority of the electorate had any idea who the candidate was.

*Second*, using polling as the sole measure of a candidate's viability fundamentally

17

disfavors independent candidates.  Because independent candidates begin with wildly different

levels of name recognition, polling often underestimates their true potential.  (AR2602).  Polling

in three-way races also is subject to greater volatility, which disproportionately harms

independent candidates.  Recent election results also suggest that pre-election polls are often, and

increasingly, fundamentally unreliable.  (AR2795-97; AR4852-53).  The experience of Gallup,

the organization headed by CPD pollster Newport, is emblematic.  Nate Silver has criticized

Gallup for "three poor elections in a row," and having "among the worst [2012] results" of all

polling firms.  (PSMF ¶ 114).  Gallup has conceded that it has no "definitive answer" for its

errors, and that its polls have been toward the "inaccurate end of the spectrum."  (AR4960;

AR4964).  As a result, Gallup recently withdrew from "horse race" polling for the 2016

Democratic and Republican primary elections.  (AR4973-74).

Polling's unreliability works to the particular detriment of independent candidates.  They

often bring out new voters, many of whom "are politically inactive or even unregistered until

mobilized by a compelling candidate," and therefore pre-election polls often severely undercount

these candidates' support.  (AR2581).  For example, recent significant independent candidates

such as Elliot Cutler (who received 36% of the vote in the 2010 Maine gubernatorial election)

and Jesse Ventura (who won the 1998 Minnesota gubernatorial race) were polling below 15%

two months before their respective elections (AR2607; AR2609; AR2616), and would have

failed to qualify for debates under a rule like the CPD's.  Data also show that polling in three-

way races is subject to increased error rates (AR2579-81), which tend to harm the candidate in

third-place in the polls (almost always the independent candidate) significantly more than the

candidates with higher levels of support.  At the average error rate from three-way gubernatorial

races, a hypothetical candidate with 17% of voter support would nonetheless be falsely excluded

by the CPD's 15% rule over 40% of the time, whereas a candidate with 42% support would be falsely excluded only .04% of the time.  (AR2515 ¶ 56; AR2517 ¶ 66).  This effect is likely to be even greater in 2016, given how much more unreliable polling has become in the last few years.

The concern with false negatives is exacerbated by the CPD's application of the 15% rule.  By not specifying what polls it considers and when it will consider them, the CPD provides itself with sufficient flexibility to manipulate the results, and also leaves independent candidates at the mercy of the unfettered choices of pollsters and the CPD about who to poll, which candidates to include in a poll, when to conduct the poll, which polls to include in the consideration, and when to make the debate selection determination.

*Third*, the mid-September timing of the CPD's 15% determination disadvantages independent candidates.  The CPD has never and would never exclude a Republican or Democratic nominee from the debates.  By contrast, independent candidates cannot be certain that they will be eligible for the debates until the CPD makes its determination two months before the election.  But participation in the debates is a prerequisite for victory.  The CPD's timing requires independent candidates to campaign and fundraise for months without even knowing whether or not they will ultimately be eligible for the debates and thus even have a shot at winning.  This uncertainty creates a serious and concrete obstacle to independent campaigns.  Donors, volunteers, and voters are much less likely to support, and the media much less likely to cover, any candidate whose participation in the debates is still up in the air.  (AR2057-58).

3.      The CPD's violations of FECA

Because the CPD is not non-partisan and its polling criterion is not objective, the CPD is not a valid debate staging organization under § 110.13.  Accordingly, the CPD unambiguously

19

violates FECA because it makes illegal corporate campaign contributions by providing candidates with free televised fora to reach voters, and makes illegal corporate campaign expenditures in providing those fora. *See* § 30118(a).

The CPD also violates FECA because it illegally accepts contributions from corporate sponsors and fails to register as a political committee and disclose its contributors and expenditures. *See* 52 U.S.C. § 30116(f); *id.* §§ 30103, 30104. The CPD takes in millions of dollars of contributions each presidential cycle, much of it from large multinational corporations such as Anheuser-Busch Companies, Southwest Airlines, American Airlines, AT&T, 3Com, Ford Motor Company, IBM, and J.P. Morgan & Co. (AR2151; AR2178-79). This is only a smattering; the CPD does not disclose all of its donors or the details of its funding.

The acceptance of undisclosed amounts of corporate funds from undisclosed sources in order to stage debates that only include the Republican and Democratic candidates also violates FECA's very purpose. FECA is designed to "limit *quid pro quo* corruption and its appearance," *McCutcheon*, 134 S. Ct. at 1444, and limiting corporate contributions and expenditures in connection with elections is central to that goal. *See* § 30118(a) (prohibiting corporations from making certain contributions or expenditures "in connection with" any federal election).

Through PACs, the CPD's corporate sponsors donate millions to the two major parties every year to try to buy influence. (*E.g.*, AR2391-92; AR2394-95; *see also* AR2370). Corporate PACs often contribute to both parties, in an attempt to ensure that they have purchased influence no matter the outcome of a particular election. (*See* AR2703-05). The CPD serves as a convenient gateway for corporations to contribute to the two major parties simultaneously.

Given this context, the CPD's corporate sponsors have a vested interest in propping up the two-party system. Corporate donors have invested heavily to purchase influence in the two

major parties, and thus inevitably disfavor independent candidates, whose election would dilute the value of this investment. Corporate donors are also opposed to independent candidates because it is more difficult and significantly more expensive for corporations to reliably buy broad influence in a race where the competition is not limited to two candidates, especially given the frequent hostility of third-party and independent candidates to corporate influence.

This appearance of corporate corruption is exemplified by the vastly different experiences of the non-partisan League of Women Voters and the CPD with respect to corporate funding. Although the League received very little interest from corporate funders, the CPD, *in only its first year of operation and without any track record, took in hundreds of thousands in corporate funds*. (AR2721). As the the League's former President explained: "There was nothing in it for corporations when they made a contribution to the League. Not a quid pro quo. That's not the case with the commission." (AR2721-22).[10]

### C.    The FEC's Dismissals

On July 13, 2015, the FEC dismissed the administrative complaint in MUR 6869 (Answer ¶ 100); on December 10, 2015, the FEC dismissed the complaint in MUR 6942 (*Id.* ¶ 101). The FEC set forth its reasoning in two virtually identical Factual and Legal Analyses (collectively, the "Analyses"). (*See* AR5003 n.1).

The Analyses contained little substance. As in the past, the FEC relied primarily on *Buchanan* and the FEC's own history of dismissing complaints against the CPD. The FEC said that Plaintiffs "ma[d]e the same allegations regarding the same candidate selection criteria that the Commission has considered and found insufficient to support a reason to believe finding." (AR3178-81; AR5006-09). But the FEC ignored nearly all of Plaintiffs' new evidence and even

---

[10] Recognizing the potential for corruption, three former CPD sponsors withdrew their support in 2012. (AR2724). A spokesperson for one stated that the CPD could "appear to support bi-partisan politics" and that the company "want[ed] to ensure that [it] doesn't provide even the slightest appearance of supporting partisan politics." (*Id.*).

ignored that ten of the CPD's directors were named as respondents.  To the extent the FEC addressed any of Plaintiffs' evidence, its analysis was conclusory and make-weight.

First, the FEC denied that Fahrenkopf meant what he said in his television interview – that the CPD's "system" was to "go with . . . the two political party candidates."  (AR3180; AR5008-09).  Instead, the FEC unquestioningly accepted Fahrenkopf's post-hoc, self-serving claim that he was merely "describing [the] historical fact" that "in the United States, the general election debates usually have been between two candidates, who have been the major party nominees."  (AR3180-81; AR5008-09).  Second, the FEC's response to Plaintiffs' extensive evidence that the CPD's 15% rule systematically disadvantages independent candidates was only the Delphic statement that "[e]ven if the CPD's 15% polling criterion may tend to exclude third-party and independent candidates, the available information does not indicate . . . that the CPD failed to use pre-established, objective criteria."  (AR3181 n.4; AR5010 n.5).  Finally, in MUR 6942, the FEC dismissed as "speculative" Gallup's withdrawal from horse race polling, relying instead on Newport's implausible declaration that "Gallup's decision not to engage in horse race polling in the 2016 primary campaign season is based on allocation of resources[,] not any lack of confidence in Gallup's ability to conduct accurate polls."  (AR5003 n.1).

The FEC's refusal to regulate the CPD is unsurprising given that the FEC itself is bipartisan.  By law, "[n]o more than 3 members of the Commission . . . may be affiliated with the same political party."  § 30106(a)(1).  In recent years, the FEC has become largely dysfunctional and a woefully inadequate protector of the election laws because of this split.  Then-Chair Ann Ravel publicly lamented that the FEC "is failing to enforce the nation's campaign finance laws," and that it is "paralyzed" by a three-member bloc of Republican Commissioners that refuses to

"pursu[e] investigations into potentially significant fund-raising and spending violations."[11]

The FEC's inertia is particularly acute when it comes to allegations of bias in favor of the major parties. As an "inherently bipartisan" institution, *DSCC*, 454 U.S. at 37, the FEC is invested in protecting the two major parties. Indeed, the idea of splitting the Commission between Republican and Democratic appointees presumes that a Commissioner affiliated with a particular party could be expected to favor that party, and that if the FEC were dominated by appointees from one major party, it could be used as a tool to discriminate against the other major party. *See, e.g.*, *Combat Veterans for Cong. Political Action Comm. v. FEC*, 795 F.3d 151, 153 (D.C. Cir. 2015) (citing the FEC's "bipartisanship requirements" as a safeguard to "reduce the risk that the Commission will abuse its powers"). That concern is equally apt when considering allegations that the major parties are discriminating against independents. The FEC's Commissioners can be expected to, and in fact do, favor the interests of the major parties. Indeed, in the administrative proceedings, they spoke openly about their "desire to strengthen party organizations," a goal completely divorced from their statutory authority and delegated role.[12] The allegations against the CPD, which allege misconduct that favors both the Democratic and Republican Parties, thus fall squarely within a blind spot for the FEC.

## VI.    PETITION FOR RULEMAKING

On September 11, 2014, LPF also filed a petition for rulemaking with the FEC, asking the FEC to revise § 110.13(c) to require debate staging organizations to use objective, unbiased criteria that do not involve satisfying a polling threshold as the exclusive means to accessing the presidential general election debates. (AR0001-32). The public comment period for the petition

---

[11] Ann M. Ravel, *How Not to Enforce Campaign Laws*, N.Y. Times (Apr. 2, 2014), http://www.nytimes.com/2014/04/03/opinion/how-not-to-enforce-campaign-laws.html?_r=0.
[12] FEC Open Meeting, July 16, 2015 (statement of Ellen Weintraub), *available at* http://www.fec.gov/agenda/2015/documents/transcripts/Open_Meeting_Captions_07_16_2015.txt.

was open for approximately one month, and the FEC received comments from approximately 1,260 individuals and entities. (AR0287-88; Answer ¶ 106). *All but one of them* – the CPD itself – requested that the FEC open a rulemaking to revise its debate staging regulations. Nevertheless, on July 16, 2015, the FEC voted 4-2 to deny the petition to open a rulemaking. (Answer ¶ 107). In its notice of disposition, the FEC observed that § 110.13 is designed to prevent unlawful "corporate contributions to the candidates taking part" in debates, rather than "to maximize the number of debate participants." (AR1904). It glossed over the petition's discussion of how polling has been used by the CPD, an organization funded by corporations seeking to influence political candidates, to systematically exclude non-major party candidates from the presidential debates, which are essential to being elected. The FEC faulted the petition for "rely[ing] primarily on policy arguments in favor of debate selection criteria that would include more candidates" (*id.*), even though the petition squarely argued that the use of polling thresholds could "easily be used as a pretext for corrupt" contributions to favored candidates. (AR0013). The petition argued that "[p]olling criteria are inherently biased against third-party and independent candidates" for the reasons described in detail above. (AR0008; *see also* AR0015-26). As a result, the use of polling thresholds provides "a means for corporate donors to give favored candidates [from the two major parties] an improper advantage" – namely, a corporate-funded media forum at which only those candidates can appear. (AR0012). Under FECA, this is a prohibited campaign contribution. (AR0010).

