**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| LEVEL THE PLAYING FIELD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-1397 (TSC) |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This case concerns a highly visible element of our democratic elections:  the presidential and vice-presidential debates held every four years by the Commission on Presidential Debates ("CPD").  Plaintiffs allege that the Federal Election Commission ("FEC") has violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in dismissing two administrative complaints regarding the CPD and in denying a petition to engage in rulemaking to change the FEC's regulations regarding debate staging organizations.

Before the court are Plaintiffs' motion for summary judgment (ECF No. 37) and Defendant's cross-motion for summary judgment (ECF No. 42).  Upon consideration of the motions, the Administrative Record (ECF No. 58), and the arguments at the hearing held on January 5, 2017, Plaintiffs' motion is GRANTED, and Defendant's cross-motion is DENIED.

## I.  BACKGROUND

### A.  The Parties

The four Plaintiffs in this case are Level the Playing Field ("LPF"), Green Party of the United States, Libertarian National Committee, Inc., and Dr. Peter Ackerman.  LPF is a nonpartisan, nonprofit corporation whose purpose is to promote reforms that allow for greater

competition and choice in federal elections.  (Administrative Record ("AR") 2019 (ECF No. 58)).  The Green Party is a political party that has nominated candidates in every presidential election since 2000.  (AR 4003–04).  The Libertarian Party is the third largest political party in the U.S. and has nominated presidential candidates in every election since 1972.  (AR 4781–82). Dr. Peter Ackerman is a citizen and voter who is an active participant in efforts to reform elections and encourage third-party or independent candidates to seek office.  (AR 2020; Tr. of Mot. Hr'g (Jan. 5, 2017) at 7:18–8:7 (ECF No. 59)).

Defendant FEC is charged with the administration and civil enforcement of the Federal Election Campaign Act ("FECA" or "Act"), 52 U.S.C. § 30101 *et seq.*  Of the FEC's six commissioners, no more than three "may be affiliated with the same political party."  52 U.S.C. § 30106(a)(1).  The FEC is authorized to "formulate policy with respect to" the FECA, including through promulgating regulations.  52 U.S.C. § 30106(b)(1).  The agency is also authorized to investigate potential violations of the FECA.  52 U.S.C. § 30109(a)(1)–(2).

### B.  The Commission on Presidential Debates

The CPD, though not a party to this case, is centrally involved in this litigation and has submitted an amicus brief.  (*See* ECF No. 45).[1]  The CPD is a nonprofit corporation that has staged every general election presidential debate since 1988, including the four debates in the 2012 election.  (AR 2144, 2882–83 ¶¶ 3–4).  It accepts corporate donations to help with the costs associated with staging the debates.  (AR 2883 ¶ 5).

Since its creation in 1987, the CPD has been led by two co-chairmen:  one Republican (former Republican National Committee Chair Frank Fahrenkopf, Jr.) and one Democrat

---

[1]  Two additional parties filed amicus briefs in support of Plaintiffs' motion:  Independent Voter Project (ECF No. 38) and FairVote (ECF No. 39).

(originally former Democratic National Committee Chair Paul G. Kirk, Jr., and then in 2009 Michael D. McCurry, former press secretary to President Bill Clinton).  (AR 2360, 2885–86 ¶ 11, 2363).  The CPD is "bipartisan" by its own description:  the press release announcing its formation stated that it was a "bipartisan . . . organization formed to implement joint sponsorship of general election presidential and vice-presidential debates . . . by the national Republican and Democratic committees between their respective nominees."  (AR 2249).  Moreover, Fahrenkopf has stated that the CPD was not likely to look with favor on including third-party candidates in the debates, and Kirk has stated that he personally believed the CPD should exclude third-party candidates from the debates.  (AR 2252).

Since 1988, the CPD's debates have included a third-party candidate—*i.e.*, a candidate not affiliated with the Democratic or Republican parties—just once, in 1992, when the campaigns of Bill Clinton and George H. W. Bush requested that the CPD include Ross Perot in the presidential debates.  (AR 2288–89, 2303–04).  Beginning with the 2000 election, the CPD has relied on the following criteria to determine whether a candidate may participate in its debates:  (1) he/she must be constitutionally eligible to hold office; (2) he/she must appear on enough state ballots to secure an Electoral College majority; and (3) he/she must have "a level of support of at least 15% . . . of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly-reported results at the time of the determination."  (AR 2917–18).

### C.  Statutory and Regulatory Framework

The FECA prohibits "any corporation whatever, or any labor organization, [from] mak[ing] a contribution or expenditure in connection with any election at which presidential and vice presidential electors . . . are to be voted for."  52 U.S.C. § 30118(a).  Contributions include

3

"any gift, subscription, loan, advance, or deposit of money or anything of value," 52 U.S.C.

§ 30101(8)(A), and expenditures include "any purchase, payment, distribution, loan, advance,

deposit, or gift of money or anything of value," but exempt is "nonpartisan activity designed to

encourage individuals to vote or to register to vote," 52 U.S.C. § 30101(9)(A)(i), (B)(ii).

"Contributions" are defined as any "expenditures made by any person in cooperation,

consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized

political committees, or their agents."  52 U.S.C. § 30116(7)(B)(i).

Pursuant to the FECA, the FEC has promulgated various regulations, including those

concerning political candidate debates.  Under the law, corporations may not give contributions

to or make expenditures on behalf of political candidates or campaigns, but they may donate to

organizations that stage debates featuring those candidates because the FEC's regulations

provide that any "[f]unds provided to defray costs incurred in staging candidate debates in

accordance with the provisions of 11 CFR 110.13 and 114.4(f) are not contributions" and are

also "not expenditures."  11 C.F.R. §§ 100.92, 100.154.  Organizations that stage debates must

be nonprofit entities and cannot "endorse, support, or oppose political candidates or political

parties."  11 C.F.R. § 110.13(a)(1).[2]  Staging organizations "must use pre-established objective

criteria to determine which candidates may participate in a debate.  For general election debates,

staging organizations(s) [sic] shall not use nomination by a particular political party as the sole

objective criterion to determine whether to include a candidate in a debate."  11 C.F.R.

