**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEVEL THE PLAYING FIELD
P.O. Box 25554
Alexandria, VA 22313

PETER ACKERMAN
1775 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006

GREEN PARTY OF THE UNITED STATES
6411 Orchard Avenue
Suite 101
Takoma Park, MD 20912

LIBERTARIAN NATIONAL COMMITTEE,
    INC.
1444 Duke Street
Alexandria, VA 22314

                    Plaintiffs,

          v.

FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463

                    Defendant.

Civil Action No.: <u>15-1397 (TSC)</u>

<u>**SUPPLEMENTAL COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Level the Playing Field, Dr. Peter Ackerman, Green Party of the United States

and Libertarian National Committee, Inc. ("Plaintiffs") bring this action for declaratory and

injunctive relief and allege as follows:

**INTRODUCTION**

1.     As this Court has recognized, there is a "mountain" of evidence supporting Plaintiffs' claim that the CPD's debate-selection criteria are rigged in favor of Democrats and Republicans and against independent candidates.[1]  The CPD's directors and officers include staunch partisans who have no qualms about their favoritism toward the Democratic and Republican parties.  They have lavished Democratic and Republican candidates with substantial cash contributions, publicly endorsed these candidates, served in high-ranking positions in the Democratic and Republican parties and the offices of their elected officials, raised money for these officials, and funneled hundreds of thousands of dollars to them as lobbyists.  The CPD's directors have confirmed on multiple occasions that the Democratic and Republican parties decide who participates in the debates and that it is the CPD's goal to exclude independent candidates.  It is therefore unsurprising that the CPD has established debate-qualifying criteria designed to achieve that goal, and that Plaintiffs' experts present empirical proof that the criteria are demonstrably biased against independent candidates.

2.     As the Court has also recognized, the FEC "appears to have stuck its head in the sand and ignored the evidence" that the process is rigged.  When Plaintiffs filed administrative complaints challenging the CPD's debate-selection criteria and petitioned for a rulemaking, the FEC ignored the evidence and summarily rejected these applications.  Plaintiffs then instituted this action challenging the FEC's decisions.  On summary judgment, this Court held that "the FEC acted arbitrarily and capriciously and contrary to law," and remanded the matter to the FEC.

---

[1]     Throughout this Complaint, the term "independent candidate" refers to candidates who are unaffiliated with any political party as well as candidates who are affiliated with political parties other than the Democratic and Republican parties, including but not limited to the Green Party of the United States and the United States Libertarian Party.

While it did not "mandate that the FEC reach a different conclusion on remand, the court note[d] that the weight of Plaintiffs' evidence is substantial, and the FEC must demonstrate that it actually considered the full scope of this evidence."

3.      Predictably, following remand, the FEC has now reached the exact same conclusions as before, again voting to dismiss the complaints and reject the rulemaking petition. And it is readily apparent from the FEC's post-remand decisions that the FEC did *not* "actually consider[] the full scope" of Plaintiffs' evidence—far from it.  The FEC continues to disregard much of this evidence, and its treatment of the remainder is frivolous.

4.      The post-remand decisions do not and cannot explain the overwhelming evidence demonstrating the partisanship of the CPD's members, including the multitude of endorsements, campaign contributions, and concessions that the CPD is "not likely to look with favor on including third-party candidates in the debates."  Most of this evidence remains unaddressed, and what the FEC does say about the evidence is laughable.  For example, one director who characterized the CPD as "bipartisan" now claims that she really meant to say it was "nonpartisan"—even though the term "bipartisan" by definition "involv[es] cooperation, agreement, and compromise *between two major political parties*."  Yet the FEC rotely accepts her explanation and others like it.

5.      The FEC's treatment of Plaintiffs' expert evidence is equally frivolous.  For example, the FEC purports to criticize one of Plaintiffs' experts, William Young, for relying on "early primary" polling.  Yet the Young report on its face uses "late primary" and "general" election polling which confirms Young's conclusions.  Thus, even now, it appears that the FEC has not even read this expert's report, let alone given it the careful consideration that this Court demanded.

6.      Similarly, in critiquing the conclusion of Plaintiffs' other expert, Douglas Schoen, that independent candidates have difficulty attracting earned media, the FEC presents a purported analysis of a Westlaw news database in which it claims that Libertarian Party candidate Gary Johnson received substantial press in 2016.  But the FEC apparently did not review the results of its news searches, or consider that "Gary Johnson" is a common name, because its "analysis" cites articles about dozens of Gary Johnsons who are not the presidential candidate, including athletes, chefs, museum presidents, criminals, doctors, lawyers, musicians and law enforcement officials all named Gary Johnson.  This is but one of the many falsehoods underlying the FEC's purported rejection of Schoen's conclusions.

7.      Tellingly, insofar as the FEC now cites any evidence to justify the outcome, that evidence largely post-dates the FEC's original decisions dismissing the administrative complaints and rejecting the rulemaking petitions.  This shows that the FEC had no basis for those decisions at the time it made them, and merely invented a rationale after realizing that this Court would not rubber stamp yet another attempt to sweep the CPD's partisanship under the rug.

8.      What is even more telling about the FEC's post-remand decisions is how little they do to actually defend the 15% polling criterion.  While the FEC quibbles with Plaintiffs' evidence, it offers no justification of its own for a polling criterion so high that, since the CPD's inception, no independent presidential candidate has satisfied it.  As this Court observed, given "the evidence that since 1988 only one non-major party candidate . . . has participated in the debates, and only then at the request of the two major parties, and the evidence that the CPD's chairmen and directors are actively invested in the partisan political process through large donations," it is "perplex[ing]" that the FEC is so quick to deem the CPD's criteria "objective."

"This begs the question:  if under these facts the FEC does not consider the fifteen percent polling criterion to be subjective, what would be?"  The Court will search the FEC's post-remand decisions in vain for an answer to its question.

9.      Accordingly, Plaintiffs now petition for relief from the post-remand decisions. They request that the Court:

a.      Declare that the FEC's dismissals of Plaintiffs' administrative complaints were arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, and direct the FEC, within 30 days, to find that the CPD has violated 11 C.F.R. § 110.13 by staging candidate debates in a partisan manner and without pre-established, objective criteria; violated 52 U.S.C. § 30118(a) by making prohibited contributions and expenditures; and violated 52 U.S.C. §§ 30103 and 30104 by failing to register as a political committee and by failing to make required reports and disclosures; and

b.      If the FEC fails to so act, authorize Plaintiffs to bring a civil action against the CPD, its executive director, and the directors who have participated in these violations of federal election law to remedy those violations; and

c.      Declare the FEC's denial of the petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, and order the FEC to open a rulemaking to revise its rules governing presidential debates to ensure that debate sponsors do not unfairly exclude independent and third-party candidates from participating.

## BACKGROUND

10.     Plaintiffs hereby incorporate, repeat and reassert the allegations in Paragraphs 1-137 of the Second Amended Complaint (ECF No. 25) as though fully set forth herein.[2]

11.     Plaintiffs commenced this action on August 27, 2015.  Plaintiffs amended their complaint on October 22, 2015, and filed their Second Amended Complaint on January 5, 2016. The Second Amended Complaint alleges that the FEC's dismissals of Plaintiffs' administrative complaints were arbitrary, capricioius, an abuse of discretion, and otherwise not in accordance with law under 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 706.  The Second Amended Complaint further alleges that the FEC's denial of LPF's petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under 5 U.S.C. § 706.