The FEC ignored these arguments. Instead, it asserted that polls were a "reasonable" method of assessing a candidate's viability and limiting the number of debate participants. (AR1904-05). The FEC presented little justification for its analysis beyond stating that "the rest of the nation" looked to polling as "an indicator of a candidate's popularity." (AR1904 (internal

quotation marks omitted)).  Although the petition and comments had presented alternative

methods of assessing viability while limiting the number of debate participants,[13] the FEC noted

only that debate sponsors might adopt these methods voluntarily.  (AR1905).

The FEC also expressed confidence that it would root out the corrupt use of polling

thresholds on a case-by-case basis through enforcement actions (AR1904-05), even though it has

repeatedly declined to pursue such actions against the CPD and its highly exclusive 15% polling

threshold.  Finally, the FEC criticized the petition for seeking to amend § 110.13 only with

respect to the presidential general election debates.  (AR1905).  It provided no reason, however,

why a one-size-fits-all rule for all elections was necessary or desirable.

Two Commissioners voted to grant the petition, observing that "[i]t has been over twenty

years since the Commission has taken a serious look at its rules on candidate debates," and that

"[s]uch a re-examination is long overdue."  (AR1874).  They further noted that although

"nomination by a major party may not be the sole objective criterion to determine who may

participate in a debate," the CPD's 15% polling threshold "seems to have accomplished the same

result by different means."  (*Id.*).

---

[13] The petition explained that a debate sponsor need only open the debate to whichever independent candidate has
gathered the most signatures in the course of securing ballot access in states that collectively have at least 270
Electoral College votes (enough to win the presidency).  (AR0029-30).  Some commentators proposed opening the
debates to all candidates with ballot access in enough states to win the presidency, observing that it was unlikely that
any more than three independent candidates per election would satisfy this criterion.  (AR1869; *see also* AR0408).

**ARGUMENT**

## I.    STANDARD OF REVIEW

Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. Summary judgment is particularly favored "for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  *Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013) (internal quotation marks omitted); *accord City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 12 (D.D.C. 2001).

The dismissal of an administrative complaint must be overturned if it is "contrary to law."  § 30109(a)(8)(C).  A dismissal may be contrary to law in two ways:  (1) if "the FEC dismissed the complaint as a result of an impermissible interpretation of the Act," or (2) "if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion."  *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). In assessing whether an agency's decision is arbitrary and capricious or contrary to law, the Court "judge[s] the propriety of [an agency's] action solely by the grounds invoked by the agency."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

A decision is arbitrary and capricious where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Though the standard is deferential, the Court is not required "to accept meekly 'administrative pronouncements clearly at variance with established facts.'"  *Braniff*

26

*Airways, Inc. v. Civil Aeornautics Bd.*, 379 F.2d 453, 463 (D.C. Cir. 1967) (citation omitted).  As

the Supreme Court has emphasized, "deference owed to an expert tribunal cannot be allowed to

slip into a judicial inertia."  *Volkswagenwerk Aktiengesellschaft v. FMC*, 390 U.S. 261, 272

(1968) (citation omitted).  "Conclusory explanations for matters involving a central factual

dispute where there is considerable evidence in conflict do not suffice to meet the deferential

standards of [the court's] review."  *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C.

Cir. 2001).  Moreover, an agency "'must take into consideration all available information

concerning the alleged wrongdoing,'" and accordingly, "'a consideration of all available

materials is vital to a rational review of [agency] decisions.'"  *Antosh v. FEC*, 599 F. Supp. 850,

855 (D.D.C. 1984) (citations omitted).  The Court should correct improper fact-finding if it

"becomes aware, especially from a combination of danger signals, that the agency has not really

taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-

making." *Greater Boston Television v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).

    Similarly, a reviewing court must overturn a refusal to initiate rulemaking "if it is

'arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law.'"

*EMR Network v. FCC*, 391 F.3d 269, 272-73 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)).

An error of law requires reversal, *see WildEarth Guardians v. EPA*, 751 F.3d 649, 653 (D.C. Cir.

2014), as does an agency's failure to take a "hard look" at the relevant issues, *WWHT, Inc. v.

FCC*, 656 F.2d 807, 817 (D.C. Cir. 1981).  The court "must assure itself that the agency

considered the relevant factors, that it explained the 'facts and policy concerns' relied on, and

that the facts have some basis in the record." *Am. Horse Prot. Ass'n Inc. v. Lyng*, 812 F.2d 1, 5

(D.C. Cir. 1987) (citation omitted).  In doing so, it "must examine 'the petition . . . , comments

pro and con . . . and the agency's explanation of its decision to reject the petition.'"  *Id.* (quoting

*WWHT*, 656 F.2d at 817-18).

In the particular context of this challenge, this Court should not even defer to the FEC. The arbitrary and capricious standard requires "close attention to the nature of the particular problem faced by the agency." *Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1050 (D.C. Cir. 1979). "The stringency of [the] review, in a given case, depends upon analysis of a number of factors," and "[m]ore exacting scrutiny will be particularly useful when for some reason the presumption of agency regularity . . . is rebutted, *as where the agency has demonstrated undue bias towards particular private interests*." *Id.* at 1049-50 & n.23 (citing *Cent. Fla. Enters., Inc. v. FCC*, 598 F.2d 37 (D.C. Cir. 1978) (emphasis added)).

As discussed above, the FEC is inherently bipartisan, and over the years has steadfastly refused to investigate allegations that the similarly bipartisan CPD is illegally favoring the two major parties. *See supra* pp. 11-13. This case thus presents a situation where an "agency has demonstrated undue bias towards particular private interests." *Natural Res.*, 606 F.2d at 1049 n.23; *cf. Sierra Club v. Thomas*, 105 F.3d 248, 251 (6th Cir. 1997) (Forest Service's decision was arbitrary and capricious where agency's institutional relationships with nearby communities and timber industry created "a political process replete with opportunities for the intrusion of bias and abuse" that led to an "artificial narrowing of options"), *vacated on other grounds sub nom.*, *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998).[14] Accordingly, the FEC should not be afforded deference in this case.

---

[14] Plaintiffs acknowledge that the D.C. Circuit rejected a similar argument in *Hagelin v. FEC*, 411 F.3d 237, 242 (D.C. Cir. 2005). There, the plaintiffs raised the argument only in an "opa[que]" footnote," *id.*, and thus did not squarely present the issue. However, to the extent this Court is bound by the D.C. Circuit's discussion in *Hagelin*, Plaintiffs reserve their right to raise this issue on appeal or petition for certiorari to the Supreme Court.

## II.     THE FEC'S DISMISSALS OF THE ADMINISTRATIVE COMPLAINTS WERE ARBITRARY, CAPRICIOUS, AND AN ABUSE OF DISCRETION

The FEC's reasons for dismissing Plaintiffs' administrative complaints were contrary to law.  The FEC adopted an unreasonably crabbed interpretation of its debate staging regulation that conflicts with the regulation's plain language and the FEC's interpretation of these terms in other contexts.  The FEC also blindly relied on its dismissal of prior complaints against the CPD, without taking a "hard look" at the actual allegations of Plaintiffs' administrative complaints.

### A.     The FEC's Determination That The CPD Does Not Endorse, Support, Or Oppose Political Parties Was Contrary To Law

#### 1.     The FEC's interpretation of the debate staging regulations is plainly erroneous and inconsistent with FECA

Section 110.13(a) requires a valid debate staging organization to be a nonprofit organization that does not "endorse, support, or oppose political candidates or political parties." In the Analyses, the FEC never explained what "endorse, support, or oppose" means or when that standard is or is not met.  However, since 2000, the FEC has uniformly reasoned that the CPD does not endorse, support, or oppose political candidates or parties because there is no:

> evidence that the CPD is *controlled by* the DNC or the RNC.  There is no evidence that any officer or member of the DNC or RNC is *involved in the operation* of the CPD.  Moreover, there does not appear to be any evidence that the DNC and the RNC had *input into* the development of the CPD's candidate selection criteria for the 2000 presidential election cycle.  Thus, it appears that the CPD satisfies the requirement of a staging organization that it not endorse, support or oppose political candidates or political parties.

Shapiro Decl. Ex. 4 at 15 (emphases added).

As explained, although the FEC asserted in *Buchanan* that this "control" standard was merely a response to a "specific contention" in a particular complaint, it has effectively adopted that test *sub silentio* as its governing interpretation of the "endorse, support, or oppose" standard. Since *Buchanan*, the FEC has dismissed subsequent complaints against the CPD by citing

*Buchanan*, without discussing whether the "endorse, support, or oppose" standard is otherwise met. *See supra* pp. 12-13.  This case was no different (*see* AR3178-79 (citing *Buchanan*'s upholding of the "Commission's determination that the CPD was an eligible debate staging organization"); AR5007 (same)).  Thus, in practice the FEC interprets § 110.13(a) to mean that a debate staging organization only endorses, supports, or opposes political candidates or parties if there is evidence that parties or candidates control the organization, are involved in the operation of the organization, or have input into the development of the candidate selection criteria.

This interpretation is plainly erroneous because it is inconsistent with the express terms of the regulation and with FECA itself.  Ordinarily, courts must defer to an agency's interpretation of its own regulations.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).[15]  However, *Auer* deference is not an "inexorable command," and "deference is inappropriate 'when the agency interpretation is plainly erroneous or inconsistent with the regulation' or 'when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment.'"  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1208 n.4 (2015) (quoting *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012)).  "*Auer* deference is warranted only when the language of the regulation is ambiguous."  *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).  Where the agency's interpretation is inconsistent with the clear language of the regulation, it cannot stand.  *See Dialysis Clinic, Inc. v. Leavitt*, 518 F. Supp. 2d 197, 203 (D.D.C.

---

[15] *Auer* and *Seminole Rock* are controlling on this Court, but Plaintiffs preserve their right to challenge the validity of those case in the Supreme Court if necessary.  Several Justices have recently indicated that the Supreme Court is ready to reconsider those decisions.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210-11 (2015) (Alito, J., concurring) ("I await a case in which the validity of *Seminole Rock* may be explored through full briefing and argument."); *id.* at 1212-13 (Scalia, J., concurring) (arguing that *Auer* deference should be overturned); *id.* at 1213 (Thomas, J., concurring) (same); *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1339-42 (2013) (Scalia, J., dissenting in part) (same).  The Justices have expressed concerns that *Auer* violates separation of powers by enabling agencies to arrogate the judicial power of interpreting the law.  *See Perez*, 135 S. Ct. at 1219, 1224 (Thomas, J., concurring); *Decker*, 133 S. Ct. at 1340-41 (Scalia, J., dissenting in part).  That concern is particularly apt here, where the Court must defer to a bipartisan agency's views about bipartisan rigging of the political system.

2007) (agency interpretation "cannot 'trump' the language of a regulation when the regulation is clear on its face").  The FEC's interpretation of § 110.13(a) presents just such a case.

*First*, § 110.13(a) does not say anything about whether a candidate or party "controls" or is "involved in the operation of" a debate staging organization or whether a political party has "input into" the organization's selection criteria.  All § 110.13(a) says is that a nonpartisan organization may not "endorse, support, or oppose political candidates or political parties."

The plain meanings of the terms "endorse," "support," and "oppose" do not connote control or influence by the party or candidate being endorsed, supported, or opposed.  To "endorse" something is merely to "approve openly" or "to express support or approval of publicly and definitely."  Merriam-Webster's *Collegiate Dictionary* 412 (11th ed. 2014).  To "support" something is to "promote the interests or cause of."  *Id.* at 1256.  And to "oppose" something is simply to "set oneself against someone or something."  *Id.* at 870.  These terms have nothing to do with whether political candidates or parties control or have input into the decision making of a debate staging organization.  That alone renders the FEC's interpretation of § 110.13(a) and therefore its dismissals of the administrative complaints, contrary to law.  *See Huerta v. Ducote*, 792 F.3d 144, 153-54 (D.D.C. 2015) (rejecting interpretation that was "unhinged from the regulation's plain text"); *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. FEC*, 177 F. Supp. 2d 48, 60 (D.D.C. 2001) (striking down FEC's construction of its regulation that "contradict[ed] the plain language" of the regulation), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003).