§ 110.13(c).  The regulation does not define "objective," but the FEC stated when it promulgated

the rule that the use of objective criteria is intended "to avoid the real or apparent potential for a

---

[2]  If the debate is staged by a broadcaster, newspaper, or magazine, the organization may stage debates "provided that they are not owned or controlled by a political party, political committee or candidate."  11 C.F.R. § 110.13(a)(2).

*quid pro quo*, and to ensure the integrity and fairness of the process," and therefore criteria cannot be "designed to result in the selection of certain pre-chosen participants," and "the rule contains an implied reasonableness requirement."  60 Fed. Reg. 64,260, 64,262 (Dec. 14, 1995).

The debate staging regulation thus acts as an exemption to the general ban on corporate contributions to or expenditures on behalf of political campaigns or candidates.  To prevent debate staging organizations such as the CPD from operating as conduits for corporate contributions made to benefit only one or two candidates from the Democratic and Republican parties—via the much-watched prime-time debates—the regulations require these organizations to (1) be nonpartisan, (2) not endorse, support, or oppose candidates or campaigns, and (3) use pre-established, objective criteria.  If a debate staging organization fails to comply with the regulations, such as failing to use objective criteria in determining which candidates participate in its debates, then the value of the debate is actually a contribution or expenditure made to the participating political campaigns in violation of the Act.

The Act provides that any person who believes a violation of the Act has occurred may file an administrative complaint with the FEC.  52 U.S.C. § 30109(a)(1).  The FEC is required to review the complaint and any responses filed by respondents and determine whether there is "reason to believe" the Act has been violated.  52 U.S.C. § 30109(a)(2).  If at least four of the six FEC commissioners vote that they find there is reason to believe a violation has occurred, then the FEC may investigate the allegations; otherwise, the complaint is ordinarily dismissed.  *Id.*  If the commissioners find there is reason to believe a violation has occurred, the next step is determining whether there is probable cause to believe that the Act has been violated; if so, the FEC is required to attempt to remedy the violation first through conciliation and then, if unsuccessful, through litigation.  52 U.S.C. § 30109(a)(4)(A)(i), (a)(6).

The Act further provides that parties "aggrieved by an order of the Commission dismissing a complaint filed by such a party . . . may file a petition with the United States District Court for the District of Columbia," which "may declare that the dismissal of the complaint or failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint."  52 U.S.C. § 30109(a)(8)(A), (C).

### D.  Procedural History and the Present Litigation

#### 1.  Administrative Complaints

Plaintiffs filed two administrative complaints with the FEC alleging that the CPD and twelve of its directors violated the FEC's debate staging regulations and the FECA in connection with the 2012 general election debates.[3]  (AR 2001–75, 4001–05, 4778–83).  These complaints were labeled Matters Under Review ("MUR") 6869 (filed by LPF and Peter Ackerman in September 2014) and 6942 (filed by the Green Party and Libertarian Party in June 2015).[4]  Both complaints alleged that in the 2012 presidential election the CPD was not a nonpartisan debate staging organization under 11 C.F.R. § 110.13(a)(1) because it endorsed, supported, or opposed certain political parties, and that therefore the debates held in 2012 were prohibited corporate contributions and expenditures to the campaigns of the 2012 candidates in violation of 52 U.S.C. § 30118(a).  Further, the complainants—now Plaintiffs—alleged that because the CPD made these contributions and expenditures, it was functioning as a political committee under the FECA

---

[3]  These directors included executive director Janet Brown, chairmen Frank Fahrenkopf, Jr. and Michael McCurry, and Howard G. Buffett, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, Newton N. Minow, Richard D. Parsons, Dorothy Ridings, and Alan K. Simpson.

[4]  The Green Party and Libertarian Party each filed individual requests to join MUR 6869, but these requests were denied and instead combined as a new administrative complaint, MUR 6942.

and violated 52 U.S.C. §§ 30103 and 30104 by failing to register and report its contributors and contributions with the FEC.  (AR 2027–73).

The complainants submitted over one hundred supporting exhibits, including information, statements, and press releases relating to the founding of the CPD, information on the recent political contributions and political activity of the CPD's directors, the expert report of Dr. Clifford Young regarding the ability of third-party or independent candidates to meet the CPD's fifteen percent polling criterion, and the expert report of Douglas Schoen regarding the financial cost to achieve the name recognition necessary to meet the CPD's polling requirement, and the financial difficulty in doing so.  (AR 2076–771).

In July 2015, the FEC voted 5-0 (with one recusal) to find no reason to believe that the CPD or its co-chairs violated these regulations or statutes, thus dismissing MUR 6869.  (AR 3172–73).  In December 2015, the FEC again voted 5-0 to make the same determination regarding MUR 6942.  (AR 5000–01).  In the Factual & Legal Analyses provided by the FEC to the Plaintiffs in its dismissals of their complaints, the FEC noted that past administrative complaints—MURs 4987, 5004, 5021, 5207, 5414, and 5530—had "made similar allegations," and that in those cases the FEC had found no reason to believe that the CPD and its co-chairs had violated regulations or the FECA.  The FEC also pointed out that its past decisions analyzing the objectivity of the CPD's fifteen percent requirement had been reviewed and upheld in *Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000) (reviewing MURs 4987, 5004, 5021).  (AR 3175–81; AR 5003–10).