12.     On April 6, 2016, Plaintiffs moved for summary judgment.  On May 4, 2016, the FEC opposed Plaintiffs' motion and filed a cross-motion for summary judgment.

13.     On February 1, 2017, this Court entered a Memorandum Opinion denying the FEC's motion and awarding summary judgment to Plaintiffs as to both the dismissal of the administrative complaints and LPF's rulemaking petition.  *Level the Playing Field v. Fed. Election Comm'n*, No. 15-cv-1397 (TSC), 2017 WL 437400 (D.D.C. Feb. 1, 2017).  The Court

---

[2]     Since the Second Amended Complaint was filed, CPD's leadership has changed in ways that do not affect the outcome of this action.   Specifically, director Dorothy Ridings has reportedly replaced Mike McCurry as co-chair, but McCurry remains on the board.  Like McCurry, Ridings has supported Democratic candidates and has expressed her preference for "the two-party system."  The composition of the board has also changed slightly, with Alan Simpson, Mitch Daniels and Leon Panetta having departed and Jim Lehrer having recently joined.  In addition, the FEC's leadership remains unchanged except that Commissioner Ann Ravel departed in March 2017.

remanded the matter to the FEC with instructions to explain the reasoning behind its dismissal of the complaints and refusal to institute a rulemaking.

14.     Specifically, the Court held that the FEC's dismissal of the administrative complaints was "arbitrary and capricious" and "contrary to law" in four respects.  First, the Court held that "the FEC did not articulate what standard it used to determine whether the CPD had endorsed, supported or opposed political parties—indeed, it did not mention these terms at all except in quoting the regulation and the respondents' denials that they had endorsed, supported or opposed political parties."  *Id*. at *5.  The Court determined that, "in the absence of any articulated standard or analysis, the FEC's reliance on its past dismissals and the *Buchanan* case strongly implies that it has effectively adopted or relied on the control test it articulated in those past dismissals," even though the "control" test "is contrary to the plain text of the regulation." *Id*. at *5-6.  Consequently, the FEC "acted arbitrarily and capriciously and contrary to law when it determined that the CPD did not endorse, support or oppose political parties in the 2012 election."  *Id*. at *6.  The Court held that, "[o]n remand, the FEC is ordered to articulate its analysis in determining whether the CPD endorsed, supported or opposed political parties or candidates."  *Id*.

15.     Second, the Court held that "the FEC failed to adequately consider the evidence [Plaintiffs] presented with [their] two administrative complaints."  *Id*. at *6-8.  The Court recognized that this "mountain" of evidence was "quite substantial," and found "that the FEC's Legal & Factual Analyses do not provide any evidence that the FEC . . . took a hard look at the evidence."  *Id*. at *6-8, *10.  Consequently, the Court ordered that, "on remand, the FEC must demonstrate how it considered the evidence," including "the newly-submitted evidence of

partisanship and political donations and the expert analyses regarding fundraising and polling."
*Id.* at *8.

16.     Third, the Court determined that the FEC violated FECA by failing to notify ten
CPD directors about the complaints.  FECA requires that "[w]ithin 5 days after receipt of a
complaint, the Commission shall notify, in writing, any person alleged in the complaint to have
committed . . . a violation" of FECA.  52 U.S.C. § 30109(a)(1).  The administrative complaints
here were brought against the CPD, its co-chairs, and ten other directors, and cited "new
evidence specific to those ten directors regarding their partisan financial contributions and
partisan political activity."  *Level the Playing Field*, 2017 WL 437400, at *9.  But "the FEC only
notified the CPD and the two chairmen [about the complaints], only solicited responses from
them, and mentioned only them in its Factual & Legal Analyses."  *Id.* at *8.  And the record
indicated "that the FEC did not even consider" the evidence "specific to th[e] ten directors" or
"the[] allegations" against them.  *Id.* at *9.  Accordingly, the Court determined that the FEC had
committed a "procedural violation of the Act" and ordered the FEC to "notify these ten
remaining directors, address these allegations and consider the evidence presented against these
respondents."  *Id.*

17.     Fourth, the Court agreed with Plaintiffs that "the FEC's dismissals were arbitrary
and capricious because the agency unreasonably found that the CPD's fifteen percent polling
criterion was 'objective' under the regulation."  *Id.*  Here again, "the FEC did not provide any
indication that it actually considered the submitted evidence and engaged in any reasoned
decision-making."  *Id.* at *10.  Because "the weight of Plaintiffs' evidence is substantial," the
Court held that on remand, "the FEC must demonstrate that it actually considered the full scope
of this evidence, including the CPD chairmen's and directors' partisan political activity and the

expert reports, as well as explain how and why it rejected this evidence in deciding that the
CPD's polling requirement is an objective criterion." *Id.*

18.     The Court reached similar conclusions with respect to the rulemaking decision.  It
found that the FEC failed to adequately respond to "the specific evidence that CPD's use of the
fifteen percent polling threshold has the result of excluding third-party and independent
candidates." *Id.* at *12.  The Court expressed particular "concern[] at the agency's cursory
treatment" of evidence that the 15% rule "is being used subjectively to exclude independent and
third party candidates" and that "polling thresholds are particularly unreliable and susceptible to
this type of subjective use." *Id.*  As the Court recognized, "the FEC appears to have stuck its
head in the sand and ignored the evidence that its lack of rulemaking and lack of enforcement
may be undermining the stated purpose of its regulations and the Act." *Id.* at *13.  Accordingly,
the Court found that "the FEC acted arbitrarily and capriciously by refusing to engage in
rulemaking without a thorough consideration of the presented evidence," and ordered the FEC to
"give the Petition the consideration it requires" on remand. *Id.*

19.     In a subsequent motion for clarification, Plaintiffs "request[ed] that the court
expressly retain jurisdiction over this matter pending the remand to the FEC, in order to allow
them to bring an additional challenge if necessary." (ECF No. 64 at 3).  On February 10, 2017,
the Court granted Plaintiffs' motion and expressly "retain[ed] jurisdiction pending remand" to
hear "any further claims Plaintiffs bring regarding the FEC's reconsideration on remand." (*Id.*).

20.     On March 23, 2017, the FEC again voted to deny Plaintiffs' petition for
rulemaking.  On March 29, the FEC entered a decision in the Federal Register purporting to
explain why it had reached the same result as before.  That same day, the FEC again voted to

dismiss Plaintiffs' administrative complaints, and issued a "Legal and Factual Analysis"

purporting to justify the dismissals.

### THE FEC FAILED TO ADEQUATELY EXPLAIN ITS DISMISSAL OF THE ADMINISTRATIVE COMPLAINTS

21.     The Court ordered the FEC to issue a decision explaining why it did not act

arbitrarily, capriciously, and contrary to law when it dismissed the administrative compaints.

Specifically, the FEC was required to (1) elaborate upon the standard it used to determine

whether the CPD endorsed, supported, or opposed political parties, (2) demonstrate its reasoned

consideration of Plaintiffs' evidence, (3) notify the 10 CPD directors and address the allegations

and evidence presented against them, and (4) explain why the CPD's polling requirement is

objective.  The FEC's post-remand Legal and Factual Analysis meets none of these

requirements.  For reasons including but not limited to those set forth below, the Factual and

Legal Analysis is arbitrary, capricious, and contrary to law.