The FEC's interpretation is also inconsistent with the structure of § 110.13(a).  Section 110.13(a) addresses what the debate staging organization does – *i.e.*, whether it endorses, supports, or opposes candidates or parties.  It is a requirement that to be nonpartisan, a debate staging organization must refrain from certain conduct.  The FEC's interpretation, however,

focuses on what *candidates and parties* do – *i.e.*, are parties in charge of the operation of the organization, or do they have input into the selection criteria?  This is not the focus of § 110.13(a) or how it was structured.  The CPD, like any organization, acts through its officers. *See, e.g.*, *DSCC*, 454 U.S. at 33 ("In the nature of things, a committee must act through its employees and agents . . . .").  Accordingly, what those agents *do*, and not simply who *controls* the organization, determines whether it endorses, supports, and opposes political parties.  Indeed, under the FEC's interpretation, the CPD and its directors could hold fundraisers for Democratic or Republican candidates or publicly announce their opposition to a third-party candidate without running afoul of § 110.13(a), so long as it was taking these actions without being controlled by party leadership.  That makes no sense within the context of FECA or the regulation.

FECA and the FEC also use and interpret the terms "endorse," "support," and "oppose" in other contexts consistent with their dictionary definitions.  *See* § 30101(20)(A)(iii) (defining "Federal election activity" to include "a public communication that refers to a clearly identified candidate for Federal office . . . and that *promotes or supports* a candidate for that office, or *attacks or opposes* a candidate for that office" (emphasis added)); § 114.4(c)(6)(i) ("A corporation or labor organization may endorse a candidate, and may communicate the endorsement to the restricted class and the general public."); FEC Advisory Opinion 2007-34 at 2-3 (Dec. 17, 2007) (concluding that congressman's appearance on billboard to "endorse a non-Federal candidate for office" was not coordinated communication with endorsed candidate); FEC Advisory Opinion 1993-18 at 4 (Dec. 9, 1993) (finding that appearances by candidates or party representatives on corporate premises would constitute "nonpartisan communications" by corporation if, *inter alia*, the corporation did not "endorse, support or oppose any candidate, group of candidates, or political party" in conjunction with these appearances).

The FEC's proposed interpretation of § 110.13(a) also would create absurd results under FECA. The statute provides a safe harbor for amounts spent for "nonpartisan activity designed to encourage individuals to vote or to register to vote." § 30101(9)(B)(ii). The FEC's debate staging regulations were explicitly promulgated to correspond to that safe harbor. *See* Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734, 76,734 (Dec. 27, 1979) ("The educational purpose of nonpartisan public candidate debates is similar to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns."). Elsewhere under FECA, whether an organization is "nonpartisan" does not turn on whether it is controlled by a political party. For example, a super PAC dedicated to fundraising and advertising for a particular candidate is clearly partisan, even though, by law, the candidate cannot control the super PAC or indeed coordinate with it at all. *See* 11 C.F.R. § 109.21. For that matter, the Supreme Court has described the FEC as "inherently bipartisan" (*i.e.*, not nonpartisan), *DSCC*, 454 U.S. at 37, and certainly the FEC does not believe that it is controlled by the Democratic and Republican Parties, or that those parties have input into the FEC's actions.

The FEC simply has never evaluated whether the CPD endorses, supports, or opposes political parties, as those words are naturally understood, and thus has never even applied its regulation to Plaintiff's allegations. Its dismissals of the administrative complaints were based on an impermissible interpretation of the debate staging regulation and were contrary to law.

2.   The FEC did not give Plaintiffs' allegations a hard look

The FEC's Analyses plainly do not reflect a "hard look" at Plaintiffs' evidence. The FEC simply invoked its previous rejections of different administrative complaints alleging that the CPD was not a nonpartisan organization and erroneously decided that Plaintiffs made "the same allegations regarding the same candidate selection criteria that the Commission has considered

33

and found insufficient," (AR3181; AR5009), even though the complaints raised new facts about the CPD's bipartisan bias and current partisan activity.

1.     The CPD is an outgrowth of an effort by the DNC and the RNC to jointly sponsor general election presidential and vice-presidential debates, and through its existence, it has repeatedly helped the major parties to perpetuate their control of the presidential debates. *See supra* pp. 8-10. In *Buchanan*, this Court noted that this evidence was "not insubstantial" and that "[a]n ordinary citizen might easily view the circumstances surrounding the creation of the CPD along with the evidence of major-party influence over the past three debates as giving some 'reason to believe' that the CPD always has supported, and still does support, the two major parties to the detriment of all others." 112 F. Supp. 2d at 72. The only thing lacking was "the absence of any contemporaneous evidence of influence by the major parties." *Id.*

Here, that is exactly what Plaintiffs showed, and what the FEC failed to adequately consider. As the administrative complaint detailed, the CPD was not just created by the two major parties; it has been, and continues to be, steeped in a bipartisan, not nonpartisan, culture. As explained, since 2005, when the FEC last addressed a challenge to the CPD's debate staging criteria, the CPD's chairmen and many of its directors have been dedicated partisans for the two major parties. Fahrenkopf and McCurry have given tens of thousands of dollars to the Republican and Democratic Parties and their candidates and have orchestrated the donation of hundreds of thousands of dollars more to Democratic and Republican candidates. Other CPD directors have similarly endorsed or supported political candidates, including by contributing hundreds of thousands of dollars to the major parties and their candidates while purportedly making nonpartisan decisions about who would appear in the CPD's debates. *See supra* pp. 14-16. Gallingly, the CPD does nothing to check these partisan ties. It has no oversight, no

procedures for restricting partisan conduct, and no anti-partisan conflict of interest policy, even though by law it is required to be nonpartisan.  (AR2768-71; AR2232-33).

The Analyses address virtually none of this evidence.  They do not discuss whether these allegations of bias and current partisan activity create a reason to believe that the CPD violates § 110.13(a).  They do not even attempt to apply the "endorse, support, or oppose" standard to Plaintiffs' allegations and instead falsely state that Plaintiffs' complaints "make the same allegations regarding the same candidate selection criteria that the Commission has considered and found insufficient" (AR3181; AR5009), blithely ignoring virtually all the new allegations and evidence.  This fundamental failure to address the basic allegations of the complaints renders the FEC's dismissals arbitrary and capricious.  *See Antosh*, 599 F. Supp. at 855 ("[T]he Commission 'must take into consideration all available information concerning the alleged wrongdoing' . . . [and] 'a consideration of all available materials is vital to a rational review of Commission decisions.'" (citations omitted)); *see also Fuller v. Winter*, 538 F. Supp. 2d 179, 192 (D.D.C. 2008) (if agency "decides to disregard [an] argument, then [it] must expressly indicate that [it] has done so").

The only new evidence about the CPD's partisan bias that the FEC responded to was Fahrenkopf's statement that the CPD's candidate selection "system" consists of "go[ing] with the two leading candidates . . . the two political party candidates."  (AR3180-81; AR5008-09).  Even though it is clear he was speaking of the CPD's current system, the FEC chose to credit his self-serving claim he was merely alluding to the fact that most previous debates have only been between two candidates.  The FEC's citation of this bogus effort by Fahrenkopf to recast his own revealing remarks is entitled to no deference given its history of accepting CPD claims without

question,[16] and especially given its failure to even consider Plaintiffs' other allegations of contemporaneous partisan activity by the directors of the CPD.  In light of the FEC's utter indifference to allegations of the CPD's bias, its refusal to scrutinize Fahrenkopf's statements sets off "danger signals, that the agency has not really taken a 'hard look' at the salient problems."  *Antosh*, 599 F. Supp. at 853 (internal quotation marks omitted).

2.      The FEC's dismissals are also arbitrary and capricious because the agency treated the administrative complaints as if filed *only* against the CPD, Fahrenkopf, and McCurry, even though ten other directors were named as respondents.  The FEC only notified those three respondents of the complaints; only solicited responses from those three respondents; only referred to those three respondents in the Analyses; and never even mentioned the specific allegations about the other respondents.[17]  (*See* Answer ¶ 114).

The FEC gave no indication that it had even considered these allegations.  It apparently made up its mind that *Buchanan* governed without considering what Plaintiffs' administrative complaints actually alleged about these ten directors.  This was arbitrary and capricious.  *See Antosh*, 599 F. Supp. at 855 ("[T]he Commission 'must take into consideration all available information concerning the alleged wrongdoing' . . . [and] 'a consideration of all available materials is vital to a rational review of Commission decisions.'" (citations omitted)); *see also State Farm*, 463 U.S. at 43 (decision is arbitrary and capricious where it "entirely failed to

---

[16] This is not the first time that the FEC has sanctioned the CPD's transparent whitewashing of its directors' comments.  In a prior matter, the complainant cited several statements by current and former directors, including that "independent candidates . . . mess things up;" that the "two parties basically have a monopoly" over and are "in absolute control of the presidential debate process;" that "entrusting such debates to the major parties is likely to exclude independent and minor-party candidates, [but] this approach is consistent with the two-party system;" that the CPD is "not really nonpartisan.  It's bipartisan;" and that the CPD is "extremely careful to be bi-partisan." (*See* AR3095).  As with Fahrenkopf's declaration, the FEC simply adopted these directors' boilerplate declarations that the statements did not "fully or fairly represent" their views, without explanation.  *See* Shapiro Decl. Ex. 8 at 14-16.

[17] In *Nader v. FEC*, this Court held that the FEC's failure to notify respondents who were named in an administrative complaint was harmless error because the respondents had no obligation to respond and, even if they did, there was "no reason to think that these responses would contain information favorable" to the plaintiff.  823 F. Supp. 2d 53, 68 (D.D.C. 2011), *aff'd* 725 F.3d 226 (D.C. Cir. 2013).  Here, the FEC did not simply fail to notify ten CPD directors that they had been named as respondents; it failed to even address the allegations about their conduct.

consider an important aspect of the problem").

**B.      The FEC's Conclusion That The CPD's Polling Criterion Was "Objective" Was Arbitrary and Capricious**

The FEC similarly failed to address the substantial evidence that the CPD's polling criterion is designed to exclude and systematically disfavors independent candidates, blindly relying on old precedent about materially distinct allegations.  (AR3178-80; AR5006-08).

As this Court observed in *Buchanan*, § 110.13(a) does not define "objective."  112 F. Supp. 2d at 73.  An objective criterion "must be free of 'content bias,' and not geared to the selection of certain pre-chosen participants."  Shapiro Decl. Ex. 1 at 7.  Moreover, the objectivity requirement contains an element of "reasonableness" and "precludes debate sponsors from selecting a level of support so high that only the Democratic and Republican nominees could reasonably achieve it."  *Buchanan*, 112 F. Supp. 2d at 74.

In rejecting Plaintiffs' evidence that the CPD's 15% polling rule is not objective, the FEC ignored these standards.  Instead, it simply cited this Court's decision in *Buchanan*, which the FEC argued "specifically addressed the CPD's use of pre-debate polling."  (AR3178-79; AR5007).  But the *Buchanan* Court explicitly observed that while the plaintiffs in that case "submit[ted] evidence about the problems associated with polling," they had not submitted "any evidence to suggest that these problems would systematically work to minor-party candidates' disadvantage."  112 F. Supp. 2d at 75.  That is exactly what Plaintiffs showed.