2.  Petition for Rulemaking

In September 2014, on the same day it filed its administrative complaint, LPF also filed a Petition for Rulemaking with the FEC under 5 U.S.C. § 553(e) of the APA.  (AR 0002–32).  The

Petition asked the FEC to revise 11 C.F.R. § 110.13(c) to specifically bar debate staging organizations from using a polling threshold as the sole criterion for accessing general election presidential and vice-presidential debates.  LPF submitted many of the same exhibits, including the Young and Schoen expert reports, in support of its arguments.

In November 2015, the FEC published in the Federal Register its Notice of Disposition that it was not initiating rulemaking in response to the Petition.  (AR 1903–05; 80 Fed. Reg. 72,616 (Nov. 20, 2015)).  The agency noted that "[b]ecause the regulation at issue is designed to provide debate sponsors with discretion within a framework of objective and neutral debate criteria, and because the Commission can evaluate the objectivity and neutrality of a debate sponsor's selection criteria through the enforcement process, the Commission finds that the rulemaking proposed by the petition is not necessary at this time."  (AR 1904; 80 Fed. Reg. 72,617).  The FEC also wrote:  "In these enforcement matters, the Commission has carefully examined the use of polling thresholds and found that they can be objective and otherwise lawful selection criteria for candidate debates."  (*Id.*).

3.  <u>Present Litigation</u>

Plaintiffs filed this lawsuit in August 2015, challenging the dismissal of their administrative complaint, MUR 6869, and the agency's decision not to engage in rulemaking. (*See* Compl. (ECF No. 1)).  In October 2015, Plaintiffs filed an Amended Complaint adding a claim that the FEC's failure to act on MUR 6942 within 120 days was arbitrary and capricious. (*See* Am. Compl. (ECF. 17)).  In January 2016, after the FEC dismissed MUR 6942, Plaintiffs filed their Second Amended Complaint adding a challenge to the dismissal.  (*See* Second Am. Compl. (ECF No. 25)).  The parties filed cross-motions for summary judgment (ECF Nos. 37, 42), on which a hearing was held on January 5, 2017.

## II.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment in a suit seeking APA review, the court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  The court is "not empowered to substitute its judgment for that of the agency," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), but instead must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).  The plaintiff bears the burden of establishing the invalidity of the agency's action.  *Id.*

## III.   DISCUSSION

### A.  FEC's Dismissals of Plaintiffs' Administrative Complaints

Plaintiffs argue that Defendant's dismissals of their two administrative complaints— MURs 6869 and 6942—violated the APA because they were contrary to law and were arbitrary and capricious.  They assert that the FEC: (1) applied a legal standard contrary to the text of the regulations; (2) failed to properly consider the submitted evidence; (3) failed to consider the allegations raised against most of the respondents; and (4) ultimately reached the wrong conclusion regarding the objectivity of the CPD's debate requirement.

1.  Legal Standard Adopted by the FEC

Plaintiffs first argue that the FEC adopted and applied a legal standard that is contrary to the text of the regulation.  In their administrative complaints, Plaintiffs alleged that the CPD "endorse[d], support[ed], or oppose[d] political candidates or political parties" in violation of 11 C.F.R. § 110.13(a) because it acted with partisan bias, its chairmen and directors were active partisans and political donors to the Democratic and Republican parties and their candidates, and its fifteen percent polling threshold for participation in the presidential debates was designed to bar any third party or independent candidate from participation.  (*See* AR 2002–75).  In its Factual & Legal Analyses, the FEC did not articulate what standard it used to determine whether the CPD had endorsed, supported, or opposed political parties—indeed, it did not mention these terms at all except in quoting the regulation and the respondents' denials that they had endorsed, supported, or opposed political parties.  When asked at oral argument *how* the FEC actually engaged in an analysis to determine whether the CPD endorsed, supported, or opposed political campaigns or parties, FEC's counsel responded simply, though unhelpfully, that "[t]he FEC applied the endorsed support opposed standard that's in the regulation."  (Tr. at 28:2–3).

In support of its decisions, the FEC cited its past dismissals of administrative complaints involving the CPD—including MURs 4987, 5004, and 5021—as well as the single prior district court decision that considered the denials, *Buchanan v. FEC*.[5]  In those dismissals, the FEC

---

[5]  The FEC also repeatedly claims that its decisions regarding the CPD were reviewed and upheld in *Natural Law Party v. FEC*, Case No. 00-cv-2138.  That case was a companion to *Buchanan*, and the final order, issued fifteen days after the complaint was filed, includes no separate analysis.  *See* Order (Sept. 21, 2000) (granting summary judgment "[f]or the reasons set forth in Part II of the September 14, 2000 Memorandum Opinion in" *Buchanan*).  The FEC also repeatedly cites to another opinion in *Natural Law Party*, 111 F. Supp. 2d 33 (D.D.C. 2000).  That decision was explicitly limited to whether plaintiffs had standing to challenge the FEC's actions, an issue not before the court here.

described the legal standard it applied:

> [Complainants] have not provided evidence that the CPD *is controlled by the DNC or the RNC*.  There is no evidence that *any officer or member of the DNC or the RNC is involved in the operation* of the CPD.  Moreover, there does not appear to be any evidence that the DNC and the RNC *had input into the development* of the CPD's candidate selection criteria for the 2000 presidential election cycle.  Thus, it appears that the CPD satisfied the requirement of a staging organization that it not endorse, support or oppose political candidates or political parties.  11 C.F.R. § 110.13(a).

(FEC Mem. at 21 (quoting First General Counsel's Report in MURs 4897, 5004, and 5021 (July 13, 2000)) (emphasis added)).  The FEC asserted in *Buchanan* that this "control" standard was in response to a "specific contention" involved in those administrative complaints, and the court agreed that the control standard was "geared toward refuting [that] specific contention."  112 F. Supp. 2d at 71 n.8.  However, Plaintiffs argue that by citing to these past MURs and the *Buchanan* case in its most recent dismissals, the FEC is effectively adopting this "control" standard *sub silentio*, as it has not articulated any other standard.  The FEC responds that there is "no instance in which the agency *actually said* it was adopting a 'control over' test."  (FEC Mem. at 28 (emphasis in original)), and adds that the control test "in any event . . . indisputably is also a helpful aid in determining whether a group's activities are nonpartisan."  (*Id.* at 28–29).