### A.     The FEC Failed To Articulate The Standard It Used

22.     The Factual and Legal Analysis does not "articulate what standard [the FEC] used

to determine whether the CPD had endorsed, supported or opposed political parties." *Level the*

*Playing Field*, 2017 WL 437400, at *5.  As the Court made clear, bare recitation of the

regulation's "endorse, support, or oppose" language is not enough.  *See, e.g.*, *id.* (when

previously asked "how the FEC actually engaged in an analysis to determine whether the CPD

endorsed, supported or opposed political campaigns or parties, FEC's counsel responded simply,

though unhelpfully, that 'the FEC applied the endorsed, support, opposed standard that's in the

regulation'").  The FEC was instead required to *explain* this standard.  Yet the Factual and Legal

Analysis offers no such explanation; it merely claims that "the meaning of this standard is plain

on its face," without clarifying what that supposed "plain meaning" is.  (Factual and Legal

Analysis at 12).  The FEC's tautological definition fails to elucidate what the FEC means when it claims that the CPD does not "endorse, support, or oppose" candidates, and disregards this Court's demand for an explanation.

23.     Moreover, the Factual and Legal Analysis indicates that the FEC continues to use the "'control' standard that is contrary to the plain text of the regulation," notwithstanding the FEC's purported assurance that the standard is inapplicable.  *Level the Playing Field*, 2017 WL 437400, at *6.  In the prior proceedings, the FEC "strongly implie[d]" that it had "effectively adopted" this improper standard by relying upon "its past dismissals of administrative complaints involving the CPD . . . as well as the single prior district court decision that considered the denials, *Buchanan v. FEC*, [112 F. Supp. 2d 58 (D.D.C 2000)]."  *Id.* at *5.  Yet, in the Factual and Legal Analysis, the FEC *again* relies upon these same prior dismissals and the *Buchanan* case.  (Factual and Legal Analysis at 14).  Indeed, the Factual and Legal Analysis directly quotes from *Buchanan*, claiming that there is no "contemporaneous evidence of *influence* by the major parties."  (*Id.*) (emphasis supplied).  In other words, the FEC remains focused on whether the major parties *control* the CPD, thereby contravening "the plain text of the regulation."  *Level the Playing Field*, 2017 WL 437400, at *6.

**B.     The FEC Failed To Demonstrate How It Considered The Evidence**

24.     The FEC fares no better when purporting to address the "mountain of submitted evidence" supporting the administrative complaints.  *Id.* at *8.  This includes (1) the numerous inculpatory statements by CPD directors and the other evidence of their partisan activities; (2) the expert analyses of Clifford Young and Douglas Schoen demonstrating the insurmountable hurdles facing independent candidates attempting to satisfy the 15% criterion; and (3) the CPD's ability to cherry-pick polls that disfavor independent candidates and ensure they do not

11

participate in the debates.  The FEC continues to disregard much of this evidence, and its

response to the remainder is arbitrary and capricious.

<em>The Partisan Statements and Activities Of The CPD And Its Members</em>

25.     The FEC specifically addresses only a handful of the numerous inculpatory

statements and partisan acts of the CPD's officers and directors.  First, at its inception,

Fahrenkopf and Kirk agreed that the CPD was "formed . . . by the National Republican and

Democratic Committees," that "future [debates] should be principally and jointly sponsored and

conducted by the Republican and Democratic National Committees," and that "all future

presidential debates" would be "between the nominees of the two political parties."  According

to the Factual and Legal Analysis, "it is not clear that, in context, these . . . past statements

constitute an endorsement of, or support for, the Democratic and Republican parties."  (Factual

and Legal Aanlysis at 15).  But the FEC does not explain how these statements could be

interpreted any other way.  The Factual and Legal Analysis purports to rely upon Frank

Fahrenkopf's March 2017 affidavit, but this affidavit confirms that Fahrenkopf's "goal" was to

"secur[e] the commitment of both major party nominees to debate"—a quintessential

"bipartisan" objective.  (*Id*. (citing CPD Dir. Resp. Ex. 1, ¶ 10)).

26.     Even less convincing is the FEC's "analysis" of two more recent statements by

CPD directors.  The first is Barbara Vucanovich's characterization of the CPD as "bi-partisan."

The FEC purports to rely upon an affidavit from Vucanovich claiming that when she "used the

word 'bi-partisan,'" she really meant "non-partisan."  (*Id*.).  But that is absurd.  By definition,

"bipartisan" means  "marked by or involving *cooperation, agreement, and compromise between*

*two major political parties*" or "of, relating to, or involving members of *two parties*."[3]  In other words, "bipartisan" means *the opposite* of "nonpartisan," and it was arbitrary and capricious of the FEC to blithely accept Vucanovich's contrary claim.

27.    Likewise, the FEC takes at face value Fahrenkopf's wholly implausible explanation for why he said the CPD has a "system" that "primarily go[es] with the two leading candidates" from "the two political part[ies]."  Fahrenkopf gave this answer in response to a question about "the prospects" of having more than two particiants in a presidential debate. Even though the question on its face was prospective, the FEC chose to credit Fahrenkopf's self-serving claim that he was making "an assertion of historical fact."  (Factual and Legal Analysis at 18).  That conclusion was both facially untenable and wholly unreasonable in light of Fahrenkopf's history and current role as an active Republican partisan, his past campaign contributions, his public comments espousing his support for and affiliation with the Republican party, and his work as a lobbyist for an organization that donated over $150,000 to Democratic and Republican candidates in the 2011-12 election cycle alone.  Likewise, the FEC's suggestion that Fahrenkopf may act in a partisan fashion if he believes it serves the "public benefit" is nothing less than an admission that the FEC actively condones the CPD's partisan bias.

28.    The Factual and Legal Analysis does not specifically address the remaining evidence of the CPD's partisan activities, including:

- Fahrenkopf's statement that the CPD was "not likely to look with favor on including third-party candidates in the debates";

- Alan Simpson's comment that "Democrats and Republicans on the commission [] are interested in the American people finding out more about the two major candidates—not about independent candidates who mess things up";

---

[3]      https://www.merriam-webster.com/dictionary/bipartisan (emphasis supplied).

- John Lewis' comment that "the two major parties [have] absolute control of the presidential debate process";

- Newton Minow's view that "other candidates could be included" in the debates only if "the Democratic and Republican nominees agreed";

- David Norcross' concession that the CPD is "not really nonpartisan. It's bipartisan."

- Congressional testimony that the Democratic and Republican parties determine who participates in the debates;

- Fahrenkopf's reference to the Republican Party as "our great party";

- The tens of thousands of dollars that the CPD's co-chairs and directors have donated to Democratic and Republican campaigns; and

- The lobbying efforts of CPD directors on behalf of industries that funneled hundreds of thousands of dollars to Democratic and Republican candidates.

29.     The FEC instead sweeps all of this evidence under the rug by claiming that the CPD members acted in a "personal" rather than "official" capacity, such that their conduct should not be attributed to the CPD. This argument elevates form over substance. It is undisputed that the CPD can and does only act through its personnel—*i.e.*, the same staunch partisans who actively promote partisan causes and have conceded time and again that they view the CPD as a partisan organization. For example, it would make no sense to suggest that, when Fahrenkopf recently admitted that the CPD's "system" is designed to include only "the two political party candidates," he was speaking only in a "personal" capacity. Fahrenkopf founded the organization and has run it for three decades; Frank Fahrenkopf *is* the CPD, and he obviously does not operate the CPD any differently from the way he described.