The CPD's 15% rule is not reasonably possible for third-party or independent candidates to satisfy.  As explained *supra*, independent candidates do not benefit from the substantial free media coverage afforded candidates in the major party primaries and do not benefit from a default level of support by partisans.  Accordingly, to generate the name recognition needed to reach 15% support in the polls, an independent candidate would need to spend upwards of $250

million.  This herculean task is exacerbated by the mid-September timing of the CPD's

determination, which leaves independent candidates to campaign and fundraise for months

without potential donors and supporters knowing whether or not they will be eligible for the

debates.  In sum, the CPD has "select[ed] a level of support so high that only the Democratic and

Republican nominees could reasonably achieve it."  *Buchanan*, 112 F. Supp. 2d at 74.

Moreover, as Commissioner Ravel herself has recognized, "the world may have a polling

problem, and it is harder to find an election in which polls did all that well."[18]  Nothing makes

this clearer than Gallup's own withdrawal from polling for the 2016 primary elections.  As

discussed above, polling's unreliability works to the systematic disadvantage of independent

candidates in three-way races.  And it often critically discounts independent candidates' level of

support due to their connection with new swaths of the electorate.  (AR2581).

The Analyses failed to substantively respond to any of this evidence.  The FEC

acknowledged, in a single conclusory footnote, that the complaints alleged that the 15% polling

threshold "is not reasonably achievable for a third-party or independent candidate," and that the

"polling criterion in a three-way race will systematically disfavor third-party and independent

candidates."  (AR3181 n.4; AR5010 n.5).  But it concluded, without explanation, that "[e]ven if

the CPD's 15% polling criterion may tend to exclude third-party and independent candidates, the

available information does not indicate . . . that the CPD failed to use pre-established, objective

criteria."  (AR3181 n.4; AR5010 n.5).

This is nonsensical.  If the polling criterion excludes independent candidates to the

benefit of the major parties, that by definition indicates that the CPD failed to use pre-established

objective criteria.  The objectivity requirement "precludes debate sponsors from selecting a level

of support so high that only the Democratic and Republican nominees could reasonably achieve

---

[18] *See* FEC Open Meeting, *supra* n.12 (statement of Ann Ravel).

it." *Buchanan*, 112 F. Supp. 2d at 74.  The FEC never explained why or how a polling criterion that excludes independent candidates could satisfy that requirement, or why or how it disagreed with the substantial evidence Plaintiffs presented.  That is the very definition of arbitrary and capricious.  *See Common Cause v. FEC*, 906 F.2d 705, 706-07 (D.C. Cir. 1990) (dismissal of administrative complaint was arbitrary and capricious where it "merely mention[ed] the statutory criteria" and "ma[d]e[] no attempt to tie those criteria to the facts of this case"); *see also AT&T Wireless*, 270 F.3d at 968-69 (remanding agency order waiving company's compliance with regulation because agency failed to explain why it rejected record evidence "suggesting a contrary conclusion"); *Summer Hill Nursing Home LLC v. Johnson*, 603 F. Supp. 2d 35, 39 (D.D.C. 2009) (agency "'failed to consider an important aspect of the problem'" where it did not explain why particular fact was insufficient to establish compliance with agency's policy (citation omitted)).

The only evidence that the FEC did consider – Gallup's withdrawal from polling for the 2016 presidential primary elections – further reveals its antipathy to Plaintiffs' significant allegations of bias and corruption by the CPD.  As with Fahrenkopf's statements, the FEC uncritically adopted Newport's self-serving affidavit, which asserted that "Gallup's decision not to engage in horse race polling in the 2016 primary campaign season is based on allocation of resources[,] not any lack of confidence in Gallup's ability to conduct accurate polls."  (*See* AR5003 n.1 (quoting AR4985 ¶ 15)).  Newport and the FEC would have the Court believe that, after three consecutive elections in which Gallup's polling performance was "poor," after a presidential election in which its results were "among the worst" results, and after Newport's own candid admission that it had no "definitive answers" for its errors, Gallup simply decided that its resources were better spent elsewhere *than the presidential election*.  This does not pass

the smell test, and the FEC's blanket adoption of this reasoning is yet another "danger signal" that it simply refuses to give allegations against the CPD a "hard look."

## III.    THE FEC'S REFUSAL TO OPEN A RULEMAKING WAS ARBITRARY AND CAPRICIOUS

The FEC's denial of the rulemaking petition is similarly arbitrary and capricious.

1.    The FEC claimed that "[t]he petition and the commenters who support it rely primarily on policy arguments in favor of debate selection criteria that would include more candidates" even though § 110.13(c) "is not intended to maximize the number of debate participants" but rather to avoid unlawful "corporate contributions to the candidates taking part." (AR1904).  This is a gross mischaracterization.  The petition repeatedly highlights the anti-corruption purpose of the FECA and the debate regulation (AR0010-13) and emphasizes that polling criteria "can easily be used as a pretext for corrupt political discrimination" and "the kind of partisan rigging that the debate regulations prohibit."  (AR0013).

As explained in the petition and comments, reliance on polling systematically discriminates against independent candidates by undercounting their support and requiring them to raise signficantly more money than the major-party candidates.  (AR0008-09, AR0015-26, AR0293-356).  As a result, the use of polling thresholds dramatically increases the risk that a debate sponsor's criteria are geared to the selection of only the major-party candidates.  When this occurs, a corporate-sponsored debate functions as a campaign contribution funneled to two particular candidates.  (AR0010, AR0012).  The FEC failed to address these arguments in any meaningful way, which "alone require[s] that [the court] reverse as arbitrary and capricious the Commission's decision to retain [its] Rule."  *Fox Television Stations, Inc. v. FCC*, 280 F.3d

1027, 1051 (D.C. Cir. 2002), *modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002).[19]  This failure is

particularly surprising given that, mere minutes before the FEC voted to deny the petition, then-

Chairwoman Ravel cited evidence suggesting that "the world may have a polling problem, and it

is harder to find an election in which polls did all that well."[20]

      2.     Rather than addressing the petition's evidence and arguments, the FEC asserted

that "it would make little sense if a debate sponsor could not look at the latest poll results even

though the rest of the nation could look at this as an indicator of a candidate's popularity."

(AR1904 (internal quotation marks omitted)).  *First*, this again reflects a fundamental

misunderstanding of the petition.  The petition "does not . . . oppose a debate sponsor allowing

candidates to participate if they meet a polling threshold, so long as the sponsor provides an

alternative avenue for gaining entry to debates that does not rely on polling."  (AR0029).  Debate

sponsors may consider polls, but for the reasons above, they should not be allowed to exclude a

candidate solely for failing to meet a polling threshold.  *Second*, whether polls are an "indicator

of popularity" considered by the general public is irrelevant.  Nomination by a major political

party is also an indicator of a candidate's popularity, but debate sponsors cannot use that to

decide who can participate in a debate.  *See* § 110.13(c).  The FEC's glib assurance that polls are

valuable is not enough to demonstrate that it considered the consequences of using polls to

exclude candidates.  *See WWHT*, 656 F.2d at 817 (requiring agencies to take a "'hard look' . . . at

the relevant issues" before denying a petition for rulemaking) (citation omitted).

---

[19] In a footnote, the FEC suggested that "the fact that polls can be *inaccurate* does not mean that a staging organization acts *unobjectively* by using them."  (AR1905 n.6).  But the petition argues not just that polls are inaccurate, but that they are particularly "ill-suited to measuring the viability of a third-party or independent candidate," and thus especially likely to result in the exclusion of such candidates.  (AR0023-26).

[20] *See* FEC Open Meeting, *supra* n.12 (statement of Ann Ravel).

3.      The FEC also stated, without elaboration, that the "use of polling criteria is a reasonable way . . . [to] control the number of candidates participating" in a debate.  (AR1905 (internal quotation marks omitted)).  This analysis fails.  *First*, using polling criteria is *not* reasonable, as they systematically disfavor independent candidates, turning what should be nonpartisan debates into corporate-sponsored rallies for the major parties.  The FEC's contrary assertion is unsupported and thus cannot be sustained.  *See Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1240 (D.D.C. 1986) (refusal to initiate rulemaking must be reversed if agency "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency" (quoting *State Farm*, 463 U.S. at 43)).

*Second*, the petition explains that there are a variety of "[w]orkable alternatives" for "measur[ing] the viability of candidates" that also limit the number of debate participants.  (AR0029).  For example:  "On April 30 of an election year, any candidate, party, or nominating process with ballot access in states that collectively have at least 270 Electoral College votes would notify the [debate sponsor] of that access.  If there is more than one, then whoever has gathered the most signatures as part of the ballot access process will participate in the debates with the Democratic and Republican nominees."  (AR0029-30).  This method avoids the vices of polling while limiting the number of debate participants.  Another proposal by commenters was to open the debates to all candidates who had secured ballot access in states with at least 270 Electoral College votes.  (AR0408, AR1869).  This would likely add only three or fewer independent candidates.  (AR0030, AR1869).  The FEC's observation that this method "is already lawful" (AR1905) misses the point entirely.  The fact that this method for selecting debate participants is available does not change the fact that, under the existing rules, debate sponsors could *instead* choose to screen participants using polling thresholds in order to ensure

42

that corporate funds support only the favored major-party candidates.

4.      The FEC also argued that a rule change was unnecessary because the FEC could address corrupt uses of polling thresholds on a case-by-case basis through the enforcement process.  (AR1904-05).  In practice, however, this simply does not happen.  Former Chairwoman Ravel admits that the FEC is "worse than dysfunctional" and so "deadlocked" along partisan lines that "[t]he likelihood of the laws being enforced is slim."[21]  Commissioner Weintraub agrees that "[t]he few rules that are left, people feel free to ignore."  Commissioner Goodman has argued that "Congress set this place up to gridlock."  As a consequence, the FEC's caseload has plummeted, the major fines assessed by the FEC dropped nearly 80% from 2013 to 2014,[22] and the FEC even went two years without a general counsel.[23]

In addition, the FEC has consistently rejected challenges to the CPD's 15% polling threshold, *see supra* pp. 11-13, including the administrative complaints in the present action.  If the FEC interprets its existing regulations to permit a polling threshold that is not reasonably possible for anyone other than a major-party candidate to satisfy, it is doubtful that the FEC is willing or able to police the use of polling at all.  *Cf. Am. Horse Prot. Ass'n*, 812 F.2d at 7 (reversing denial of rulemaking petition because although "the agency's regulations contain[ed] a general prohibition" that encompassed the conduct challenged by the petitioner, "[s]ome administrative decisions" failed to enforce this prohibition and "demonstrate[d] that the [agency] ha[d] [not] adopted a reasonable interpretation of the [governing statute]").

---

[21] Eric Lichtblau, *F.E.C. Can't Curb 2016 Election Abuse, Commission Chief Says*, N.Y. Times (May 2, 2015), http://www.nytimes.com/2015/05/03/us/politics/fec-cant-curb-2016-election-abuse-commission-chief-says.html; *see also* Ravel, *supra* n.11.
[22] Lichtblau, *supra* n.21.
[23] Dave Levinthal, *'Dysfunctional' FEC Has Gone Two Years Without Top Lawyer*, NBC News (June 30, 2015), http://www.nbcnews.com/news/investigations/dysfunctional-fec-has-gone-2-years-without-top-lawyer-n383936.

5.      Finally, the FEC noted that while the petition focuses on presidential general election debates, § 110.13 applies to all presidential and congressional debates.  In the absence of evidence pertaining to "all federal elections," the FEC "decline[d] to initiate a rulemaking that would impose a nationwide prohibition on the use of [polling] thresholds, or that could result in giving different legal effect to the use of polling criterion [*sic*] in different elections."  (AR1905). The first possibility that the FEC identifies, a "nationwide prohibition" on polling thresholds, is a strawman.  The petition's proposed rules specific to "general election presidential and vice-presidential debates."  (AR0009).  While some of the evidence cited could apply to all federal elections (AR0023-26), much of it shows that polling thresholds are particularly difficult for independent candidates to surmount in the expensive, nationwide race for the presidency (AR0015-22).  The FEC provides no reason why there would be anything undesirable about a rule "giving different legal effect to the use of polling criteri[a] in different elections."  It is entirely reasonable to tailor a debate rule to the different circumstances presented by different types of campaigns.  By failing to articulate any explanation beyond the few "conclusory sentences quoted above," the FEC cannot "assure [the] reviewing court that [its] refusal to act was the product of reasoned decisionmaking."  *Am. Horse Prot. Ass'n*, 812 F.2d at 6.