The court agrees with Plaintiffs that, in the absence of any articulated standard or analysis, the FEC's reliance on its past dismissals and the *Buchanan* case strongly implies that it has effectively adopted or relied on the control test it articulated in those past dismissals.  However, such a test appears to be contrary to the text of the agency's own regulations.  The FEC's regulations do not define "support, endorse, or oppose" as used in 11 C.F.R. § 110.13(a)(1), and the FEC did not define them in its Factual & Legal

11

Analyses.[6]  However, the regulations suggest that, whatever these terms do mean, they do

not mean "control," for that is the standard given in the regulation's subsequent

subsection, 11 C.F.R. § 110.13(a)(2), applying to broadcasters, as opposed to nonprofit

organizations.  That subsection permits only broadcasters that "are not owned or

controlled by a political party, political committee or candidate" from staging debates.

11 C.F.R. § 110.13(a)(2).  Therefore, the FEC's own regulations create a distinction

between the control test, which applies to broadcasters, and an endorse-support-oppose

test, which applies to nonprofit organizations.

       The FEC heavily relies on the district's court 2000 decision in *Buchanan*, which

permitted the agency's control test as applied to the CPD.  As described above, that test

assessed whether the CPD was "controlled by" the two major parties, whether either

party was "involved in" the CPD's operations, or whether those parties "had input in"

CPD's debate decisions.  However, the court in *Buchanan* simply noted that the control

standard was used to refute the specific control-specific facts alleged in that case.  112 F.

Supp. 2d at 71 n.8.  Here, Plaintiffs' do not allege that the Democratic or Republican

parties exercised control over the CPD, but instead that the CPD and its directors acted on

a partisan basis to support those parties.  Therefore, unlike in *Buchanan*, there are no

control-specific factual allegations here to warrant applying a control standard.

Moreover, as noted above, a plain reading of the regulation in the context of the

following subsection does not support applying a control standard, and to do so may be

---

[6]  According to the Oxford Dictionary, "endorse" means to "declare one's approval of";
"support" means "contributing to the success of or maintaining the value of"; and "oppose"
means to "set oneself against" or "stand in the way of."  *See* Oxford, *The New Shorter Oxford
English Dictionary* 818, 3153, 2009 (4th ed. 1993).

an incorrect construction of the regulation.

Courts are to be "exceedingly deferential" when reviewing an agency's construction of its own regulations, and the court "is not to decide which among several competing interpretations best serves the regulatory purpose." *Thomas Jefferson Uni. v. Shalala*, 512 U.S. 504, 512 (1994); *Trinity Broadcasting of Fla., Inv. v. FCC*, 211 F.3d 618, 625 (D.C. Cir. 2000). The court must defer to the FEC unless the agency fails to meet the "minimal burden of showing a 'coherent and reasonable explanation [for] its exercise of discretion.'" *Carter/Mondale Presidential Comm., Inc. v. FEC*, 775 F.2d 1182, 1185 (D.C. Cir. 1985) (quoting *MCI Telecommunications Corp. v. FCC*, 675 F.2d 408, 413 (D.C. Cir. 1982)); *see also FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (FEC "is precisely the type of agency to which deference should presumptively be afforded"). However, deference is not appropriate "when the agency interpretation is plainly erroneous or inconsistent with the regulation" or "when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997)).

The *Buchanan* court was satisfied that while the FEC's "terse explanation could have been more clear and thorough," the court could still determine what legal analysis was "apparent from the report." 112 F. Supp. 2d at 72. This court is not as willing to read thoughtful consideration into the FEC's threadbare Factual & Legal Analyses. Here, the FEC either applied a "control" standard that is contrary to the plain text of the regulation, or it possibly applied no analytical standard at all, given that it articulated none. Therefore, the court cannot defer to the FEC's analysis and further concludes that

13

the FEC acted arbitrarily and capriciously and contrary to law when it determined that the CPD did not endorse, support, or oppose political parties in the 2012 election.

The court therefore GRANTS Plaintiffs' motion and DENIES Defendant's cross-motion with respect to the appropriateness of the legal standard applied.  On remand, the FEC is ORDERED to articulate its analysis in determining whether the CPD endorsed, supported, or opposed political parties or candidates.

## 2.   FEC's Alleged Failure to Give Evidence a Hard Look

Plaintiffs next argue that the FEC failed to adequately consider the evidence it presented with its two administrative complaints.  Courts must assess whether agencies have considered the "relevant factors" and must "engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'"  *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (quoting *Overton Park*, 401 U.S. at 415).  While the court's review is deferential, it is not required to "rubber-stamp the agency decision."  *Id.*  Here, the court finds that the FEC's Legal & Factual Analyses do not provide any evidence that the FEC considered the relevant factors or took a hard look at the evidence.  Indeed, the FEC fails to cite or discuss virtually any of the evidence submitted with Plaintiffs' complaints.

### a.   *Evidence Submitted With Past Complaints*

The parties agree that some of evidence submitted with the complaints in this case was identical to evidence submitted with prior CPD-related complaints, including MURs 4987, 5004, and 5021, which were reviewed by the court in *Buchanan*.  In those complaints, Plaintiffs presented evidence that the CPD was created by the then-chairmen of the Republican and Democratic parties, who entered into a Memorandum of Agreement that the debates "should be principally and jointly sponsored and conducted by the Republican and Democratic National

Committees," and that the press release announcing the CPD's formation stated it was a "bipartisan . . . organization."  (AR 2244, 2249).