30.     In any event, the FEC does not even really believe that the CPD as an organization is untainted by the partisanship of its directors. It never made such an argument in any of the prior CPD-related cases, including *Buchanan*. To the contrary, in its dismissal of the administrative complaint in MUR 5414, the FEC observed that certain statements made by CPD

14

director Alan Simpson about excluding independent candidates from the CPD's debates "raise[d]

questions" about the CPD's opposition to independent candidates.  And during summary

judgment briefing in this case, the FEC similarly recognized that the behavior of the leaders of a

debate staging organization is highly probative of whether that organization is partisan in

violation of § 110.13(a).

   31. In a last-ditch attempt to circumvent Plaintiffs' evidence, the CPD now claims for

the first time that "[i]t has long been the informal policy of the CPD that Board Members are to

refrain from serving in any official capacity with a political campaign."  (Factual and Legal

Analysis at 20-21 (citing CPD Dir. Resp. Ex. 4, ¶ 6)).  It is curious that the CPD never thought to

mention this until now, but in any event, the alleged "informal policy" is meaningless.  By its

nature, an "informal policy" is one that is not enforced.  Indeed, the CPD directors have

repeatedly violated this alleged "informal policy"; Fahrenkopf himself did so as recently as May

2017, when it was announced that he would serve as "co-chair" of a "fundrais[ing]" event for

Nevada Republican Attorney General Adam Laxalt.  Moreover, the "informal policy" only

purports to prohibit supporting "political campaigns" in "an official capacity."  That would still

allow the CPD members to endorse candidates, contribute to their campaigns, attend campaign

functions, raise money for political candidates, campaign on their behalf, "unofficially" consult

campaigns, and support either the Democratic or Republican parties in ways not connected to a

particular campaign.  This, of course, is precisely what the FEC has allowed the CPD's directors

to do for the past three decades.

   32. Similarly, the CPD now claims to also have a previously undisclosed "formal

political activities policy" that is "intended to deter CPD-affiliated persons from participating,

even in a personal capacity, in the political process at the presidential level."  (Factual and Legal

Analysis at 20 (citing CPD Dir. Resp. Ex. 4, ¶ 7)).  The CPD thereby tacitly admits that it was improper for its personnel to engage such activities—if they were truly blameless, why adopt a policy prohibiting them?  Indeed, the policy was supposedly adopted not long after the original action challenging the FEC's dismissal of the administrative complaints was filed.  Moreover, the CPD never supplied this alleged policy to the FEC.  All the FEC received was the one-sentence description quoted above, which the FEC was apparently content to rely upon.  Even that cursory description reveals that the policy does not actually prohibit partisan activities, and is at most "intended to deter" them.  It was arbitrary and capricious for the FEC to rely on the curiously-timed announcement of a previously undisclosed "policy" that the CPD continues to withhold from the FEC and, by the CPD's own reckoning, is as toothless as the aforementioned "informal policy" that the CPD's co-chairman openly flouts.

*The Young Report*

33.     The Young Report showed that a candidate must, on average, obtain name recognition of at least "60-80%" among the "American public" in order to potentially achieve 15% in the polls.  The Factual and Legal Analysis offers nothing to undermine this conclusion. Instead, it responds with two non sequiturs:  that (1) "polling results are not merely a function of name recognition," because there are other things that could make a candidate "unpopular"; and (2) a single "YouGov" poll allegedly showing that Gary Johnson achieved 63% name recognition in 2016.  (Factual and Legal Analysis at 24).  Neither of these arguments addresses, let alone refutes, Young's conclusion.

34.     As to the first argument, Young found that at least 60% name recognition is *necessary* to reach 15% in the polls.  Young never suggested that it was *sufficient*, such that anyone who achieves this level of name recognition will automatically attract 15% support.

16

Rather, widespread name recognition is merely the first of many hurdles that an independent candidate would face when attempting to satisfy the CPD's polling criterion.  Of course there are factors beyond name recognition that might influence a candidate's popularity, as Young himself acknowledges.  But that does not undermine Young's point—that a candidate must *first* become "known" before he or she can be "liked," and 60-80% name recognition is what is required.

35.   Gary Johnson never achieved this level of name recognition.  Young found that, on average, a candidate needs 60-80% name recognition among *the population at large*.[4]  The "YouGov" poll cited by the FEC was for *a subset of those eligible to vote*, and not the population at large.  And even if the "YouGov" poll supported the FEC's argument (it does not), the FEC cherry-picked that poll to create a misleading impression of Johnson's name recognition.  The FEC ignored two other polls, each taken within approximately two months of the "YouGov" poll, in which little more than *one-third* of Americans regonized Gary's Johnson's name.  Even the CPD recognizes that a single poll can be erroneous and misleading, and that multiple polls should be consulted to better understand public opinion.  That is why the CPD averages *five* polls in determining which candidates qualify for the debates.  In any event, as discussed above, Young never suggested that 60% name recognition *automatically* translates into a 15% vote share.  He only said it was necessary, and Johnson's alleged showing in no way undermines that conclusion.

36.   Young also concluded that polling conducted in three-way races is more error-prone than in two-way races, and that there is a significant probability that an independent candidate could be excluded because of polling error.  The FEC's response is both counterfactual

---

[4]   *See, e.g.*, Young Report at 14 ("all models point to a need for significant levels of name recognition—in excess of 60% of *the American public*…") (emphasis supplied).

and superficial.  Specifically, the Factual and Legal Analysis (1) purports to re-define polling "error" in a way that contradicts the CPD's own definition; (2) argues that polling error is "just as likely to result in overinclusion of candidates shy of the 15 percent threshold"; and (3) quibbles with Young's use of data from gubernatorial elections, ignoring the fact that Young already corrected for this.

37.     According to the FEC, "Young's metric for polling error appears to be based on the difference between the poll and the actual results on Election Day.  However, the CPD does not purport to use polls as predictors of what will occur on Election day, but as a reliable measure of candidates' support at a given moment in September."  (Factual and Legal Analysis at 30).  This contradicts the CPD's own explanation of the 15% rule—indeed, the very explanation supplied by the CPD materials on which the FEC purports to rely.  For example, when announcing its debate-qualifying criteria for the 2016 race, the CPD explained that rule as follows:  "The purpose of the criteria is to identify those candidates whose support among the electorate places them among the candidates who have a realistic chance of being elected President of the United States."  Young faithfully adheres to the CPD's own rationale for the 15% rule.  It was arbitrary and capricious for the FEC to contradict that explanation and to rely instead upon a conflicting, post-hoc rationale.

38.     The FEC next argues that while a deserving independent candidate might be excluded from the debate due to unfavorable polling error, it is also possible that an "undeserving" candidate might be included due to favorable polling error.  That is completely beside the point.  Democratic and Republican candidates are *never* excluded by the 15% rule; only an independent candidate at or near the 15% threshold is affected by the high risk of a false negative resulting from polling error.  That risk therefore hurts only the independent candidate,

18

which makes the rule biased.  *Cf. Buchanan*, 112 F. Supp. 2d at 74 ("the objectivity requirement precludes debate sponsors from selecting a level of support so high that only the Democratic and Republican nominees could reasonably achieve it").  Moreover, the inaccuracy of polling is more likely to result in the exclusion of independent candidates who would otherwise satisfy polling thresholds.  This is because, as explained in the petition for rulemaking, independent candidates tend to mobilize new voters whom pollsters tend to overlook when creating samples for their polls.