In sum, the FEC failed to adequately consider the petition's arguments and evidence and to take the required "hard look" at the risks posed by continuing to allow the use of polling thresholds to exclude independent and third-party candidates from presidential and vice-presidential debates.  Tellingly, the dissenting Commissioners stated that "[i]t has been over twenty years since the Commission has taken a serious look at its rules on candidate debates." (AR1874).  The FEC's denial of the petition was therefore arbitrary and capricious.  *See Fox Television*, 280 F.3d at 1047; *Am. Horse Prot. Ass'n*, 812 F.2d at 7-8.

**CONCLUSION**

The importance of the issues at stake here for the future of American democracy cannot be understated.  No one can be elected President without participating in the general election debates.  Since the televised debates began in 1960, however, no independent candidate who did not first run in the major party primaries would have qualified for the debates under the CPD's current rule.  This includes Ross Perot, who was polling at only 9% in September, but obtained nearly 20% of the popular vote *because* he was allowed in the debates under different criteria.  If the CPD is permitted to continue hosting the debates using its present unlawful, exclusionary rule, no one other than the Democratic and Republican nominees will ever be able to compete for the Presidency.  Today more than ever, most Americans want a viable third choice, and want to hear from an independent candidate in the debates.  Yet the CPD, an unelected, unaccountable body, is thwarting the popular will.  The Court should grant summary judgment for Plaintiffs, and direct the FEC to do its job, which is to enforce the law and put an end to the CPD's biased, anti-democratic, and fundamentally corrupt and exclusionary polling rule.


Dated: April 6, 2016
      New York, New York

                Respectfully submitted,

                /s/ Alexandra A.E. Shapiro
                Alexandra A.E. Shapiro (D.C. Bar No. 438461)
                Chetan A. Patil (D.C. Bar No. 999948)
                SHAPIRO ARATO LLP
                500 Fifth Avenue
                40th Floor
                New York, New York 10110
                Phone:  (212) 257-4880
                Fax:  (212) 202-6417

                *Attorneys for Plaintiffs Level the Playing Field,*
                *Peter Ackerman, Green Party of the United States,*
                *and Libertarian National Committee, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEVEL THE PLAYING FIELD, PETER
ACKERMAN, GREEN PARTY OF THE
UNITED STATES, and LIBERTARIAN
NATIONAL COMMITTEE, INC.

                Plaintiffs,

       v.

FEDERAL ELECTION COMMISSION

                Defendant.

Civil Action No.:  <u>15-cv-1397 (TSC)</u>

**PLAINTIFFS LEVEL THE PLAYING FIELD, PETER ACKERMAN,**
**GREEN PARTY OF THE UNITED STATES, AND LIBERTARIAN NATIONAL**
**COMMITTEE, INC.'S STATEMENT OF MATERIAL FACTS AS TO WHICH**
**PLAINTIFFS CONTEND THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7.1(h), Plaintiffs submit the following statement of material facts

as to which there is no genuine dispute:

**I.    PARTIES**

1.    Plaintiff Level the Playing Field ("LPF") is a nonpartisan, nonprofit corporation

not affiliated with any candidate or candidate committee.  (AR2019).  Its purpose is to promote

reforms that allow for greater competition and choice in elections for federal office, particularly

for the Presidency and Vice Presidency.  LPF is the successor to Americans Elect, which

obtained signatures sufficient to qualify for ballot access in 41 states in connection with the 2012

presidential election.  (*Id.*).

2.    Plaintiff Green Party of the United States (the "Green Party") evolved from

gatherings of people concerned with various matters that included ecology, civil rights, and

peace to a more formalized and structured political party.  Candidates of the Green Party and predecessor organizations competed in presidential elections in 2000, 2004, 2008 and 2012, and the Green Party intends to nominate candidates for President and Vice President in the 2016 election.  (AR4003-05).

3.      Plaintiff Libertarian National Committee, Inc. controls and manages the affairs and resources of the United States Libertarian Party (the "Libertarian Party"), the third largest political party in the country.  The Libertarian Party has nominated presidential candidates in every presidential election since its formation in 1971, and intends to nominate candidates for President and Vice President in the 2016 election.  (AR4781-83).

4.      Plaintiff Dr. Peter Ackerman is a United States citizen and a registered voter who is interested in the presidential electoral process and is committed to reforming politics and elections in the United States.  (AR2020).

5.      Defendant Federal Election Commission ("FEC" or "Commission") is a federal agency charged with the administration and civil enforcement of the Federal Election Campaign Act ("FECA").

## II.      PROCEEDINGS BEFORE THE FEDERAL ELECTION COMMISSION

6.      On September 11, 2014, Plaintiffs LPF and Dr. Ackerman filed an administrative complaint with the FEC against the Commission on Presidential Debates, Inc. ("CPD"), Frank J. Fahrenkopf, Jr., Michael D. McCurry, Howard G. Buffett, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, Newton N. Minow, Richard D. Parsons, Dorothy Ridings, Alan K. Simpson, and Janet Brown.  (AR2001-75; Pls.' Second Amended Complaint (Dkt. No. 25) ("SAC") ¶ 88; Def.'s Answer (Dkt. No. 27) ¶ 88).  The FEC designated this administrative complaint MUR 6869.  (SAC ¶ 88; Answer ¶ 88).

7.       On September 17, 2014, the FEC notified the CPD, Fahrenkopf, and McCurry of the filing of the administrative complaint in MUR 6869, but did not notify the other 10 directors named as Respondents.  (AR2775-76; AR277-78; SAC ¶ 114; Answer ¶ 114).

8.       On November 24, 2014, LPF and Dr. Ackerman submitted a supplement to the complaint in MUR 6869, addressing recent evidence of errors in pre-election polling in connection with the 2014 midterm elections.  (AR2794-78; Answer ¶ 88).

9.       The CPD, Fahrenkopf, and McCurry submitted a response to the administrative complaint in MUR 6869 on December 15, 2014.  (AR2867-78).  The response enclosed, *inter alia*, declarations from Janet Brown and from Frank M. Newport.  (AR2882-99; AR3043-50).

10.      On April 10, 2015, LPF and Dr. Ackerman submitted a second supplement to the complaint in MUR 6869, addressing comments made by Fahrenkopf in an April 1, 2015 interview with Sky News.  (AR3093-96; Answer ¶ 88).

11.      On May 26, 2015, the CPD, Fahrenkopf, and McCurry submitted a response to the April 10, 2015 supplement, enclosing a declaration from Fahrenkopf.  (AR3114-21).

12.      On June 16, 2015, Plaintiff the Green Party submitted a request to join MUR 6869 as a complainant.  (AR4001-05).  On June 18, 2015, Plaintiffs the Libertarian Party submitted a request to join MUR 6869 as a complainant.  (AR4778-83).  The requests did not raise new allegations against the CPD, and instead incorporated the allegations at issue in MUR 6869. (AR4001; AR4778).

13.      On June 19, 2015, the FEC acknowledged receipt of the Green Party and Libertarian Party's requests, and treated the requests as the filing of a new administrative complaint raising the same allegations as in MUR 6869.  (SAC ¶ 98; Answer ¶ 98).  The FEC designated this new complaint MUR 6942.  (AR4784; SAC ¶ 98; Answer ¶ 98).

14.     On June 19, 2015, the FEC notified the CPD, Fahrenkopf, and McCurry of the filing of the administrative complaint in MUR 6942, but did not notify the other 10 directors named as Respondents.  (AR4785-86; AR4787-88; SAC ¶ 114; Answer ¶ 114).

15.     On July 13, 2015, the FEC voted 5-0 to find no reason to believe that the CPD, Fahrenkopf, or McCurry violated FECA and to close the file in MUR 6869.  (AR3172-73).  The FEC set forth its reasons in a Factual and Legal Analysis which it sent to LPF and Dr. Ackerman on July 17, 2015.  (AR3174-82; Answer ¶ 100).

16.     On October 20, 2015, the Green Party and the Libertarian Party submitted a supplement to the complaint in MUR 6942, addressing errors in the polling of the Gallup Organization and its withdrawal from horse race polling for the 2016 presidential primary elections.  (AR4852-54).

17.     On November 18, 2015, the CPD, Fahrenkopf, and McCurry responded to the October 20, 2015 supplement, enclosing a supplemental declaration from Newport.  (AR4981-96).

18.     On December 10, 2015, the FEC voted 5-0 to find no reason to believe that the CPD, Fahrenkopf, or McCurry violated FECA and to close the file in MUR 6942.  (AR5000-01).  The FEC set forth its reasons in a Factual and Legal Analysis which it sent to the Green Party and the Libertarian Party on December 16, 2015.  (AR5000-01; AR5002-11; Answer ¶ 101).

19.     On September 11, 2014, LPF filed a petition for rulemaking with the FEC, asking the FEC to revise 11 C.F.R. § 110.13(c) to require that debate staging organization use objective, unbiased criteria that do not require satisfying a polling threshold as the exclusive means to accessing the presidential and vice presidential general election debates.  (AR0001-32).

20.     The public comment period for the petition was open from November 14, 2014

4

through December 15, 2014.  (AR0287-88).

21.     The FEC received comments from approximately 1,260 individuals and entities. (SAC ¶ 106; Answer ¶ 106).  All of these commenters, other than the CPD itself, requested that the FEC open a rulemaking.

22.     The Libertarian Party was one of the commenters that filed a comment in support of LPF's petition.  (AR0400-01).

23.     On July 16, 2015, the FEC voted 4-2 to deny the petition to open a rulemaking. (AR1871; Answer ¶ 107).

24.     Captions of the FEC's Open Meeting of July 16, 2015 at which it discussed LPF's petition are available on the FEC's website at http://www.fec.gov/agenda/2015/documents/transcripts/Open_Meeting_Captions_07_16_2015.t xt.  During the discussion on LPF's petition, FEC Commissioner Ellen L. Weintraub stated "I know everyone at the table talks about their desire to strengthen party organizations . . . but the reality is – and I think my source here is a [P]ew poll, [P]ew Research Center, based on 2014 data, 39% identify as independents, 32% as democrats, and 23% as republicans."  *Id.*  Then-Chair Ann M. Ravel stated that "the world may have a polling problem, and it is harder to find an election in which polls did all that well . . . ."  *Id.*

25.      The FEC issued a notice of disposition on November 6, 2015, setting forth its reasons for denying the petition.  (AR1903-05; Answer ¶ 107).

26.     On August 14, 2015, the FEC Secretary's Office published a statement of then-Chair Ravel and Commissioner Weintraub explaining their reasons for voting in favor of LPF's petition to open a rulemaking to revise 11 C.F.R. § 110.13(c).  (AR1872-74).

27.     Plaintiffs filed their initial Complaint in this action on August 27, 2015.  (Dkt. No.

1).  On October 22, 2015, Plaintiffs amended their complaint (Dkt. No. 17), and on January 5,

2016, Plaintiffs filed a Second Amended Complaint.  (Dkt. No. 25).

## III.   SUMMARY OF THE ALLEGATIONS OF THE ADMINISTRATIVE COMPLAINTS

28.     Plaintiffs' administrative complaints in MURs 6869 and 6942 alleged that the

CPD and its directors violated FECA and the FEC's debate staging regulations in connection

with the 2012 general election presidential and vice presidential debates because (1) the CPD is

not a nonpartisan organization, and it endorses, supports, or opposes political parties, (2) the

CPD's 15% polling criterion is not objective, and therefore (3) the CPD violated FECA by

making illegal corporate contributions and expenditures, accepting illegal contributions, and

failing to register as a political committee and disclose its contributors and expenditures.

(AR2001; AR4001; AR4778).

29.     The CPD is a non-profit corporation organized under the laws of the District of

Columbia.  (AR2882 ¶ 3).