Plaintiffs also submitted numerous statements by the CPD chairmen and directors, including:  the CPD was not likely to look with favor on including third-party candidates in the debates (CPD Co-Chairman Fahrenkopf, AR 2252); the CPD should exclude third-party candidates from the debates (CPD Co-Chairman Kirk, AR 2252); "Democrats and Republicans on the commission [] are interested in the American people finding out more about the two major candidates—not about independent candidates who mess things up" (CPD Director Alan Simpson, AR 3095); "[t]here's no question" that "the two major parties [have] absolute control of the presidential debate process" (CPD Director John Lewis, AR 3095); "responsibility for [the debates] should rest with the political system—with the Democratic and Republican Parties . . . [and] if the Democratic and Republican nominees agreed, other candidates could be included" (CPD Director Minow, AR 3095); the CPD "is not really nonpartisan[;] [i]t's bipartisan" (CPD Director Norcross, AR 3095); and the CPD is "extremely careful to be bi-partisan" (CPD Director Vucanovich, AR 3095).

Finally, Plaintiffs submitted evidence from the 1993 Congressional testimony of Bobby Burchfield, who served as General Counsel of President Bush's re-election campaign in 1992, that the CPD did not want to invite Ross Perot to participate in the 1992 election debates, but "the Bush campaign insisted, and the Clinton campaign agreed, that Mr. Perot and Admiral Stockdale be invited to the debates," after which Perot was included.  (AR 2299–304).

The court in *Buchanan* noted that this evidence of the CPD's alleged partisanship was "not insubstantial" and "[a]n ordinary citizen might easily view the circumstances surrounding the creation of the CPD along with the evidence of major-party influence over the past three

debates as giving some 'reason to believe' that the CPD always has supported, and still does

support, the two major parties to the detriment of all others."  112 F. Supp. 2d at 72.  However,

the court found that Plaintiffs lacked "contemporaneous evidence" specifically relating to the

CPD's decisions regarding the 2000 election debates at issue in that case.  *Id.*

> ### b.  *Plaintiffs' New Evidence*

In this case, Plaintiffs submitted new evidence in addition to the evidence described

above.  Much of this evidence pointed to the recent partisanship of the CPD's chairs and

directors.  According to the submitted materials, CPD Chairman Fahrenkopf donated more than

$23,000 between 2008 and 2012 and $35,000 between 2012 and 2014 to the Republican Party.

(AR 2370, 2373–80).  Similarly, CPD Chairman McCurry donated almost $85,000 to Democrats

between 2008 and 2012.  (AR 2370).  Additionally, several of the CPD directors contributed tens

of thousands of dollars to the two major political parties and candidates.  (AR 2370, 2403–05,

2407–08).  CPD directors also have engaged in active partisanship.  For example, in 2011,

Fahrenkopf referred to the Republican Party as "our great party," and in April 2015, he stated

that the CPD "primarily go[es] with the two leading candidates" in its debates.  (AR 2382–83,

3099).

Plaintiffs also submitted the reports of two experts:  Dr. Clifford Young, who discussed

the ability of third-party or independent candidates to meet the CPD's fifteen percent polling

criterion (AR 2487–526); and Douglas Schoen, who discussed the financial obstacles to

achieving the name recognition necessary for a third-party or independent candidate to meet the

CPD's polling requirement (AR 2552–82).  Finally, in support of their argument that using

polling as the single criterion for admission into the debates is not objective or fair, Plaintiffs in

MUR 6942 submitted evidence that Gallup was no longer polling during the 2016 presidential

election, because polling "has become inherently unreliable."  (AR 4946–76).

### c.   FEC's Consideration of the Evidence

In its two Factual & Legal Analyses, the FEC addressed just two items from this mountain of submitted evidence:  the April 2015 quote from Fahrenkopf that the CPD goes with the two leading candidates in its debates (AR 3180; AR 5008–09), and Gallup's decision to not conduct polling during the 2016 election (AR 5003 n.1).[7]  The FEC accepted on its face Fahrenkopf's declaration that he was merely stating a historical fact (AR 3180; AR 5008–09), and similarly accepted the statement in a declaration submitted by Gallup's Editor-in-Chief that the polling decision was "based on allocation of resources[,] not any lack of confidence in Gallup's ability to conduct accurate polls" (AR 5003 n.1).

At oral argument, when asked why the FEC had only mentioned these two items of evidence, counsel for the FEC stated that this was the only other evidence that "required [a] separate response."  (Tr. at 31:2–14).  A casual reader of  the Factual & Legal Analyses would get the distinct impression that these two pieces of evidence were all that Plaintiffs had even submitted.  Certainly, the court does not expect the FEC to discuss every single page of evidence in order to demonstrate that it had carefully considered the facts, but here the FEC *did not even mention* the vast majority of the substantive evidence submitted regarding partisanship, party support, and the non-objectivity of the CPD's fifteen percent threshold.  While the court hopes that the FEC carefully reviewed the evidence submitted by Plaintiffs before thoughtfully

---

[7]  The court notes with concern that the Fahrenkopf interview quote was presented to the FEC in April 2015 as an amendment to the original September 2014 complaint (*see* AR 3093–96), and the Gallup information was similarly submitted in an amendment in October 2015 (*see* AR 4852–54), rather than with the initial submission of evidence.  The FEC's decision to address only these stray, supplemental pieces of submitted evidence suggests that the FEC may not have considered or even reviewed the originally submitted evidence at all.

reaching its conclusions, the two Factual & Legal Analyses provide no basis whatsoever for the court to reach that conclusion.  Therefore, the court GRANTS Plaintiffs' motion and DENIES Defendant's cross-motion with respect to whether the FEC acted arbitrarily and capriciously and contrary to law by not reasonably considering the evidence before it.  On remand, the FEC must demonstrate how it considered the evidence, particularly, but not necessarily limited to, the newly-submitted evidence of partisanship and political donations and the expert analyses regarding fundraising and polling.