39.     Finally, when assessing the error in two-way races versus three-way races, Young relied upon data from gubernatorial races due to the relative paucity of three-way races at the presidential level.  Recognizing that gubernatorial races are more error prone than presidential races, Young explicitly corrected for this difference in his calculations.  In response, the Factual and Legal Analysis states that polling in presidential races is "inherently more reliable" than in gubernatorial races, but neither acknowledges that Young addressed this issue nor refutes the manner in which he corrected for it.  (Factual and Legal Analysis at 31).  Moreover, that three-way races are more error-prone than two-way races is a mathematical certainty, and not just Young's "opinion" or a function of the gubernatorial results.  The FEC does not and cannot refute the fundamental mathematical principles that make the 15% rule biased against independent candidates.

*The Schoen Report*

40.     Schoen demonstrated that, because independent candidates have difficulty attracting earned media, they must raise approximately $266 million to achieve at least 60% name recognition.  In response, the Factual and Legal Analysis argues that (1) independent candidates supposedly received "extensive" media coverage in 2016; (2) the 2016 election

supposedly demonstrates that Super PACs and social media substantially relieve third-party candidates of their fundraising burden, and (3) independent candidates "may start with some name recognition or financial resources," using Gary Johnson and Michael Bloomberg as purported examples.  Each of these arguments relies upon the 2016 election, which had not even occurred when the FEC issued its original 2015 decisions dismissing the complaints.  And, for the reasons below, the FEC's belated reliance upon the 2016 race is wholly unavailing.

41.    To support its claim that Gary Johnson and Jill Stein received "extensive" media coverage, the Factual and Legal Analysis claims (at 25 & n.7) that between them, they made on average about two media appearanes per month during their respective campaigns, many of which ran only on C-Span.  It is absurd to suggest that this could support a modern presidential campaign.  Nor does the FEC account for how fractured the media has become; to the extent that many media appearances was ever enough, voters now have innumerable news sources to choose from, and making a handful of appearances on a handful of these news outlets is patently insufficient.  Moreover, the FEC's rulemaking decision presents a separate analysis (discussed below) confirming that coverage of major party candidates dwarfed that of independent candidates in 2016.  And all of this happened in a race in which the major party candidates were historically disliked, and the public's appetite for a third-party or independent alternative was higher than ever.  If the third-party candidates could not generate sufficient earned media in this race—according to the FEC's own rulemaking analysis, they did not come close—it is hard to imagine a race in which that could happen.

42.    Independent candidates must spend money to garner sufficient attention, and neither Super PACs nor social media could plausibly relieve the massive fundraising burden imposed on them.  Super PACs benefit Democrats and Republicans, not third parties, as the 2016

race amply shows.  According to the FEC's own data, in 2016 Super PACs and other outside funding sources raised over *$700 million* for Democratic and Republican candidates, and only *$1.4 million* for their third-party and independent counterparts (Johnson, Stein and McMullin).[5] Among the 21 Republican and Democratic candidates listed on the Open Secrets website— including also-rans like Jim Webb, Martin O'Malley, James Gilmore, Scott Walker, Bobby Jindal, Rick Perry and George Pataki—the *average* Republican and Democratic candidate received almost $34 million, whereas the average third-party and independent candidate received $462,000.  This merely adds to the substantial fundraising disadvantage independent candidates already face.  Together with the Super PAC money, the average Democrat and Republican raised over $100 million in 2016, compared to approximately $6 million for their third-party and independent counterparts.  Adding up these amounts, third-party and independent candidates received *less than 1%* of the *billions* of dollars raised for the 2016 presidential race.  Super PACs don't alleviate the financial burden on third-party and independent candidates; they *increase* that burden by placing those candidates at an even greater disadvantage.

43.    And the FEC does not seriously suggest that an independent candidate can overcome these massive disparities by sending messages on Facebook and Twitter.  The sheer enormity of the major party candidates' fundraising advantage renders that argument dubious on its face.  The argument is also decisively refuted by the FEC's own purported examples of how social media can relieve a candidate's fundraising burden—the 2016 Trump campaign and the Obama presidential campaigns.  (Legal and Factual Analysis at 26).  Between the campaign itself, Super PAC donations and joint/party fundraising, Trump raised close to *$1 billion* in 2016,

---

[5]    *See, e.g.*, https://www.opensecrets.org/pres16; https://www.opensecrets.org/pres16/also-rans.

and Obama raised comparable amounts.  By relying upon Trump and Obama as examples of how a campaign can be run cost-efficiently using social media, the FEC only bolsters the argument that independent candidates must raise amounts that make Schoen's $266 million estimate seem modest by comparison.

44.    Finally, the Factual and Legal Analysis cites no poll to support its "presum[ption]" that independent candidates begin their campaign with meaningful name recognition.[6]  (Factual and Legal Analysis at 27-28).  That is because candidates like Stein, Johnson, McMullin, and others without strong ties to the major political parties are, by and large, starting from scratch.  That leaves independently wealthy candidates as the only ones realistically able to launch a serious independent campaign.  The FEC uses Michael Bloomberg as an example (Factual and Legal Analysis at 28), and on this we agree with the FEC:  if you are the 10th richest person in the world, then you can run for President of the United States as an independent candidate.  The problem is that virtually no one else can, because the CPD has rigged the process and the FEC refuses to do anything about it.

*The CPD's Discretion To Manipulate Poll Selection*

45.    The CPD's polling criterion is biased for another reason:  the CPD retains complete discretion regarding whom to poll, when to poll, what polls to consider, and when to make the debate-selection determination, which permits the CPD to arbitrarily select polls that disfavor an independent candidate.  The FEC has no answer to this.  It claims that the CPD has

---

[6]     In the rulemaking decision, discussed below, the FEC cites (at p. 15471) an early 2011 poll in which Johnson had 11% name recognition among Republican voters.  This poll (1) says nothing about Johnson's overall name recognition, including whether Democratic or independent voters knew who the former Republican governor was, and (2) ranked Johnson dead last among the 2012 presidential candidates included in the poll.  Presumably that is why, unlike the rulemaking decision, the Factual and Legal Analysis does not even purport to rely upon this poll.

yet to exclude an independent candidate in this manner (Factual and Legal Analysis at 29), but

that is because the CPD has not had the opportunity, given how hard it is for an independent

candidate even to approach the 15% threshold.  It is undisputed that, if and when an independent

candidate were ever to poll that high, there is nothing to stop the CPD from manipulating the

selection of polls to exclude an independent candidate.  Nor is there any real dispute that the

polls themselves can be unreliable, as the CPD's consultant, Frank Newport, recognized by

discontinuing his own organization's presidential horse-race polling.

**C.**    **The FEC Failed To Meaningfully Consider The Evidence Against the CPD**
         **Directors**

46.    The FEC previously failed to notify many of the CPD directors about the

administrative complaints or respond to the allegations specific to those directors.  This Court

ordered the FEC to notify them, "address" the "allegations made against" them, and "consider

the evidence presented against these respondents."  *Level the Playing Field*, 2017 WL 437400, at

*9.

47.    The directors were finally notified of this action in or about February 2017, but

their response demonstrates that neither they nor the FEC gave any thought to the evidence

implicating them in this dispute.  Soon after the Court's decision, nine of the directors signed an

identically worded, five-paragraph affidavit.  Each affidavit has the same Microsoft Word

document identifier in the footer ("232792 v.1"), and all but two were signed on the same day,

suggesting that the same lawyer simultaneously distributed a form affidavit to all nine directors,

seven of whom immediately signed it.  And this form affidavit addresses the case only in

conclusory terms.  It summarily denies Plaintiffs' allegations without responding to any of them

specifically or addressing any of the evidence, let alone evidence specific to these directors.