30.     The CPD has staged all of the general election presidential and vice presidential

debates since 1988, including the four debates held in connection with the 2012 election.

(Answer ¶ 29; AR2144; AR2883 ¶ 4).

31.     The CPD accepts contributions from various for-profit corporations to fund the

staging of its debates.  (AR2883 ¶ 5; Answer ¶ 77).

### A.     The Bipartisan Creation Of The CPD

32.     In 1976, 1980, and 1984, the non-partisan League of Women Voters was

responsible for sponsoring the general election presidential debates.  (AR2206; AR2210-11).

33.     In 1980, the League of Women Voters came into conflict with President Jimmy

Carter's campaign over the inclusion of third-party candidate John Anderson.  Carter's campaign

was concerned that Anderson would siphon voters from Carter and was "adamant about not
including him."  (AR2227).  When the League announced that Anderson would be invited to the
first debate, Carter refused to participate in the debate.  (AR2224).  The League refused to back
down and held the first debate between Ronald Reagan and Anderson alone.  (*Id.*).

34.     In 1984, the relationship between the two major parties and the League of Women
Voters deteriorated.  (AR2227-28).  The campaigns of President Reagan and Walter Mondale
made a series of demands to the League regarding the terms of the debates, including the choice
of potential moderators.  (AR2229).  The League publicly admonished both campaigns,
complaining that "[t]here was abuse of the process by both campaigns.  The letter of the
agreement was lived up to, but the spirit was not."  (AR2240).

35.     In 1985, the then-chairmen of the Republican National Committee ("RNC") and
the Democratic National Committee ("DNC"), Frank Fahrenkopf, Jr. and Paul G. Kirk, Jr.
respectively, entered into a Memorandum of Agreement on Presidential Candidate Joint
Appearances.  (AR2244).  The Memorandum stated that:

> Frank J. Fahrenkopf, Jr., Chairman of the Republican National
> Committee, and Paul G. Kirk, Jr., Chairman of the Democratic National
> Committee, acknowledge and recognize that nationally televised joint
> appearances by the presidential nominees of both parties have often played
> an important and constructive role in recent presidential campaigns. . . .
>
> It is our bipartisan view that a primary responsibility of each major
> political party is to educate and inform the American electorate of its
> fundamental philosophy and policies as well as its candidates' positions on
> critical issues.  One of the most effective means of fulfilling that
> responsibility is through nationally televised joint appearances conducted
> between the presidential and vice-presidential nominees of the two major
> political parties during general election campaigns.  Therefore, to better
> fulfill our parties' responsibilities for educating and informing the
> American public and to strengthen the role of political parties in the
> electoral process, it is our conclusion that future joint appearances should
> be principally and jointly sponsored and conducted by the Republican and
> Democratic National Committees.

(*Id.*).

36.     The CPD was created in 1987.  (AR2249).

37.     The DNC and RNC announced the creation of the CPD in a joint press release issued on February 18, 1987.  The press release described the CPD as a "bipartisan, non-profit, tax exempt organization formed to implement joint sponsorship of general election presidential and vice presidential debates, starting in 1988, by the national Republican and Democratic committees between their respective nominees."  (AR2249).  Fahrenkopf and Kirk were quoted in the release as saying:  "We have no doubt that with the help of the Commission we can forge a permanent framework on which all future presidential debates between the nominees of the two political parties will be based."  (AR2250).

38.     In an article discussing the creation of the CPD, the New York Times reported:

> In response to questions, Mr. Fahrenkopf indicated that the new Commission on Presidential Debates, a nonprofit group made up of representatives from each party, was not likely to look with favor on including third-party candidates in the debates.  He said the issue was a matter for the commission to consider when it worked out the format, timing and other details of the debates with the candidates.

> Mr. Kirk was less equivocal, saying he personally believed the panel should exclude third-party candidates from the debates.

(AR2252).

### B.     The CPD's Bipartisan Bias

39.     The CPD has always had one Republican co-chair and one Democratic co-chair. Fahrenkopf, who was the chairman of the RNC from 1983 to 1989, has always been the Republican co-chair of the CPD.  (AR2360; AR2885-86 ¶ 11).  Kirk, who was the chairman of the DNC from 1985 to 1989, was the Democratic co-chair until 2009, when he left to accept an appointment as a Democratic Senator for the Commonwealth of Massachusetts.  (AR2885-86 ¶ 11; AR2483-84).

40.     Kirk was replaced by Michael D. McCurry, who had previously served as director of communications for the CPD and press secretary to President Clinton.  (AR2360; AR2363).

41.     Between 2008 and 2012, Fahrenkopf donated $23,750 to Republican candidates. (AR2370).  Between 2012 and 2014, he donated over $35,000 to Republican candidates and committees.  (AR2373-80).

42.     Fahrenkopf donated to the campaign of President George W. Bush in June 2003. (AR2377; SAC ¶ 41d; Answer ¶ 41).

43.     From 2008 to 2012, McCurry donated almost $85,000 to Democrats.  (AR2370). McCurry has donated approximately $7,500 to Hillary Clinton, including in April 2015.[1]  (SAC ¶ 43c; Answer ¶ 43).

44.     Through the 2012 presidential election, Fahrenkopf served as President and CEO of the American Gaming Association, the trade association for the United States gaming industry.  (AR2370).  In 2011 and 2012, the American Gaming Association spent more than $3.5 million in lobbying efforts, and gave over $150,000 to Democratic and Republican candidates. (AR2370; AR2385; Answer ¶ 41).

45.     From at least 2012 through the present, McCurry has been a partner with the lobbying firm Public Strategies Washington.  (AR2370).  Public Strategies' clients include, among other large corporations, CPD sponsors Anheuser-Busch and Southwest Airlines. (AR2388-89).

46.     In addition to Fahrenkopf and McCurry, the CPD directors responsible for the operation of the CPD during its staging of the 2012 general election presidential debates were Respondents Buffett, Danforth, Griffen, Hernandez, Jenkins, Minow, Parsons, Ridings, Simpson,

---

[1] *See* List of Michael McCurry Individual Contributions, retrieved on March 28, 2016 from FEC's website using Transaction Query By Individual Contributor, http://www.fec.gov/finance/disclosure/norindsea.shtml.

and Brown.  (*E.g.*, AR2157).

47.     Brown has been the Executive Director of the CPD since March 1987.  (AR2882 ¶ 1).  Before taking this position, she served as an aide to high-ranking Republicans Elliott Richards (former United States Attorney General under President Richard M. Nixon and Ambassador to the United Kingdom) and Senator John Danforth.  (*Id.* ¶ 2).

48.     Danforth and Simpson are former Republican senators.  (AR2360).  In August 2015, Danforth donated $2,700 to the 2016 presidential campaign of John Kasich (SAC ¶ 44b; Answer ¶ 44), and he served on a host committee for a fundraising event for Right to Rise, Jeb Bush's super PAC.[2]

49.     Minow was a key aide to Adlai Stevenson and was appointed by President John F. Kennedy to the Federal Communications Commission. (AR2222-23).

50.     Hernandez served as counsel on the Senate Committee on the Judiciary when it was led by Senator Ted Kennedy.  (AR2400).  In April 2015, Hernandez donated $2,700 to the 2016 presidential campaign of Hillary Clinton.  (SAC ¶ 44c; Answer ¶ 44).

51.     Parsons and his wife gave $119,000 to candidates and committees between 2008 and 2012, mostly to Republicans.  (AR2370).  This includes a $25,000 donation in 2008 to presidential candidate and CPD debate participant John McCain's Victory Committee.  (*Id.*).  In June 2015, Parsons donated $2,700 to the 2016 presidential campaigns of Bush and Clinton.[3]

52.     Buffett contributed to President Barack Obama's 2008 presidential campaign in the same month that the CPD sponsored debates between Obama and John McCain.  (AR2403; SAC ¶ 44e; Answer ¶ 44).

---

[2] *See* Maeve Reston, *Jeb Bush heads to California fundraisers, some hosted by former Romney donors*, CNN (Jan. 14, 2015), http://www.cnn.com/2015/01/13/politics/jeb-bush-california-fundraisers/.
[3] *See* List of Richard Parsons Individual Contributions, retrieved on March 28, 2016 from FEC's website using Transaction Query By Individual Contributor, http://www.fec.gov/finance/disclosure/norindsea.shtml (New York resident).

53.     Ridings donated to Democratic candidates between 2008 and 2012.  (AR2408).

54.     In 2011, Fahrenkopf authored an op-ed in Politico exhorting the RNC to find a "dynamic and hardworking new chairman" who could win back the trust of "our major-donor base" and "rebuild the tattered reputation and organization of our great party."  (AR2382-83).

55.     On April 1, 2015, Fahrenkopf was interviewed on the United Kingdom news channel Sky News.  (AR3098-101).  In response to a question about the "prospects" for a multicandidate debate, Fahrenkopf stated:  "[I]n the general election debate, we have a system, and we, you know, as you know, primarily go with the two leading candidates, it's been the two political party candidates, save in except for 1992 when Ross Perot participated in the debates."  (AR3099).

56.     Several of the CPD's past and current directors, including Simpson and Minow, have made prior comments revealing the CPD's bipartisan purpose.  (AR3095).  In particular, (a) Simpson has stated "You have a lot of thoughtful Democrats and Republicans on the commission that are interested in the American people finding out more about the two major candidates – not about independent candidates who mess things up;" (b) Minow has stated "Because debates are political events, responsibility for them should rest with the political system – with the Democratic and Republican Parties . . . . Although entrusting such debates to the major parties is likely to exclude independent and minor party candidates, this approach is consistent with the two-party system.  Moreover, if the Democratic and Republican nominees agreed, other candidates could be included;" (c) John Lewis has stated "There's no question that having the two major parties in absolute control of the presidential debate process, and there's no question that they do, strengthens the two-party system.  These are the most important events of an election, and if no other candidates are getting in the debates, the American people are just not

going to hear about them, which means the two parties basically have a monopoly;" (d) David

Norcross has stated that the CPD is "not really nonpartisan. It's bipartisan;" and (e) Barbara

Vucanovich has stated that the CPD is "extremely careful to be bi-partisan." (*Id.*).

57.     Simpson has also stated that:

It is a two-party country. It seems to work better when you have the embracing of
the two-party system. I'd like to preserve that. I have seen enough in my time, in
my lifetime, with three very capable people—Anderson, Perot, and Nader—who
have messed things up, who have ruined the cake mix. . . . The purpose of the
commission, it seems to me, is to try to preserve the two-party system that works
very well, and if you like the multiparty system, then go to Sri Lanka and India and
Indonesia and get picking around it instead of all this ethereal crap.[4]

58.     Ridings has stated: "I certainly believe in a two-party system . . . . It's a lot better

than the France I knew when I was growing up . . . ."[5]

59.     Former CPD co-chairman Kirk served as a Democratic superdelegate in 2008

when he was still co-chairman of the CPD. (AR2480).

60.     In 2009, Kirk left the CPD to accept an appointment from Deval Patrick to serve

as a Senator, filling the vacancy that arose from Ted Kennedy's passing. (AR2483).

61.     Former CPD director Paul O'Neill joined the CPD's board of directors in 1999,

and less than two years later, he was appointed as Secretary of the Treasury under President

George W. Bush. (AR2420-21).

62.     In April 2014, the CPD announced new board members: Mitchell E. Daniels, Jr.,

Charles Gibson, Jane Harman, Leon E. Panetta, Olympia Jean Snow, and Dr. Shirley M.

Tilghman. (AR2411). Snowe is a former Republican Senator and Congresswoman who donated

---

[4] *See* George Farah, *No Debate: How the Republican and Democratic Parties Secretly Control the Presidential Debates* 41 (2004).
[5] *Id.* at 9.

to Bush's 2016 presidential campaign in June 2015.[6]  Panetta is a former Democratic

Congressman and a Cabinet member to Presidents Clinton and Obama who has publicly

endorsed Clinton's 2016 presidential campaign.[7]

63.     The CPD meets as infrequently as once per year, generally by conference call,

and board members "frequently . . . leave because of real or perceived conflicts of time or

interest."  (AR2232).