### 3.   FEC's Failure to Include CPD Directors as Respondents

Plaintiffs' two administrative complaints were filed against the CPD, its two co-chairmen, and ten other directors.  The FECA requires that "[w]ithin 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed such a violation."  52 U.S.C. § 30109(a)(1).  Despite the Act's dictate, the FEC only notified the CPD and the two chairmen, only solicited responses from them, and mentioned only them in its Factual & Legal Analyses.  Plaintiffs argue that the FEC's failure to notify the ten other respondents and to consider the evidence and allegations made against them is further indication that the agency's dismissals were arbitrary and capricious.  Despite its clear violation of the Act's procedural requirements, the FEC maintains that this failure amounted to no more than harmless error because this failure "is almost always harmless error."  (Def. Mem. at 30).

In support, the FEC cites *Nader v. FEC*, 823 F. Supp. 2d 53, 67–68 (D.D.C. 2011), which found that under the facts of that case the agency's failure to notify respondents was indeed harmless error because the plaintiff did not "identify the harm to him."  Here, while Plaintiffs' allegations against the ten un-notified respondents were the same as those against the CPD, Fahrenkopf, and McCurry, Plaintiffs did submit new evidence specific to those ten directors

regarding their partisan financial contributions and partisan political activity.  Whether the FEC considered this evidence is essential in assessing the FEC's final determination as to whether the CPD has supported, endorsed, or opposed political parties or candidates.

The FEC may ultimately decide that its conclusions would be the same regarding these ten directors as with the CPD and two chairmen, but from the record before the court, it appears that the FEC did not even consider this evidence or these allegations.  The court cannot brush aside this procedural violation of the Act and determine that it was harmless error, because there is no way for the court to determine that Plaintiffs experienced no harm from having their evidence ignored.  Therefore, the court GRANTS Plaintiffs' motion and DENIES Defendant's cross-motion with respect to whether it was arbitrary and capricious and contrary to law to ignore the allegations made against ten of the CPD's directors in violation of the Act's notification requirements.  On remand, the FEC must notify these ten remaining directors, address these allegations, and consider the evidence presented against these respondents.

### 4.  FEC's Conclusion that the CPD's Polling Criterion Was Objective

Finally, Plaintiffs argue that the FEC's dismissals were arbitrary and capricious because the agency unreasonably found that the CPD's fifteen percent polling criterion was "objective" under the regulation.  The regulation requires that staging organizations such as the CPD "use pre-established objective criteria to determine which candidates may participate in a debate," but does not define what it means for criteria to be "objective." 11 C.F.R. § 100.13(c); *see also Perot v. FEC*, 97 F.3d 553, 559–60 (D.C. Cir. 1996) (regulation "does not spell out precisely what the phrase 'objective criteria' means," giving "the individual organizations leeway to decide what specific criteria to use").  In *Buchanan*, however, the court noted that "the objectivity requirement precludes debate sponsors from selecting a level of support so high that only the

Democratic and Republican nominees could reasonably achieve it."  112 F. Supp. 2d at 74.

In support of their assertion that the fifteen percent requirement was not objective, but instead designed to keep third-party or independent candidates out of the CPD's debates, Plaintiffs submitted evidence that no non-major party nominee had or would have qualified under this requirement since the CPD began staging debates in 1988, as well as the reports of two experts, one of whom found that polling is not inherently reliable, particularly in races with more than two candidates, and the other who concluded that achieving fifteen percent support in polls requires spending about $266 million before the debates even take place.  The FEC gave this evidence only glancing attention, writing in a footnote in both its Factual & Legal Analyses, without reference to any specific evidence or how it came to this conclusion, that "[e]ven if CPD's 15% polling criterion may tend to exclude third-party and independent candidates, the available information does not indicate—as the available information in previous complaints did not indicate—that the CPD failed to use pre-established, objective criteria."  (AR 3181 n.4; AR 5010 n.5).

As discussed above, the court is faced with the difficult task of determining the reasonableness of the FEC's analysis when the FEC did not provide any indication that it actually considered the submitted evidence and engaged in any reasoned decision-making.  This task is made all the more difficult by the fact that the evidence unaddressed—or outright ignored—by the FEC is quite substantial.  Dr. Clifford Young's expert report concluded that for a third-party or independent candidate to achieve fifteen-percent approval in polls, she "must achieve a minimum of 60% [national] name recognition, and likely 80%," (AR 2493), while participation in the Republican or Democratic party primary process affords greater name recognition and even greater reported support in polls due to the "party halo effect" (AR 2500–

20

01).  Dr. Young's report also concluded that election polling, particularly involving third-party

candidates, suffers from "sampling and non-sampling error," including "coverage bias and

measurement error," which make polling of "three-way races [] more error prone than two-way

races."  (AR 2518–19).  He also calculated that, due to these polling errors, a hypothetical

independent candidate with a seventeen percent level of support had a thirty-seven to forty-one

percent likelihood of reporting as under fifteen percent support and thus being excluded from the

debates.  (AR 2519).

Douglas Schoen's report discussed the realities of modern media markets and campaign

spending, and concluded that to achieve name recognition of sixty percent and support of fifteen

percent, an independent candidate "should reasonably expect to spend" approximately 266

million dollars on her campaign—*before* the debates—including "broadcast, cable, and digital

media placement costs."  (AR 2555).  To reach the eighty percent name recognition Dr. Young

found was "likely" necessary to achieve fifteen percent support, Schoen determined that an

independent candidate would have to spend nearly forty million additional dollars, bringing the

total to over $300 million—just to hope to gain access to the CPD's debates, a *de facto*

prerequisite for competing in the presidential election.  (*See* AR 2564).  In Schoen's opinion,

such a spending threshold "is, for all practical purposes, impossible for all but the major-party

candidates" in part because of competition with the nominating processes of the major parties,

the potential lack of ties with media networks and broadcast companies, and a lack of media

interest in third-party candidates prior to the debates.  (AR 2556).