48.     Indeed, none of these directors confirm that they even *reviewed* the complaint or the evidence supporting it,[7] and they clearly did not.  For example, Alan Simpson is the director who once commented that "Democrats and Republicans on the commission [] are interested in the American people finding out more about the two major candidates—not about independent candidates who mess things up."  Yet in the affidavit he signed, Simpson declares under penalty of perjury that the CPD does not try to "keep any party or candidate from participating in the CPD's debates" or "bring about a predetermined result," and that "it has long been [Simpson's] view that the CPD's debates should include any independent . . . candidate if that candidate is properly considered a leading candidate."  Either Simpson (i) was not shown the evidence of his prior statement, (ii) did not read the conflicting affidavit before he signed it, or (iii) both.

49.     Similarly, Newton Minow is the director who once confirmed that "other candidates could be included" in the debates only if "the Democratic and Republican nominees agreed."  Yet the affidavit Minow signed is identical to Simpson's, and contradicts Minow's prior statement.  Like Simpson, Minow fails to acknowledge, let alone reconcile, this inconsistency.

50.     The director affidavits are an obvious sham.  The FEC failed to meaningfully consider the evidence against these directors, and its rote, unquestioning acceptance of their affidavits was arbitrary and capricious.  (*See, e.g.*, Factual and Legal Analysis at 16-17).

**D.     The FEC Arbitrarily And Capriciously Concluded That The CPD's Polling Criterion Was Objective**

51.     For reasons including those set forth above, the FEC does not and cannot meaningfully address the evidence demonstrating that the CPD's polling criterion is not

---

[7]     *See* CPD Dir. Resp. Ex. 6, ¶ 3 ("Contrary to what *I understand* the complainants have claimed . . .") (emphasis supplied).

objective.  Nor does the FEC even try to explain why, in its view, the polling criterion does

satisfy the objectivity requirement.  All it does is identify a handful of independent candidates

who supposedly would have qualified under the 15% rule—Teddy Roosevelt in 1912, Robert

LaFolette in 1924, Strom Thurmond in 1948, Henry Wallace in 1968, John Anderson in 1980,

and Ross Perot in 1992.  The FEC's purported reliance upon these campaigns does not withstand

even the slightest scrutiny.

52.      It is undisputed that Perot would not have satisfied the CPD's current rule,

because he was polling at or below 10% prior to the 1992 debates.  And neither George Wallace

nor John Anderson was unaffiliated with the Democratic or Republican parties.  Both competed

in their respective parties' primaries, and thus received the enhanced name recognition that truly

unaffiliated candidates do not receive.  Their candidacies do not undercut the case that the CPD's

rule is not one that unaffiliated candidates can reasonably satisfy.

53.      The FEC's other examples are equally unavailing.  The campaigns of Roosevelt,

LaFolette and Thurmond are 105, 97, and 69 years old, respectively, and are plainly

anachronistic.  They predated not only the Internet age, but the television age too, and provide no

guidance on 21st century campaigns.  Nor does the Factual and Legal Analysis cite any evidence

that these candidates would have qualified under the CPD's current criteria.  Moreover, to the

extent any did poll at 15% or higher during the relevant time period, each rose to national

prominence within a major party before running independently.  Roosevelt was a two-term

Republican president who then ran a third time on a third-party ticket.  LaFolette was a

Republican Senator who had previously run for president as a Republican.  And Thurmond

attended the 1948 Democratic National Convention as a prominent segregationist governor,

where Southern delegations staged a dramatic walkout and later nominated Thurmond on a segregationist third-party ticket.

54.     As this Court observed, "[g]iven . . . the evidence that since 1988 only one non-major party candidate . . . has participated in the debates, and only then at the request of the two major parties," it is "perplex[ing]" that the FEC is so quick to rubber stamp the CPD's criteria and find it to be "objective." *Level the Playing Field*, 2017 WL 437400, at *10.  "This begs the question:  if under these facts the FEC does not consider the fifteen percent polling criterion to be subjective, what would be?" *Id*.  The Factual and Legal Analysis simply ignores this critical question.

## THE FEC FAILED TO EXPLAIN ITS REFUSAL TO ENGAGE IN RULEMAKING

55.     The rulemaking decision largely mirrors the FEC's reasoning in dismissing the administrative complaints.  To the extent the rulemaking decision offers additional reasoning, it is equally arbitrary and capricious for reasons including, but not limited to, those set forth below. Put simply, nothing in the rulemaking decision justifies the FEC's arbitrary and capricious refusal to institute a rulemaking.

### *The Young Report*

56.     The rulemaking decision presents two additional critiques of the Young report, both of which are frivolous.  First, the FEC argues that "the Young Report reaches its 60-80% name recognition result" by examining "data about name recognition of major party candidates at the early stages of the party primary process."  (Rulemaking Decision at 15470).  The FEC claims that this purported focus on early polling "may amplify polling errors," and suggests that the focus should be on data from later in the process.  But the Young Report on its face informs the reader that the 60-80% result is based on polling data from *every* stage of the election,

including "late primary" and "general" election polling.  Indeed, focusing the analysis on later stages of the election would require name recognition at the higher end of the 60-80% range.  For example, Young ran three variations of the computation using only "late primary" data, which required name recognition of 76.9%, 78.4% and 77.1%, respectively.

57.     Second, while apparently acknowledging the strong correlation between name recognition and vote share, the FEC purports to question whether a "causative effect" can be implied.  (Rulemaking Decision at 15470).  In fact, a causative effect *must* be implied.  As explained above, voters cannot like a candidate unless they first know who that candidate is. Consequently, there *must* be a causal relationship between name recognition—whether voters even know who the candidate is—and vote share—whether voters have decided to vote for that person.  Indeed, because so many voters default to either the Republican and Democratic nominees, common sense dictates that an independent candidate must be widely known before he or she can achieve a vote share as high as 15%.  The FEC does not seriously suggest otherwise.

*The Schoen Report*

58.     The rulemaking decision's attempt to impugn Schoen is equally unpersuasive. First, it disputes Schoen's conclusion that independent candidates have difficulty attracting earned media, purportedly in reliance upon an analysis of newspaper coverage of the 2016 presidential election.  (Rulemaking Decision at 15470 n.6).  In fact, as explained below, the FEC's presentation of this newspaper coverage is false and misleading.

59.     The FEC claims to have searched the Westlaw "newspaper" database to determine how many newspaper stories mentioned the candidates during specified periods. Specifically, based on the results it reports, the FEC appears to have searched Westlaw's "major

newspaper" database, which includes 46 newspapers from around the country.  The FEC claims

it searched the database for "Gary Johnson," "Jill Stein" and "Evan McMullin" for the 277 days

between February 5, 2016 and November 7, 2016.  It claims that these searches yielded 3,001

hits for Gary Johnson, 1,744 hits for Jill Stein, and 353 hits for Evan McMullin.  The FEC also

searched for stories that mentioned certain Republican and Democratic candidates, but for much

earlier 277-day periods:  August 1, 2015 to May 4, 2016 for the Republicans, and September 4,

2015 to June 7, 2016 for the Democrats.  The FEC claims that the results for Donald Trump and

Hillary Clinton were 7,451 and 7,404, and that the results for other primary candidates (Jim

Webb, Martin O'Malley, Lincoln Chafee, Rick Perry, George Pataki, Bobby Jindal, and Mike

Huckabee) were lower and comparable to the independent candidates.