64.     From 1997 to 2007, the CPD's tax returns represented that each of its board

members (other than Brown) spent an average of zero hours per week on CPD matters.

(AR2413-40).  From 2008 to 2012, the CPD's tax returns represented that each of its board

members (other than Brown) spent an average of one hour per week on CPD matters.  (AR2442-

51).

65.     In the first presidential debate in 2012, five of the CPD's 11 board members were

absent, and Fahrenkopf stated "I don't think we've ever had six of us together at one debate."

(AR2454).

66.     Directors are nominated by a subcommittee of the board of directors with "no

overseeing public or private authority."  (AR2232-33).  The CPD's original bylaws gave the

chairmen unilateral authority to determine which directors could serve on the nominating

committee, and to fill vacancies that occurred prior to the expiration of the director's official

term.  (AR2752-53 §§ 2-3).

67.     Former CPD Chairman Kirk was McCurry's "former boss" when McCurry was at

---

[6] *See* List of Olympia Snowe Individual Contributions, retrieved on March 28, 2016 from FEC's website using Transaction Query By Individual Contributor, http://www.fec.gov/finance/disclosure/norindsea.shtml.
[7] *See* Lucy McCalmont, *Leon Panetta goes all in for Hillary Clinton*, Politico (Oct. 14, 2014), http://www.politico.com/story/2014/10/leon-panetta-hillary-clinton-111892.  Since the commencement of this action, Panetta has been removed from the CPD's website.  *See* CPD:  Commission, Leadership, http://www.debates.org/index.php?page=commission-leadership (last visited Apr. 5, 2016).

the DNC.  (AR2455).

68.     The CPD has little staff.  At least as late as 2008, the CPD's staff consisted of

Brown, her two assistants, and a receptionist.  (AR2232).  In 2012, the CPD only spent $274,947

on all salaries and wages for non-officer employees.  (AR2160).

69.     The CPD's conflict of interest policy does not contain any prohibition on partisan

activities or conduct.  (AR2768-71).

### C.     The CPD's History Of Sponsoring The Debates

70.     In 1988, the campaigns of then Vice-President George H.W. Bush and Michael

Dukakis entered into a memorandum of understanding ("MOU") that stipulated the number,

dates, locations, formats, staging, camera placement, audience reaction shots, process for

selecting moderators and panelists, etc. for the debates.  (AR2255-59).

71.     Though the 1998 MOU called for one debate to be sponsored by the League of

Women Voters (AR2255), the League refused.  In a press release entitled "League Refuses to

'Help Perpetrate A Fraud,'" League President Nancy M. Neuman explained that "the demands of

the two campaign organizations would perpetrate a fraud on the American voter . . . . It has

become clear to us that the candidates' organizations aim to add debates to their list of campaign-

trail charades devoid of substance, spontaneity and honest answers to tough questions."

(AR2214).

72.     In 1992, 1996, and 2000, the Democratic and Republican nominees also entered

into MOUs regarding the terms of the debates, which the CPD followed.  (AR2234).

73.     When an administrative complaint filed with the FEC alleged that the CPD

blanketly accepted the demands of the major party candidates' MOUs, the CPD was unable to

identify any instance where it had contravened the candidates' demands.  *See* Response from

14

CPD at 7-8, MUR 5414 (Commission on Presidential Debates) (Mar. 30, 2004).[8]

74.     In 2004, the CPD refused to sign the MOU agreed to by the campaigns of President George W. Bush and John Kerry.  (AR2236).  But even though the CPD advised the candidates that it would not sign the MOU, it still advised the candidates that it would "make every good faith effort to accommodate [the] terms" of the MOU.  (AR2267).

75.     In 1992, the CPD purported to use a multifactor test to select candidates for participation in the debate, which took into account (1) evidence of national organization, including constitutional eligibility for office, placement on the ballot in states sufficient to secure an Electoral College majority, organization in a majority of congressional districts in those states, eligibility for matching funds from the FEC or other demonstration of the ability to fund a national campaign, and endorsements from federal and state officeholders; (2) signs of national newsworthiness and competitiveness, including the professional opinions of Washington bureau chiefs of major media outlets, the opinions of professional campaign managers and pollsters not affiliated with a candidate, the opinions of expert political scientists, comparative media exposure to the major party candidates, and the published views of prominent political commentators; and (3) indicators of national public enthusiasm or concern, including findings of significant public opinion polls and attendance at meetings and rallies in comparison with the two major party candidates.  *See* First General Counsel's Report at 8-9, MURs 4451 and 4473 (Commission on Presidential Debates) (Feb. 6, 1998).[9]

76.     Under these criteria, the CPD's Advisory Committee concluded that third-party candidate H. Ross Perot should be invited to the first general election presidential debate, but that his inclusion in subsequent debates would be subject to further review.  (AR2288-89).

---

[8] This document as attached as Exhibit 2 to the Declaration of Alexandra A.E. Shapiro ("Shapiro Declaration").
[9] This document as attached as Exhibit 3 to the Shapiro Declaration.

77.     The campaigns of President George H.W. Bush and Bill Clinton, both believing that Perot's inclusion in the debates would inure to their benefit, agreed that Perot should be included in the debates.  (AR2295-96).  As Bush campaign official Bobby Burchfield explained:

> We wanted Ross Perot to be included. . . . [On October 1] Mr. Perot stood at less than ten percent in every national poll, and few, if any commentators gave him a chance of winning.  Under the CPD's criteria for determining whether a non-major party candidate would be included in the debates, it was far from clear that Mr. Perot would qualify. . . . Therefore, the Bush campaign insisted, and the Clinton campaign agreed, that Mr. Perot and Admiral Stockdale be invited to participate in the debates.

(AR2302-03).

78.     Accordingly, the Bush and Clinton campaigns instructed the CPD to include Perot in the debates, and the CPD complied.  (AR2303-04).

79.     In 1996, 60% of the American public wanted Perot to appear in the presidential election debates, and Perot was receiving $29 million in public funding.  (AR2306-07).

80.     However, the CPD excluded Perot, using the same criteria that it had previously used in 1992 purportedly because (1) his poll numbers in 1996 were lower than his poll numbers in 1992; (2) academics and journalists consulted by the CPD did not believe he had "a realistic chance of being elected president;" and (3) Perot's funding was limited because he had accepted federal matching funds.  (AR2892 ¶ 27).

81.     Perot's polling numbers from his reentry in the 1992 presidential race on October 1, 1992 to the date of the CPD's decision to include him in the first debate on October 5, 1992 showed him with only 7 to 10% support.  (AR2337-38).  Polls taken at or around the same time of the CPD's decision to exclude Perot from the 1996 debates showed Perot with 7 to 8% support.  (AR2340; AR2348-50).[10]

---

[10] *See also U.S. Presidential Election Center*, Gallup, http://www.gallup.com/poll/154559/us-presidential-election-center.aspx (last visited Apr. 4, 2016).

82.     The CPD did not disclose the Washington bureau chiefs with whom it consulted, but the Washington bureau chiefs of the New York Times, The Wall Street Journal, the Los Angeles Times, The Chicago Tribune, Time, Newsweek, NBC, CNN, and ABC were not consulted.  (AR2352).

83.     The CPD cited Perot's acceptance of federal matching funds as a basis for excluding him from the debates (AR2892 ¶ 27), but its criteria at the time counted acceptance of federal matching funds as a factor favoring inclusion.  *See* Shapiro Decl. Ex. 3 at 8-9.

84.     Senior Clinton campaign official George Stephanopoulos stated:

[The Bob Dole campaign] didn't have leverage going into the negotiations.  They were behind, they needed to make sure Perot wasn't in it.  As long as we would agree to Perot not being in it we could get everything else we wanted going in. We got our time frame, we got our length, we got our moderator.

(AR2358).

**D.     The CPD's Candidate Selection Criteria Disadvantages Third-Party And Independent Candidates**

1.     The CPD's application of its criteria

85.     The CPD's criteria for selecting candidates to participate in the 2012 general election presidential debates were (1) evidence of constitutional eligibility to hold office; (2) evidence of ballot access, *i.e.*, that the candidate appear on enough state ballots to have at least a mathematical chance of securing an Electoral College majority; and (3) "a level of support of at least 15% (fifteen percent) of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly-reported results at the time of the determination."  (AR2917-18).

86.     The CPD used these same criteria in connection with the general election presidential debates in 2000, 2004, and 2008.  (AR2892-93 ¶ 29).

87.     The CPD does not stipulate a date for determining whether a candidate satisfies the 15% polling criterion.  Rather, the CPD states that its determination "will be made after Labor Day but sufficiently in advance of the first-scheduled debate to allow for orderly planning."  (AR2918).

88.     The CPD does not announce what public opinion polls it intends to use in applying its 15% polling criterion.  (*Id.*).

89.     The CPD has used the following polls in connection with prior general election presidential debates:

> **2000:**  ABC News/The Washington Post, NBC News/The Wall Street Journal, CBS News/The New York Times, Fox News/Opinion Dynamic, CNN/USA Today/Gallup

> **2004:**  ABC News/The Washington Post, NBC News/The Wall Street Journal, CBS News/The New York Times, Fox News/Opinion Dynamic, CNN/USA Today/Gallup

> **2008:**  ABC News/The Washington Post, NBC News/The Wall Street Journal, CBS News/The New York Times, Fox News/Opinion Dynamic, USA Today/Gallup

> **2012:**  ABC News/The Washington Post, NBC News/The Wall Street Journal, CBS News/The New York Times, Fox News, Gallup.

(AR3045 ¶¶ 9-13)

90.     The CPD has stated that in connection with every election since 2000, it has relied on the assistance of Newport, the Editor-In-Chief of the Gallup polling organization, in applying its 15% polling criterion.  (AR3044 ¶ 7).

18

2.      Third-Party and independent candidates cannot realistically satisfy the CPD's 15% rule

91.      In order for any candidate to satisfy the CPD's 15% polling threshold, that candidate must have sufficient name recognition to garner that level of support.  (AR2493 ¶ 11). According to the Expert Report of Dr. Clifford Young, the President of the Public Affairs practice of Ipsos, the presidential polling data from the past 22 years demonstrate that realistically, an independent candidate must achieve at least 60% name recognition, and likely at least 80% name recognition, in order to reach 15% support in public opinion polls.  (AR2493 ¶ 10; AR2504-05 ¶¶ 29-30, 32).

92.      The typical third-party or independent candidate would not have 60% name recognition prior to running for the presidency.  For example, Jon Huntsmann, a former Republican governor, had only 21% name recognition among Republican voters when he declared his candidacy for the Republican nomination for president.  (AR2589).  Similarly, prior to the 2016 presidential primary campaign, major politicians such as Marco Rubio (46%), Paul Ryan (56%), Scott Walker (34%), Elizabeth Warren (38%), and Martin O'Malley (16%) did not possess that level of name recognition.  (AR2592-93).

93.      Republican and Democratic candidates benefit from a "party halo effect," in which such candidates, no matter who they are, garner a significant minimum vote share simply from being associated with a political party.  (AR2500-51 ¶ 21).  Candidates unaffiliated with the major parties do not benefit from this effect.  (*Id.*).

94.      The Republican and Democratic party primaries also offer a clear mechanism for a candidate without a national profile to build name recognition, namely through substantial media coverage and participation in primary debates, which provide free avenues to additional name recognition.  (AR2048; AR2558-59).

95.     For example, Rick Santorum began the 2012 primary process in May 2011 with only 47% name recognition among Republican voters.  (AR2528).  By February 13, 2012, he had a name recognition among all Americans of 85%, and had spent only $13.1 million on his campaign up to that point.  (AR2534; AR2536).

96.     Similarly, Herman Cain had a name recognition among Republican voters of only 21% in March 2011. (AR2538).  By October 2011, his name recognition was 78%, and his campaign had spent less than $16 million.  (*Id.*; AR2542).