Given these expert analyses, the evidence that since 1988 only one non-major party

candidate, Ross Perot, has participated in the debates, and only then at the request of the two

major parties, and the evidence that the CPD's chairmen and directors are actively invested in the

partisan political process through large donations, the court is perplexed that the full extent of the

FEC's analysis consisted of no more than a footnote stating that even if the fifteen percent

threshold excluded third-party candidates, this still did not indicate that it was not an objective

criterion.   (*See* AR 3181 n.4; AR 5010 n.5).  This begs the question:  if under these facts the

FEC does not consider the fifteen percent polling criterion to be subjective, what would be?

Unfortunately, the FEC articulated no analysis, and the court cannot discern the FEC's

reasoning.

      In its briefs on this issue, the FEC again relies heavily on the district court's decision in

*Buchanan* sixteen years ago.  In that case, the court found that the FEC's conclusion that the

CPD's polling threshold was objective was not arbitrary and capricious.  111 F. Supp. 2d at 76.

As the court in *Buchanan* noted, the record before it regarding the objectivity of the polling

threshold was limited to the plaintiffs' arguments that federal funding eligibility for presidential

candidates is tied to a much lower five percent threshold, that polling is inexact because "even

the best polls have significant margins of error," and that pre-debate polls fail to reflect the level

of support that could result from participation in the debates themselves.  *See id.* at 73–76.  Here,

however, the record is far more developed and involves different and considerably stronger

evidence.  The FEC's reliance on the holding in *Buchanan* is thus misplaced.

      With regard to Plaintiffs' arguments on the objective criteria, the FEC's Factual & Legal

Analyses suffer from two notable flaws.  First, there is no discussion, or even mention, of

Plaintiffs' substantial and lengthy evidence and arguments.  Second, there appears to be little to

no legal analysis applying the agency's regulation.  Missing from the single footnote that the

FEC devoted to this issue is any explanation as to how it reached its conclusion, what it

considered, what analysis it engaged in, and any other information that would allow the court to

find the FEC's conclusions were the result of reasoned decision-making.  The court therefore GRANTS Plaintiffs' motion and DENIES Defendant's cross-motion as to whether the FEC's analysis of the criterion's objectivity was arbitrary and capricious and contrary to law.  While the court cannot and does not mandate that the FEC reach a different conclusion on remand, the court notes that the weight of Plaintiffs' evidence is substantial, and the FEC must demonstrate that it actually considered the full scope of this evidence, including the CPD chairmen's and directors' partisan political activity and the expert reports, as well as explain how and why it rejected this evidence in deciding that the CPD's polling requirement is an objective criterion.

In sum, with respect to Plaintiffs' allegation that the FEC acted arbitrarily and capriciously and contrary to law when it dismissed their two administrative complaints, this court agrees and grants their motion for summary judgment and denies Defendant's cross-motion. Pursuant to the Act, 52 U.S.C. § 30109(a)(8)(C), the FEC is ORDERED to reconsider the evidence and allegations and issue a new decision consistent with this Opinion "within 30 days, failing which the complainant[s] may bring, in the name of such complainant[s], a civil action to remedy the violation involved in the original complaint."

### B.  FEC's Decision to Not Engage in Rulemaking

LPF also moves for summary judgment on its claim that the FEC's decision not to initiate rulemaking was arbitrary and capricious in violation of the APA.[8]  The court's review of an agency's decision not to engage in rulemaking is very limited, and that decision "is at the high

---

[8]  The FEC contends that the Green Party is barred from challenging the FEC's refusal to engage in rulemaking following the denial of the Petition because "it previously litigated the question" of whether 11 C.F.R. § 110.13 is contrary to the FECA.  (FEC Mem. at 35).  The court disagrees. The claim here is about the refusal to engage in rulemaking, not whether a regulation is unlawful under the Act, and more importantly, this claim is brought by LPF alone, not by the Green Party. (*See* Second Am. Compl. ¶¶ 142–44; Pls. Rep. at 17 n.6).

end of the range of levels of deference we give to agency action under our 'arbitrary and capricious' review." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (internal quotation omitted). The proper inquiry is "whether the agency employed reasoned decision-making in rejecting the petition." *Id.* In making this assessment, the court "must examine 'the petition for rulemaking, comments pro and con . . . and the agency's explanation of its decision to reject the petition." *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987) (quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 817–18 (D.C. Cir. 1981)). An order to overturn the agency's decision and require promulgation of a rule is reserved for only "the rarest and most compelling of circumstances." *WWHT*, 656 F.2d at 818. However, if the agency fails to provide a reasonable explanation for its decision, an appropriate remedy may be a remand to the agency for reconsideration and publication of a new decision or the commencement of rulemaking if the agency so decides. *See, e.g.*, *Shays v. FEC*, 424 F. Supp. 2d 100, 116–17 (D.D.C. 2006).

In its Petition requesting rulemaking, LPF requested the following:

> The FEC should conduct a rulemaking to revise and amend 11 C.F.R. § 110.13(c), the regulation governing the criteria for candidate selection that corporations and broadcasters must use in order to sponsor candidate debates. The amendment should (A) preclude sponsors of general election presidential and vice-presidential debates from requiring that a candidate meet a polling threshold in order to be admitted to the debates; and (B) require that any sponsor of general election presidential and vice-presidential debates have a set of objective, unbiased criteria for debate admission that do not require candidates to satisfy a polling threshold to participate in debates.