60.     There are numerous problems with the FEC's purported analysis.  First, its

premise is deeply flawed.  Simply being mentioned in an article is not necessarily indicative of

increased or sustained name recognition.  For example, an article may simply mention the

independent candidate in passing after devoting most of its attention to the major party

candidates, or discuss how an independent candidate has been excluded from the presidential

debates.  The FEC makes no effort to differentiate between articles that meaningfully advance a

candidacy and those that do not.

61.     Second, the FEC simply misrepresents the number of newspaper stories

mentioning the candidates in the Westlaw database, radically understating the coverage of the

major party nominees.  During the time periods it allegedly searched, Trump had at least 49,500

stories (not 7,541), and Clinton had at least 39,608 (not 7,404).  If one instead searches the later

time period searched for the independent candidates (February 2016 to November 2016), these

numbers increase to at least 84,709 for Trump and at least 68,997 for Clinton.  The number of

stories devoted to the major party nominees therefore dwarfed those mentioning the independents, contrary to what the FEC suggests.

62.     Third, the FEC misrepresents the results in another way—it assumes that any search hit for "Gary Johnson" must be about the Libertarian presidential candidate.  But because Gary Johnson is a common name, a number of the articles on which the FEC relies were not even about the presidential candidate, and were instead about a different person named Gary Johnson.  Examples include:

a.   Dozens of obituaries in which either the deceased or a relative of the deceased was named "Gary Johnson";

b.   Articles about up and coming Hawaiian chef Gary Johnson and his new restaurant, "Hana Ranch Provisions";

c.   Articles about Gary "Big Hands" Johnson, the legendary defensive standout of the NFL's San Diego Chargers;

d.   Property listings from around the country in which homeowners named Gary Johnson bought or sold their homes;

e.   A September 2016 article about Missouri real estate agent Gary Johnson's collection of hand-painted earthenware;

f.   Articles recounting Texas Longhorn power forward Gary Johnson's dramatic last-second bankshot to win the NCAA Maui Invitational;

g.   Articles detailing the criminal charges faced by the clients of Illinois defense attorney Gary Johnson;

h.   An August 2016 article covering a "competitive ax-throwing" event attended by Norristown, Pennsylvania resident Gary Johnson;

      i.    Results for golf, bowling, bass fishing and other tournaments in which various amateur athletes named Gary Johnson participated;

      j.    An October 2016 story about musician Gary Johnson's four-piece band celebrating German culture;

      k.    Articles chronicling both the service of law enforcement officials named Gary Johnson and the misdeeds of the Gary Johnsons on the wrong side of the law who were either arrested or convicted of crimes in 2016; and

      l.    The Boston Globe's August 2016 plug for the Greg Abate Quartet, a jazz ensemble featuring Gary Johnson on the drums.

      63.    These are just examples of the dozens of people named Gary Johnson referenced in the articles who are not Libertarian presidential candidate Gary Johnson.  And, in addition to these irrelevant articles, the search results also include numerous duplicate articles and stories that, despite appearing in the Westlaw search results, do not actually refer to Gary Johnson.  It is only by including all of these articles that the FEC arrived at the 3,001 references to "Gary Johnson" in its newspaper searches.[8]  The FEC either knowingly included these irrelevant articles, or failed to conduct even a cursory review of the search results to exclude them.  Either way, the FEC's suggestion that these articles somehow advanced the candidacy of candidate Gary Johnson is arbitrary and capricious, and shows that the rationale for its decision is entirely pretextual.

      64.    Third, the FEC gerryrigged the date ranges it searched to arrive at a predetermined result.  It searched for articles about the Republican candidates between August

---

[8]    When Plaintiffs search the "Major Newspaper" database for "Gary Johnson" using the time period specified by the FEC, it yields 3,001 results—the same number reported by the FEC in its decision—which includes the irrelevant articles described above.

2015 and May 2016; and it searched for articles about the Democratic candidates between

September 2015 and June 2016.  But all of the primary candidates the FEC uses in its

comparison (O'Malley, Webb, Chafee, Pataki, Jindal, Perry, and Huckabee) ended their

campaigns long before May or June 2016.  For example, Perry ended his campaign on

September 11, 2015, meaning he was only running for president for the first month of the nine-

month period for which his name was searched.  The FEC apparently set up the searches this

way to make it seem like these candidates received less press than they did during the nine-

month search period, when in fact they were simply not running for president for most of that

period.

65.     Conversely, the FEC went out of its way to inflate the results for the third-party

candidates.  It did not search for press coverage of those candidates during the same time period

it examined for the major party candidates.  Instead, it compared apples to oranges, examining a

later time period for the third-party candidates—February 5, 2016 to November 7, 2016.  It did

this because (i) Gary Johnson and Jill Stein had active candidacies for this entire time period,

unlike the major party candidates they were compared to, and (ii) there is more interest in the

election in 2016 as opposed to 2015, thereby increasing news coverage.

66.     Thus, the FEC cherry-picked date ranges that would suppress the search results

for the major party candidates, but inflate the results for the third-party candidates, in order to

make it seem like the former and the latter received comparable press.  By contrast, Plaintiffs

conducted a comparison for the time periods when the third-party candidacies overlapped with

the major party candidacies, using the same major party primary candidates whom the FEC

claimed received press coverage that was comparable to the third-party candidates.  This apples

to apples comparison demonstrates that, in fact, the major party candidates received far more press[9]:

| Major Party Candidate | Search Hits | Third-Party Candidate | Search Hits |
|---|---|---|---|
| Huckabee | 3,557 | Stein | 17 |
| Jindall | 2,668 | Stein | 11 |
| Perry | 1,719 | Stein | 5 |
| Pataki | 977 | Stein | 15 |
| Webb | 581 | Stein | 9 |
| Chafee | 564 | Stein | 10 |
| O'Malley | 3,128 | Stein | 17 |
| Huckabee | 447 | Johnson | 17 |
| O'Malley | 525 | Johnson | 17 |

67.    Thus, similar to the general election, media coverage of third-party candidates during the primaries was dwarfed by coverage of the Democratic and Republican candidates. And, it is worth noting, the FEC also cherry-picked some of the least successful candidates from the major party primaries to compare to the third-party candidates—Jim Webb, Martin O'Malley, Bobby Jindall, George Pataki, Lincoln Chafee, Mike Huckabee, and Rick Perry. For every Jim Webb and Lincoln Chafee, there is a Bernie Sanders or Marco Rubio who is catapulted to national prominence through his participation in the primaries. Had the FEC compared press coverage of Sanders or Rubio to the third-party candidates, the results would have been even more one-sided.

68.    Fifth, regardless of the foregoing, the FEC fails to explain how the coverage it claimed the third-party candidates received could be remotely sufficient to support a presidential

---

[9]    This chart otherwise mimics the FEC's methodology in order to show what the results would look like if the FEC performed an apples to apples comparison.

candidacy, and attract a level of support in polls of at least 15%.  Because the search results for

these candidates are for 46 different newspapers over a 9-month period, the independent

candidates in reality received very little press.   Below is a chart of each paper's average number

of stories per week that mentioned each candidate during their candidacies (compared with

results for Trump and Clinton):

| Third-Party / Independent Candidate | Average Mentions Per Week |
|---|---|
| Stein | 0.6 |
| Johnson | 1.6 |
| McMullin | 0.6 |
| Trump | 34.1 |
| Clinton | 27.8 |

69.     Stein and McMullin were mentioned, on average, about once every two weeks by

these papers.  And that includes a number of articles that made a mere passing reference to the

candidate, discussed how the candidates were excluded from the debates, and/or or simply

recited a poll result that happened to include the candidate.  The number of stories that were

meaningfully devoted to these candidates was much smaller.  Meanwhile, these same

newspapers published stories about Trump, on average, over 34 times per week.

70.     The FEC further contends that Schoen's conclusion that independent candidates

have difficulty attracting earned media is "based primarily on research published in 1999."

(Rulemaking Decision at 15471).  This argument simply cherry-picks the one article Schoen

cites from that time period, and ignores the various recent publications on which Schoen relies,

including articles from 2010, 2012, and 2014.  Moreover, the 2016 data above on which the FEC

purports to rely amply demonstrates the inability of third-party candidates to generate sufficient

earned media.

33

71.     Next, Schoen provided two examples of major party candidates who benefited from the national exposure provided by early party primaries:  Barack Obama in 2008 and Rick Santorum in 2012.  The FEC quibbles with these examples, but offers nothing to undermine their validity.  Specifically, the FEC disputes that Obama received a significant boost from Iowa.  But this is a fact—Obama's support increased dramatically following the Iowa caucuses.[10] (Rulemaking Decision at 15471).  Moreover, to the extent people were already familiar with Obama, that was because he delivered the keynote address at the previous Democratic Convention.  Approximately 9.1 million viewers are reported to have watched the speech, which elevated Obama's status in the party and immediately led to speculation that he would run for president.  This proves Plaintiffs' point—it was the party nominating process that gave Obama a national audience and increased his notoriety.  This opportunity would not be available to a third-party or independent candidate.

72.     Similarly, Schoen made the point that Santorum received a significant boost from news coverage of the 2012 Iowa caucus despite spending only $21,980 on media in Iowa.  The FEC appears to dispute this figure, but offers no evidence that it was any higher than Schoen indicated.  The FEC instead points to Santorum's *aggregated* campaign expenditures, which include non-media costs like "rent, payroll, lodging, direct mail, communication consulting and coalition building."  (Rulemaking Decision at 15471).

73.     Finally, the FEC purports to question the experience and motives of Canal Partners, the media-buying firm that supplied Schoen with the $266 million estimate.  (*Id.*).  But there was nothing preventing the FEC from researching or seeking a further explanation if it had

---

[10]     *See* http://www.realclearpolitics.com/epolls/2008/president/us/democratic_presidential_ nomination-191.html.

any concerns about Canal Partners.  Had it done so, it would have learned that Canal Partners' credentials are impeccable.  They have decades of experience buying media for presidential and other high-profile races (including the presidential campaigns of Bill Clinton and Al Gore).  And Schoen blinded Canal Partners to the identity of his clients (Plaintiffs) precisely to avoid any accusations of bias.

* * * * *

74.     The CPD's violation of the debate regulations and the FEC's dismissals of Plaintiffs' administrative complaints and LPF's rulemaking petition have caused and continue to cause injury to Plaintiffs.  In addition to the reasons set forth above, the Libertarian and Green Parties intend to nominate presidential candidates in the 2020 election, and LPF intends to recruit qualified independent candidates to run on a nonpartisan 2020 ticket should the relief sought herein be granted.

75.     It bears repeating that, as explained more fully above, the FEC itself is an inherently bipartisan institution that is invested in the bipartisan control of our politics in the same way that the CPD is.  The FEC has now had two opportunities to explain why it dismissed the administrative complaints and declined to institute a rulemaking.  In neither instance did it carefully consider Plaintiffs' applications or give the evidence the hard look that the law requires.  Because the FEC has demonstrated that it either cannot or will not fairly review Plaintiffs' allegations, Plaintiffs respectfully submit that it would be futile to remand the administrative complaints to the FEC yet again, and that Plaintiffs should instead be permitted to bring a civil action against the CPD, its executive director, and the directors who have participated in the violations of law set forth above.

## FIRST CAUSE OF ACTION
## FOR DECLARATORY AND INJUNCTIVE RELIEF
### (28 U.S.C. §§ 2201-2202)

76.      Plaintiffs repeat and reassert the allegations in paragraphs 1 through 75 as though fully set forth herein.

77.      The FEC's dismissals of Plaintiffs' administrative complaints were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  *See* 52 U.S.C. § 30109(a)(8)(A); 5 U.S.C. § 706.

78.      The FEC's dismissals of Plaintiffs' administrative complaints reflect the agency's unwillingness and inability to investigate the CPD.

79.      The Court should declare that the FEC's dismissals are contrary to law and direct the FEC, within 30 days, to find that the CPD has violated FECA as set forth in the administrative complaints, and, if the FEC fails to so act, order that Plaintiffs may bring a civil action to remedy the violations of FECA alleged in their administrative complaints.

## SECOND CAUSE OF ACTION
## FOR DECLARATORY AND INJUNCTIVE RELIEF
### (28 U.S.C. §§ 2201-2202)

80.      LPF repeats and reasserts the allegations in paragraphs 1 through 75 as though fully set forth herein.

81.      The FEC's denial of LPF's petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  *See* 5 U.S.C. § 706.

82.      The Court should declare that the FEC must act within 30 days to open a rulemaking to revise the regulations governing presidential debates and further declare that the FEC must complete that rulemaking in sufficient time to ensure that the revised rules will be in place for the 2020 presidential election.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs, by their undersigned counsel, respectfully request that the Court grant the following relief:

a)      Declare that the FEC's dismissals of Plaintiffs' administrative complaints were arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

b)      Declare that the FEC's denial of LPF's petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

c)      Direct that the FEC find that the CPD has violated 11 C.F.R. § 110.13 by staging candidate debates in a partisan manner and without pre-established, objective criteria;

d)      Direct that the FEC find that the CPD has violated 52 U.S.C. § 30118(a) by making prohibited contributions and expenditures;

e)      Direct that the FEC find that the CPD has violated 52 U.S.C. § 30116(f) by accepting prohibited contributions;

f)      Direct that the FEC find that the CPD has violated 52 U.S.C. §§ 30103 and 30104 by failing to register as a political committee and by failing to make required reports and disclosures;

g)      Order the FEC to conform to such declaration and directives within 30 days and, if the FEC fails to so act, order that Plaintiffs may bring a civil action (1) to remedy the violations of FECA alleged in their administrative complaints and, (2) because the CPD also adopted rules for the 2016 election that violate 11 C.F.R. § 110.13, to remedy those violations of FECA as well;

h)      Order that the FEC within 30 days open a rulemaking to revise its rules governing presidential debates and that the FEC conclude that rulemaking in sufficient time to ensure that the revised rules will be in place for the 2020 presidential election;

i)      Award legal fees and costs of suit incurred by Plaintiffs; and

j)      Grant such other and further relief as this Court deems just and proper.


Dated:  May 26, 2017

                              Respectfully submitted,


                                _/s/    Alexandra A.E. Shapiro
                              Alexandra A.E. Shapiro (D.C. Bar No. 438461)
                              Eric S. Olney (pro hac admission pending)
                              Fabien Thayamballi (pro hac admission pending)
                              SHAPIRO ARATO LLP
                              500 Fifth Avenue
                              40th Floor
                              New York, New York 10110
                              Phone:  (212) 257-4880
                              Fax:  (212) 202-6417