97.     In comparison, the average winner of a 2012 senatorial election raised $10.5 million.  (AR2547).

98.     Candidates unaffiliated with the two major parties lack an institutionalized avenue for free media coverage similar to the primary process.  The media frequently does not cover third-party and independent candidates at all.  (AR2557-58).  As NBC political analyst Chuck Todd stated, "[t]hird party candidates typically don't get the media attention – and thus name ID – that Democrats and Republicans get."  (AR2584-86).[11]

99.     According to the Expert Report of veteran pollster and campaign strategist Douglas Schoen, a third-party or independent candidate seeking to obtain name recognition of at least 60% would need to embark on an 18-week advertising strategy for broadcast, cable, and digital media.  (AR2559-63).  Implementing this strategy would likely cost over $106 million in media purchase, and an additional $6 million to produce the advertising content, for a total approximate cost of $113 million.  (AR2559-64).  To reach 80% name recognition, the total approximate cost would be over $150 million.  (AR2564).

100.     A third-party or independent candidate would also need to pay additional costs

---

[11] *See also* Chuck Todd, Mary Murray & Carrie Dan, *Independents' Day?  Game Rigged Against Third-Party Candidates*, NBC News (July 3, 2014), http://www.nbcnews.com/politics/first-read/independents-day-game-rigged-against-third-party-candidates-n147331.

related to his or her campaign, such as payroll, consultants, polling, legal fees, facility costs, travel, direct mail, security, event staging, telemarketing, and design and printing services. (AR2565-67).  In order to be competitive with major party candidates, a third-party or independent candidate would likely need to spend an additional $133 million for these campaign costs.  (AR2567-69).

101.    By comparison, the presidential campaign of Mitt Romney spent only $106.5 million to secure the Republican nomination in 2012.  (AR2600; *see also* AR2596 (explaining that Romney clinched the nomination by May 30, 2012)).

102.    In addition, a third-party or independent candidate would also have to spend money to coordinate a signature gathering campaign necessary to get sufficient ballot access. (AR2570).  That effort could cost in excess of $13 million.  (*Id.* n.18).

103.    In sum, the total amount a third-party or independent candidate would need to spend to mount a legitimate effort to reach 15% support in the polls is approximately $253 million.  (*Id.*).  This estimate is based on costs and expenditures made in connection with the 2012 election.  (*Id.*).  Factoring in a 5% growth in costs (as occurred between 2008 and 2012), a third-party or independent candidate would need to spend over $266 million to reach 15% support in the polls in 2016.  (AR2570-71).

104.    By law, individuals may only donate a maximum of $2,700 to a candidate per election (primary and general).[12]

105.    In 2012, a plurality of individual donations to major party candidates were under $200.  (AR2577).

3.    Polling's unreliability disproportionately harms independent candidates

---

[12] *See* Contribution Limits for 2015-16 Federal Elections, FEC, http://www.fec.gov/info/contriblimitschart1516.pdf (last visited Apr. 6, 2016).

106.     A candidate's potential voter support is a function of the candidate's name recognition, and in order to compare the "upside" of candidates, one must account for the differential in name recognition between those candidates.  (AR2602).

107.     The accuracy of a particular poll relies on the pollster's choice of the representative sample, which in turn depends on assumptions made about the anticipated voter turnout on Election Day.  (AR2509 ¶¶ 43, 43a-c).  If a pollster's predictions about voter turnout prove incorrect, the accuracy of the polls necessarily suffer.  (AR2510 ¶¶ 43d-e).

108.     Third-party and independent candidates frequently bring out new voters, some of whom are politically inactive or unregistered until mobilized by a compelling candidate. (AR2581).

109.     As the Schoen Report explains:

[R]aces with a serious third party or independent contender are prone to a distinct volatility in terms of voter support that limits the predictive power of pre-election data. . . . A recent article by Harry Enten of *FiveThirtyEight* outlined a short historical analysis over the last 12 years for gubernatorial races where a third candidate was polling at or above 5%.  Analyzing polling data from the months prior to the election and comparing them to the final results, he found a median *absolute error* of 10.1% in the mid-election polls for those polling in second place.  That number grows to 15.3% for those polling third.

(AR2579 (emphasis added)).

110.     In the 1998 Minnesota gubernatorial race, third-party candidate Jesse Ventura was polling at only 10% in late September, but ultimately won the race with approximately 37% of the vote.  (AR2607).

111.     In the 2010 Maine gubernatorial race, independent candidate Elliot Cutler was polling at only 11% in mid-September.  (AR2609).  Cutler finished second, with 35.9% of the vote.  (AR2616).

112.     In three-way gubernatorial races, the average absolute difference between a poll

taken two months prior to the election and the final result is 8.04%.  (AR2515 ¶ 56).  Given that error rate, a hypothetical candidate with a true level of support of 17% would fail to satisfy the CPD's 15% rule approximately 40.2% of the time, while, by comparison, a hypothetical candidate with a true level of support of 42% would fail to satisfy the CPD's rule only .04% of the time.  (AR2517 ¶ 66).

113.    In recent years, major pre-election polls have suffered from widespread inaccuracies.  (AR2796 (discussing errors in pre-election polling averages in the 2014 midterm elections); AR2837-40 (discussing how, on average, pre-election polls systemically overestimated Democratic vote share by 4% in Senate races and 3.4% in gubernatorial races in connection with the 2014 midterm elections)).

114.    The polls of the Gallup Organization in particular exhibited substantial inaccuracies in the 2012 presidential election.  (AR4852-54).  Its polls "consistently showed Mr. Romney ahead by about six percentage points" in an election that President Obama won by 3.87%, and demonstrated an average error of 7.2%.  (AR4948).[13]  Nate Silver has characterized Gallup's errors as "among the worst results" of all polling firms, and criticized Gallup as having "three poor elections in a row."  (*Id.*).

115.    Newport has admitted that Gallup has no "definitive answer" for its errors, and that Gallup's polls were toward the "inaccurate end of the spectrum."  (AR4964; AR4960).

116.    In October 2015, Gallup announced that it would no longer conduct "horse race" polling for the 2016 presidential primary race.  (AR4973-74).

---

[13] *See also* Nate Silver, *Which Polls Fared Best (and Worst) in the 2012 Presidential Race*, N.Y. Times (Nov. 10, 2012), http://fivethirtyeight.blogs.nytimes.com/2012/11/10/which-polls-fared-best-and-worst-in-the-2012-presidential-race/?_r=0.

E.     **There Is Reason To Believe The CPD Violates FECA**

    1.     <u>The acceptance of corporate funds contributes to an appearance of corruption</u>

117.     Though the CPD does not disclose all of its sponsors, it has accepted contributions from Anheuser-Bush Companies, Southwest Airlines, BBH New York, American Airlines, Continental Airlines, Discovery Channel, EDS, JetBlue Airways, AT&T, 3Com, Atlantic Richfield, Dun & Bradstreet, Ford Motor Company, Hallmark, IBM, J.P. Morgan & Co., Philip Morris Companies Inc., and Prudential.  (AR2178-79).

118.     It is customary practice for the political action committees of large corporations to contribute to both Republicans and Democrats in an effort to buy influence broadly in the political system.  (AR2703-05).  The political action committees of Anheuser-Busch and Southwest Airlines alone contributed nearly $1.5 million to Democratic and Republican candidates in 2011 and 2012.  (AR2391-92; AR2394-95).Although the non-partisan League of Women Voters had solicited corporate contributions when it sponsored the presidential debates, it received little support; by contrast, the CPD was able to solicit hundreds of thousands of corporate donations in its first year of operation alone.  (AR2721).  As Nancy Neuman, the former president of the League, explained:  "There was nothing in it for corporations when they made a contribution to the League.  Not a quid pro quo.  That's not the case with the commission."  (AR2721-22).

119.     In 2012, three CPD sponsors – BBH New York, the YWCA, and Philips Electronics – withdrew their sponsorship over concerns that they may be supporting partisan activities.  (AR2724).  A spokesperson for Philips stated that "[w]e respect all points of view and, as a result want to ensure that Philips doesn't provide even the slightest appearance of supporting partisan politics.  As such, no company funds have been or will be used to support the

Commission on Presidential Debates." (*Id.*). The YWCA stated that "[a]s a nonpartisan organization . . . we have decided to withdraw our sponsorship effectively immediately." (AR2727).

2.  <u>The CPD's acceptance of contributions, its own contributions and expenditures, and its failure to disclose its contributions and expenditures violate FECA</u>

120.    The CPD accepted over $7.7 million in contributions in 2011 and 2012. (AR2151).

121.    The CPD does not disclose all of its contributors.

122.    The CPD spent more than $3.7 million to "organize, produce, finance and publicize the general election debates" and on "other voter education activities." (AR2152; AR2160).

123.    The CPD does not disclose its expenditures.

124.    The debates provide "what is easily the largest audience of any public activity associated with the election," and constitute an "irreplaceable" opportunity for candidates to communicate their message. (AR2733; AR2737-38).

3.  *The American public is dissatisfied with the partisan rigging of the debates*

125.    A large portion of the American public is dissatisfied with the current political system. According to a Rasmussen Reports study, 62% of American do not believe the federal government has the consent of the governed. (AR2078). According to veteran pollster Douglas Schoen, 86% of the people believe the political system is broken and does not serve the interests of the American people. (AR2089).

126.    According to Schoen, 81% believe it is important to have independent candidates run for office, and 65% wish they had the option to vote for an independent candidate for

president.  (AR2101; AR2133).

127.    According to a September 2013 Pew Research study, significant majorities of the American public believe that government economic policies benefit financial institutions, large corporations, and the wealthy, while similarly sizable majorities believe those policies do little to nothing to benefit the poor, middle class, and small businesses.  (AR2710).

128.    The American public is also in favor of a more inclusive debate system.  Fifty percent of voters wish to see a third candidate from outside the two major parties included in the debates.  (AR2095).  When specific candidates have been raised, the numbers are even higher: 56% of respondents supported the inclusion of Ralph Nader and Pat Buchanan in the 1996 debates, and 62% of Americans were in favor of Perot's inclusion in the 1996 debates. (AR2647; AR2655).

## IV.    SUMMARY OF THE PETITION

129.    LPF's petition asked the FEC to revise C.F.R. § 110.13(c) to require that debate staging organizations use objective, unbiased criteria that do not involve satisfying a polling threshold as the exclusive means to accessing the presidential general election debates. (AR0001-32).

130.    The petition argued that polling thresholds had been used by the CPD to systematically exclude third-party and independent candidates from the presidential debates, and as a result, they increase the risk that a debate staging organization's selection criteria are geared to the selection of only the major-party candidates.  (AR0010-13; AR0015-26).  This raises concerns that the corporate-funded debates could be used to funnel corporate money to favored candidates.

131.    The petition explained that there are workable alternatives to using polling

thresholds as the exclusive measure of a candidate's viability.  The petition suggested one potential alternative:  "On April 30 of an election year, any candidate, party, or nominating process with ballot access in states that collectively have at least 270 Electoral College votes would notify the CPD of that access.  If there is more than one, then whoever has gathered the most signatures as part of the ballot access process will participate in the debates . . . ." (AR0029-30).

132.    Other commenters suggested opening the debates to all candidates who secured ballot access in states with at least 270 Electoral College votes.  (AR0408; AR1869).  This alternative would likely add three or fewer independent candidates to the Democratic and Republican nominees.  (AR0030; AR1869).

Dated: April 6, 2016
        New York, New York

Respectfully submitted,

 _/s/ Alexandra A.E. Shapiro_
Alexandra A.E. Shapiro (D.C. Bar No. 438461)
Chetan A. Patil (D.C. Bar No. 999948)
SHAPIRO ARATO LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
Phone:  (212) 257-4880
Fax:  (212) 202-6417

*Attorneys for Plaintiffs Level the Playing Field,
Peter Ackerman, Green Party of the United States,
and Libertarian National Committee, Inc.*