(AR 0009–10). In support of this request, LPF presented much of the same evidence, including the Young and Schoen reports, as it presented in support of its administrative complaint. LPF's basic argument is that the use of a single polling criterion to determine admission to candidate debates is particularly susceptible to excluding candidates and

24

lending support to the two major party candidates, creating an appearance of corruption or unlawful conduct.  LPF therefore argues that in the unique context of presidential and vice-presidential debates, which are run solely by the CPD, the FEC should continue permitting the CPD or future debate staging organizations to craft their own objective criteria but disallow the use of polling thresholds.  The FEC received 1,264 comments, and only one—from the CPD—opposed the Petition.  (AR 1903).  FEC published its Notice of Disposition in the Federal Register, notifying the public that it had declined to engage in rulemaking and stating its reasoning.

In its Notice, the FEC first noted that "the purpose of section 110.13 . . . is to provide a specific exception so that certain nonprofit organizations . . . and the news media may stage debates, without being deemed to have made prohibited corporate contributions to the candidates taking part in debates."  (AR 1904).  It stated that "debate staging organizations may use [objective selection criteria] to control the number of candidates participating in . . . a meaningful debate but must not use criteria designed to result in the selection of certain pre-chosen participants," and "[t]he choice of which objective criteria to use is largely left to the discretion of the staging organization."  (*Id.* (internal quotations omitted)).  Moreover, the agency stated that the regulation "is not intended to maximize the number of debate participants" but instead "is intended to ensure that staging organizations do not select participants in such a way that the costs of a debate constitute corporate contributions to the candidates taking part."  (*Id.*).  The FEC therefore found "that section 110.13(c) in its current form provides adequate regulatory implementation of the corporate contribution ban and is preferable to a rigid rule that would prohibit or mandate use of particular debate selection criteria in all debates."  (*Id.*).

In response to the specific evidence that CPD's use of the fifteen percent polling threshold has the result of excluding third-party and independent candidates, the FEC stated only that "[t]he use of polling data by a single debate staging organization for candidate debates for a single office . . . does not suggest the need for a rule change." (AR 1905).  It further acknowledged that a "polling threshold could be used to promote or advance one candidate (or group of candidates) over another," but noted that "this would already be unlawful under the Commission's existing regulation," and "the Commission can evaluate the objectivity and neutrality of a debate sponsor's selection criteria through the enforcement process."  (AR 1904–05).  The FEC did not explain why the enforcement process was preferable.

The FEC also did not explain why it was rejecting the Petition's request for a specific debate rule for presidential and vice-presidential debates.  Instead, it responded to the Petition as if it requested a general rule change (which the Petition did not), only stating, again without any additional explanation or analysis, that "[i]n the absence of any indication that polling thresholds are inherently unobjective or otherwise unlawful as applied to all federal elections . . . the Commission declines to initiate a rulemaking that would impose a nationwide prohibition on the use of such thresholds."  (AR 1905).

As with the above review of the FEC's dismissals, the court must accord substantial deference to the agency's decisions.  However, the court is again concerned at the agency's cursory treatment of Plaintiff LPF's Petition, its arguments, and its evidence.  LPF clearly argued, and attempts to establish with significant evidence, that in presidential elections CPD's polling threshold is being used subjectively to exclude independent and third-party candidates, which has the effect of allowing corporations to channel money to the CPD's expenditures to the

26

campaigns they would be prohibited from giving the campaigns directly.  It further argued and presented evidence that polling thresholds are particularly unreliable and susceptible to this type of subjective use at the presidential level, undermining the FEC's stated goal of using "objective criteria to avoid the real or apparent potential for a *quid pro quo*, and to ensure the integrity and fairness of the process."  In its Notice, the FEC brushed these arguments aside, describing the practice as "[t]he use of polling data by a single debate staging organization for candidate debates for a single office."  (AR 1905).  This characterization makes little sense.  Referring to the CPD as just "a single debate staging organization" ignores the fact that for thirty years it has been the only debate staging organization for presidential debates; similarly, referring to the presidential debates as simply "debates for a single office" ignores that the entire Petition is aimed at the unique characteristics of presidential elections and debates.

In light of the court's conclusions above that the FEC acted arbitrarily and capriciously in its enforcement decisions by failing to address evidence or articulate its analysis, the court views with some skepticism the FEC's assertion that rulemaking is unnecessary because the agency has chosen to root out subjective debate criteria through the enforcement process.  By citing past practice—and the *Buchanan* decision—as its only response to LPF's Petition, the FEC appears to have stuck its head in the sand and ignored the evidence that its lack of rulemaking and lack of enforcement may be undermining the stated purpose of its regulations and the Act.  This is not the reasoned decision-making that is required of all agencies.  Therefore, despite the deferential standard of review, this court concludes from reviewing the Petition and Notice of Disposition that the FEC acted arbitrarily and capriciously by refusing to engage in rulemaking without a thorough consideration of the presented evidence and without explaining its decision.

The decision in *Shays v. FEC* is instructive, and the court reaches a similar conclusion

here.  The FEC's failure to provide a reasoned and coherent explanation for its decision requires remand for reconsideration.  However, the court will not order the FEC to promulgate the rule requested in the Petition based on the record here.  Such a remedy is appropriate in "only the rarest and most compelling of circumstances."  *WWHT*, 656 F.2d at 818.  The D.C. Circuit has found such circumstances when an agency refused rulemaking despite new evidence and behavior that "strongly suggest[ed] that it ha[d] been blind to the nature of [its] mandate from Congress."  *Am. Horse Prot. Ass'n*, 812 F.2d at 7.  While the FEC's refusal to engage in thoughtful, reasoned decision-making in either enforcement or rulemaking in this case may strike some, including Plaintiffs, as being "blind to the nature of [its] mandate from Congress," this court will not take the extraordinary step of ordering promulgation of a new rule, but instead will permit the FEC a second opportunity to give the Petition the consideration it requires.

LPF's motion is therefore GRANTED as to its rulemaking petition, and Defendant's cross-motion is DENIED.  The FEC is ORDERED to reconsider the Petition for Rulemaking and issue a new decision consistent with this Opinion within sixty days.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED in full, and Defendant's cross-motion is also DENIED.

Date:  February 1, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge