# Exhibit A



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

<u>VIA CERTIFIED AND ELECTRONIC MAIL</u>                    MAR 3 1 2017

Alexandra A.E. Shapiro, Esq.
Shapiro, Arato & Isserles LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110

                                        RE:    MURs 6869R & 6942R
                                               Commission on Presidential
                                               Debates, *et al.*

Dear Ms. Shapiro:

        The Commission previously notified you of its findings in MURs 6869 and 6942, which
were generated by complaints you filed on behalf of Level the Playing Field and Dr. Peter
Ackerman, and the Green Party of the United States and the Libertarian National Committee,
Inc., respectively.  In each matter, the Commission found that there was no reason to believe the
Commission on Presidential Debates ("CPD") or Frank Fahrenkopf Jr. and Michael D. McCurry
as co-chairs violated 52 U.S.C. §§ 30116(f) or 30118(a), and no reason to believe that CPD
violated 52 U.S.C. §§ 30103 or 30104.  Accordingly, the Commission closed each file.

        You challenged the Commission's decisions in MURs 6869 and 6942 in *Level the
Playing Field v. FEC*, No. 1:15-cv-01397.  On February 1, 2017, the United States District Court
for the District of Columbia ordered the Commission to issue a decision consistent with the
court's opinion.  Pursuant to the court's remand, these matters were reopened and numbered
MUR 6869R and MUR 6942R.

        On March 29, 2017, the Commission reconsidered the allegations in the complaints and
found, on the basis of the information provided, that there is no reason to believe the
Commission on Presidential Debates ("CPD"), Frank Fahrenkopf Jr. and Dorothy S. Ridings as
co-chairs, or the ten named staff and board members violated 52 U.S.C. §§ 30116(f) or 30118(a)
by making prohibited contributions and expenditures and accepting prohibited contributions, and
no reason to believe that CPD violated 52 U.S.C. §§ 30103 or 30104 by failing to register and
report as a political committee.  Accordingly, on March 29, 2017, the Commission closed the
files in MUR 6869R and 6942R.

        Documents related to the cases will be placed on the public record within 30 days.  *See*
Disclosure of Certain Documents in Enforcement and Other Matters, 81 Fed. Reg. 50,702
(Aug. 2, 2016).  The Factual and Legal Analysis, which explains the Commission's findings, is
enclosed for your information.

Alexandra A.E. Shapiro, Esq.
MURs 6869R & 6942R
Page 2

        The Federal Election Campaign Act of 1971, as amended, allows a complainant to seek judicial review of the Commission's dismissal of this action.  *See* 52 U.S.C. § 30109(a)(8).  If you have any questions, please contact Meredith McCoy, the attorney assigned to this matter, at (202) 694-1650.

                                        Sincerely,

                                        Mark Allen
                                        Assistant General Counsel


Enclosure
  Factual and Legal Analysis

1                  **FEDERAL ELECTION COMMISSION**

2                  **FACTUAL AND LEGAL ANALYSIS**

| | | |
|---|---|---|
| 3 | RESPONDENTS: | Commission on Presidential Debates   MURs: 6869R; |
| 4 | | Frank Fahrenkopf Jr., Co-Chair             6942R |
| 5 | | Dorothy S. Ridings, Co-Chair |
| 6 | | Michael D. McCurry |
| 7 | | Janet H. Brown |
| 8 | | Howard G. Buffet |
| 9 | | John C. Danforth |
| 10 | | John Griffen |
| 11 | | Antonia Hernandez |
| 12 | | John I. Jenkins |
| 13 | | Newton N. Minow |
| 14 | | Richard D. Parsons |
| 15 | | Alan K. Simpson |

16  **I.     INTRODUCTION**

17         These matters are before the Commission on remand from the United States District

18  Court for the District of Columbia following its decision in *Level the Playing Field v. FEC*, No.

19  1:15-cv-01397 (D.D.C. Feb. 1, 2017). At issue in the case was the Commission's prior

20  determination that there is no reason to believe the Commission on Presidential Debates ("CPD")

21  and its then-co-chairs, Frank Fahrenkopf Jr. and Michael D. McCurry, made or accepted

22  prohibited corporate contributions by failing to comply with the Commission's regulations on

23  debate sponsorship in hosting its 2012 presidential and vice-presidential general elections

24  debates. The court also reviewed the Commission's finding that there is no reason to believe

25  CPD failed to register and report as a political committee. The district court concluded that the

26  Commission acted "arbitrarily and capriciously in its enforcement decisions by failing to address

27  evidence or articulate its analysis" and ordered the Commission to issue a new decision

28  consistent with its Opinion.[1]

---

[1]    *Level the Playing Field v. FEC*, No. 1:15-cv-01397, 2017 WL 437400 at \*13 (D.D.C. Feb. 1, 2017).

1    In accordance with the court's instructions, the Commission has reconsidered the full

2    scope of the available information.[2] On the basis of that review, the Commission has concluded

3    that the available information does not support a reasonable inference[3] that CPD "endorses,

4    supports, or opposes" federal candidates or political parties or failed to use "objective criteria" in

5    selecting its 2012 debate participants. Accordingly, the Commission finds no reason to believe

6    that CPD, Fahrenkopf and Dorothy S. Ridings as co-chairs, and the ten named staff and board

7    members (collectively, "Respondents") violated 52 U.S.C. §§ 30116(f) or 30118(a) by making

8    prohibited contributions and expenditures and accepting prohibited contributions, and no reason

9    to believe that CPD violated 52 U.S.C. §§ 30103 or 30104 by failing to register and report as a

10   political committee.

---

[2]    *See* Compl., MUR 6869 (Sept. 11, 2014) ("6869 Compl."); Resp. of CPD, Fahrenkopf, and McCurry, MUR 6869 (Dec. 15, 2014) ("6869 CPD Resp."); First Supp. Compl., MUR 6869 (Nov. 25, 2014) ("6869 Supp. Compl. #1"); Second Supp. Compl., MUR 6869 (Apr. 15, 2015) ("6869 Supp. Compl. #2"); Supp. Resp. of CPD, Fahrenkopf, and McCurry, MUR 6869 (May 26, 2015) ("6869 Supp. CPD Resp."); *see also* Compl. MUR 6942 (June 17, 2015) ("6942 Compl."); Resp. of CPD, Fahrenkopf, and McCurry, MUR 6942 (July 1, 2015) ("6942 CPD Resp."); Supp. Compl., MUR 6942 (Oct. 21, 2015) ("6942 Supp. Compl."); Supp. Resp. of CPD, Fahrenkopf, and McCurry, MUR 6942 (Nov. 18, 2015) ("6942 Supp. CPD Resp.").

Consistent with the court's instructions, the Commission also notified ten CPD board and staff members that had been named as respondents in these matters but not previously notified and provided each with an opportunity to respond. Janet H. Brown, Howard G. Buffet, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, N. Minow, Richard D. Parsons, Dorothy S. Ridings, and Alan K. Simpson responded jointly on March 6, 2017. Resp. of Janet H. Brown, Howard G. Buffet, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, N. Minow, Richard D. Parsons, Dorothy S. Ridings, and Alan K. Simpson, MURs 6869R & 6942R (Mar. 6, 2017) ("CPD Dir. Resp."), and this analysis reflects the information presented therein.

[3]    *See Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process*, 72 Fed. Reg. 12545, 12546 (Mar. 16, 2007)(explaining circumstances supporting a no-reason-to-believe finding).

1    **II.      FACTUAL BACKGROUND**

2         CPD is a nonprofit corporation formed under Section 501(c)(3) of the Internal Revenue

3    Code[4] to "organize, manage, produce, publicize and support debates for the candidates for

4    President of the United States."[5] The organization derives its funding from a variety of sources,

5    including corporations, foundations, universities, and private donations.[6]

6         According to information presented by both the Complainants and Respondents, CPD

7    was created in response to the recommendations of two studies on presidential debates from the

8    Georgetown University Center for Strategic and International Studies and the Harvard University

9    Institute of Politics.[7] Both studies observed the educational value of presidential debates and

10   proposed mechanisms to guarantee them as a permanent part of the electoral process.[8] Among

11   other recommendations, the studies called upon the Democratic and Republican Parties to play a

12   role in institutionalizing the debates in order to ensure the participation of leading candidates[9]

13   who, as recent history had shown, at times had a disincentive to participate.[10] In response, the

---

[4]      26 U.S.C. § 501(c)(3).

[5]      6869 Compl. Ex. 100 (IRS Form 1023, *Application for Recognition of Exemption for the Commission on Presidential Debates* (Mar. 5, 1987)); 6942 Compl. Ex. 100 (same). The CPD also staged three presidential debates and one vice-presidential debate in the 2016 election cycle. CPD Dir. Resp. Ex. 4 (Supp. Declaration of Janet H. Brown) ("Supp. Brown Decl.").

[6]      6869 Compl. Ex. 4 (*CPD: Our Mission*, COMM'N. ON PRESIDENTIAL DEBATES, http://www.debates.org/index.php?page=about-cpd (last visited Mar. 1, 2017)); 6942 Compl. Ex. 4 (same).

[7]      6869 Compl. Ex. 20 (Excerpts from NEWTON N. MINOW AND CRAIG L. LAMAY, INSIDE THE PRESIDENTIAL DEBATES 62-63 (2008)) ("MINOW & LAMAY"); 6942 Compl. Ex. 20 (same); 6869 CPD Resp. Ex. 1 (Declaration of Janet H. Brown) ("Brown Decl."); 6942 CPD Resp. Ex. 1 (same); CPD Dir. Resp. Ex. 1 (Decl. of Frank J. Fahrenkopf) ("Supp. Fahrenkopf Decl."); CPD Dir. Resp. Ex. 2 (Decl. of Dorothy S. Ridings) ("Ridings Decl.").

[8]      MINOW & LAMAY, *supra* note 7, at 63; Brown Decl., *supra* note 7, ¶ 9; Supp. Fahrenkopf Decl., *supra* note 7, ¶¶ 7-9.

[9]      MINOW & LAMAY, *supra* note 7, at 63; Brown Decl., *supra* note 7, ¶ 10; Supp. Fahrenkopf Decl., *supra* note 7, ¶¶ 7-9.

[10]      MINOW & LAMAY, *supra* note 7, at 62. Minow has been a CPD board member since the organization's founding after previously serving as co-chair of presidential debates for the League of Women Voters and a member of the Harvard debate study. *Id.* This exhibit, provided by Complainants, is an excerpt from his book on presidential debates, which provides a first-hand history of the formation of the CPD. In it, he and his co-author write:

1    then-chairmen of the Democratic and Republican National Committees, Paul G. Kirk Jr. and

2    Frank J. Fahrenkopf Jr., respectively, jointly called for the creation of the independent

3    Commission on Presidential Debates, which was incorporated on February 19, 1987.[11]

4         Since its founding, CPD has staged almost every general election presidential debate,

5    including three presidential debates in the 2012 election cycle.[12] CPD purports to stage its

6    debates pursuant to the safe harbor provision of the Federal Election Campaign Act of 1971, as

7    amended (the "Act"), that exempts from the definition of "expenditure" any "nonpartisan activity

8    designed to encourage individuals to vote or to register to vote."[13] Although the Act generally

9    prohibits corporations from making contributions to federal candidates,[14] this exemption permits

10    501(c)(3) and 501(c)(4) organizations that do not "endorse, support, or oppose political

---

> The most persistent and difficult impediment to debates, anywhere, is that the
> candidate who is ahead in the polls — and particularly an incumbent — will
> almost never want to debate, and for good reason. . . . The leader's potential for
> gain is small, while the potential for the challenger is great. . . . But I thought the
> voters benefit from debates and so it was essential to find a way to bring
> pressure on the candidates to participate. The parties could do that.

*Id.* This conclusion followed Minow's experience co-chairing the League's 1980 presidential debates. That year, President Jimmy Carter had refused to participate in a debate hosted by the League after the organization invited both Republican nominee Ronald Reagan and independent candidate John B. Anderson. MINOW & LAMAY, *supra* note 7, at 56; Ridings Decl., *supra* note 7, ¶¶ 9-12, Tab A. With the hope of enticing Carter's participation, the League subsequently offered to host a two-way debate between Carter and Reagan if all three candidates agreed to participate in a three-way debate afterward. MINOW & LAMAY, *supra* note 7, at 56; Ridings Decl., *supra* note 7, Tab A. Reagan refused and the plan was scrapped. Ultimately, after Anderson dropped below the League's 15 percent polling threshold, Carter and Reagan agreed to a two-way debate. MINOW & LAMAY, *supra* note 7, at 57; Ridings Decl. ¶ 11, Tab A.

[11]    MINOW & LAMAY, *supra* note 7; Brown Decl., *supra* note 7, ¶ 11.

[12]    6869 Compl. Ex. 4 (*CPD: Our Mission*, COMM'N. ON PRESIDENTIAL DEBATES, http://www.debates.org/index.php?page=about-cpd (last visited Mar. 1, 2017)); 6942 Compl. Ex. 4 (same). CPD has also hosted every vice-presidential debate since 1988, including one in the 2012 election cycle. *See CPD: Our Mission*, COMM'N. ON PRESIDENTIAL DEBATES, http://www.debates.org/index.php?page=about-cpd.

[13]    52 U.S.C. § 30101(9)(B)(ii).

[14]    52 U.S.C. § 30118(a); *see also* 52 U.S.C. § 30116(f).

1     candidates or political parties" to stage candidate debates,[15] provided the events abide by certain

2     standards, including the use of "pre-established objective criteria" to determine which candidates

3     may participate.[16]

4         On October 20, 2011, CPD adopted three criteria that candidates would be required to

5     satisfy in order to participate in the 2012 general election debates. CPD required participants to:

6     (1) satisfy the eligibility requirements for president under the U.S. Constitution; (2) qualify for

7     enough state ballots to have a mathematical chance of securing an Electoral College majority;

8     and (3) obtain the support of at least 15 percent of the national electorate "as determined by five

9     selected national public opinion polling organizations, using the average of those organizations'

10     most recent publicly-reported results at the time of determination."[17] CPD applied the same

11     participation criteria in 2000, 2004, 2008, and 2016.[18]

12         Applying these criteria to the 2012 candidate field, CPD determined that Democratic

13     nominee President Barack Obama and Republican nominee Mitt Romney were eligible to

14     participate in the three presidential debates.[19] CPD also determined that Vice President Joe Biden

---

[15]     11 C.F.R. § 110.13(a); Explanation and Justification, Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734 (Dec. 27, 1979) ("1979 E&J"); *see also Corporate and Labor Organization Activity; Express Advocacy and Coordination with Candidates*, 60 Fed. Reg. 64,260 (Dec. 14, 1995) ("1995 E&J").

[16]     11 C.F.R. § 110.13(b), (c).

[17]     6869 Compl. Ex. 8 (*CPD: 2012 Candidate Selection Criteria*, COMM'N. ON PRESIDENTIAL DEBATES, http://www.debates.org/index.php?page=candidate-selection-process (last visited March 1, 2017)) ("2012 Debate Criteria"); 6942 Compl. Ex. 8 (same).

[18]     2012 Debate Criteria, *supra* note 17.

[19]     6869 Compl. Exs. 9 (*2012 Application of Criteria*, COMM'N. ON PRESIDENTIAL DEBATES (Sept. 21, 2012), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=42&cntnt01origid=27&cntnt01det ailtemplate=newspage&cntnt01returnid=80), 11 (*2012 Application of Criteria – Second Presidential Debate*, COMM'N. ON PRESIDENTIAL DEBATES (Oct. 12, 2012), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=46&cntnt01origid=27&cntnt01det ailtemplate=newspage&cntnt01returnid=80), and 12 (*2012 Application of Criteria – Third Presidential Debate*, COMM'N. ON PRESIDENTIAL DEBATES (Oct. 19, 2012), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=47&cntnt01origid=27&cntnt01det ailtemplate=newspage&cntnt01returnid=80); 6942 Compl. Exs. 9 (same), 11 (same), and 12 (same).

1  and Representative Paul Ryan qualified for the vice presidential debate.[20] CPD concluded that no

2  other candidates satisfied the criteria for inclusion in its 2012 debates.[21]

3  **III.    PROCEDURAL BACKGROUND**

4      On September 11, 2014, Level the Playing Field, Inc. ("LPF") and Dr. Peter Ackerman

5  filed the complaint in MUR 6869. The Complaint, which includes over 100 exhibits, makes two

6  principal allegations. First, Complainants allege that CPD is a partisan organization that

7  "endorses" and "supports" political candidates and political parties, *to wit,* the Democratic and

8  Republican Parties and their respective presidential nominees.[22] Broadly, Complainants provide

9  three categories of information in support of this claim: (1) documents and statements from CPD

10  officers and directors suggesting that CPD was formed as a partisan organization;[23] (2)

11  information suggesting that CPD continues to promote the interests of the two major parties in

12  the present day;[24] and (3) records of officers' and directors' connections and financial

13  contributions to major party committees and candidates.[25] These exhibits, they argue,

---

[20]     6869 Compl. Ex. 9 (*2012 Application of Criteria,* COMM'N. ON PRESIDENTIAL DEBATES (Sept. 21, 2012), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=42&cntnt01origid=27&cntnt01det ailtemplate=newspage&cntnt01returnid=80); 6942 Compl. Ex. 9 (same).

[21]     6869 Compl. Exs. 9, 11, and 12, *supra* note 19; 6942 Compl. Exs. 9, 11, and 12, *supra* note 19.

[22]     6869 Compl. at 14-32.

[23]     *Id.* Exs. 20 (MINOW & LAMAY, *supra* note 7), 22 (Memorandum of Agreement on Presidential Candidate Joint Appearances (Nov. 26, 1985)) ("1985 MOU"), 23 (*G.O.P. Seeks a City for '88,* N.Y. TIMES (Jan. 26, 1986)), 24 (Press Release, News from the Democratic and Republican National Committees (Feb. 18, 1987)) ("1987 DNC/RNC Press Release"), 25 (Phil Gailey, *Democrats and Republicans Form Panel to Hold Presidential Debates,* N.Y. TIMES (Feb. 19, 1987)), and 32 (Excerpts from H. Comm. on H. Admin., *Presidential Debates: Hearing Before the Subcomm. On Elections of the H. Comm. on H. Admin.* at 50-51, 103d Cong., 1ˢᵗ Sess., June 17, 1993); *see also LPF* at *7.

[24]     6869 Supp. Compl. #2 Ex. A (Transcript, Frank Fahrenkopf Interview, SKY NEWS (Apr. 1, 2015)) ("Fahrenkopf Interview Transcript").

[25]     6869 Compl. Exs. 43 (*Michael D. McCurry,* PUBLIC STRATEGIES WASHINGTON INC., http://www.psw-inc.com/team/member/michael-d.-mccurry), 44 (Press Briefing by Mike McCurry, WHITE HOUSE (Sept. 23, 1996), *available at* http://www.presidency.acsb.edu/ws/?pid=48827), 45 (Harrison Wills, *Debate Commission's Own Hot Topic,* OPEN SECRETS (Oct. 2, 2012), https://www.opensecrets.org/news/2012/10/debate-commission), 46 (List of Frank Fahrenkopf Individual Contributions, FEC (retrieved Sept. 4, 2014)) ("List of Fahrenkopf Contributions"), 47 (Frank Fahrenkopf and Jim Nicholson, *Don't Repeat Error of Picking Steele,* POLITICO (Jan. 12, 2011, 4:37 a.m.),

1   demonstrate that CPD was formed by the Democratic and Republican Parties for partisan gain,[26]

2   has consistently supported Democrats and Republicans to the exclusion of third party or

3   independent candidates,[27] and continues to be led by individuals with partisan interests.[28]

4        Respondents deny the allegation. CPD and its leaders maintain that there is no evidence

5   the organization "endorses" or "supports" major party candidates or "opposes" independent

6   candidates, within any plain meaning of those terms.[29] The organization asserts that the

7   Complaint's information on CPD's formation and practices is not relevant, has been rejected by

8   the Commission and the courts, and has been taken out of context to create a "false narrative"

9   about CPD.[30] Further, the CPD's leadership asserts that the personal allegiances or actions of

10  officers and directors in their individual capacities are not evidence of CPD's *organizational*

11  endorsement of or support for the major parties.[31] Respondents argue that to insist otherwise is

12  unconstitutional and practically unworkable.[32]

---

http://www.politico.com/news/stories/0111/47440.html) ("Fahrenkopf Editorial"), 48 (2012 Two-Year Summary of American Gaming Association Political Action Committee, FEC (retrieved Sept. 4, 2014)), 49 (*What We Do*, PUBLIC STRATEGIES WASHINGTON INC., http://www.psw-inc.com/what), 53 (Andrea Saenz, *Former MALDEF Chief Antonia Hernandez Speaks at HLS*, HARV. L. RECORD (Nov. 16, 2007)), 54 (List of Howard Buffett Individual Contributions, FEC (retrieved Sept. 4, 2014) ("List of Buffett Contributions"), 55 (List of Dorothy Ridings Individual Contributions, FEC (retrieved Sept. 4, 2014) ("List of Ridings Contributions"), 56 (*CPD Elects Six New Directors*, COMM'N. PRESIDENTIAL DEBATES (Apr. 16, 2014), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=52&cntnt01origid=15&cntnt01detailtemplate=newspage&cntnt01returnid=80), 60 (Jonathan D. Salant, *Former Democratic Party Leader Paul Kirk Backs Obama*, BLOOMBERG (May 2, 2008 2:22 p.m.), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aBtdfyDJEwZM&refer=home), and 61 (Abby Goodnough & Carl Hulse, *Former Kennedy Aide Is Appointed to Fill His Senate Seat*, N.Y. TIMES (Sept. 24, 2009)).

[26]     6869 Compl. at 16-20.

[27]     *Id.* at 20-25; 6869 Supp. Compl. #2 at 1-4.

[28]     6869 Compl. at 25-32.

[29]     6869 CPD Resp. at 4; CPD Dir. Resp. at 2.

[30]     CPD Dir. Resp. at 2-8.

[31]     6869 CPD Resp. at 4-5; CPD Dir. Resp. at 6.

[32]     CPD Dir. Resp. at 6-7.

1    Second, the Complaint contends that the CPD's 15 percent threshold is not an "objective

2    criterion," but rather designed to ensure the participation of Republican and Democratic

3    nominees to the exclusion of virtually all independent candidates.[33] In support, Complainants

4    primarily offer two expert reports from Dr. Clifford Young and Douglas Schoen, respectively.

5    Young concludes that, in order to meet CPD's 15 percent polling threshold, candidates must

6    obtain name recognition among 60-80 percent of the electorate.[34] Young also opines that the

7    type of polling relied upon by CPD systematically disfavors independent candidates due to

8    increased inaccuracy in three-way races. Following on Young's conclusions, Schoen submits

9    that, in order to obtain 60-80 percent name recognition, an independent candidate must raise over

10   $266 million, including almost $120 million for paid media content production and

11   dissemination.[35] Complainants argue that these requirements are prohibitively high for

12   independent candidates who do not enjoy the same exposure and resources of major party

13   candidates. On this basis, the Complaint concludes that CPD's 15 percent threshold is so high

14   that only major party candidates could reach it and therefore not an objective means of selecting

15   debate participants.[36]

16       Respondents also deny this allegation. CPD argues that Commission regulations afford

17   debate sponsors broad discretion to determine participant selection criteria and point out that the

18   Commission and the courts have affirmed the 15 percent threshold as an objective condition.[37]

19   Noting that the 15 percent threshold was originally a requirement of CPD's predecessor in debate

---

[33]    6869 Compl. at 32-47.

[34]    *Id*. Ex. 62 (Expert Report of Dr. Clifford Young) ("Young Report").

[35]    *Id*. Ex. 70 (Expert Report of Douglas Schoen) ("Schoen Report").

[36]    *Id*. at 37-38.

[37]    6869 CPD Resp. at 7-11; CPD Dir. Resp. at 9.

1   sponsorship, the League of Women Voters,[38] Respondents contend that the polling threshold

2   provides an objective means of achieving its educational mission. Specifically, the organization

3   argues that the 15 percent threshold:

4           best balanced the goal of being sufficiently inclusive to invite those
5           candidates considered to be among the leading candidates, without
6           being so inclusive that invitations would be extended to candidates
7           with only modest levels of public support, thereby creating an
8           unacceptable risk that leading candidates with the highest levels of
9           public support would refuse to participate.[39]

10  Likewise, the limiting criterion also ensures that debate itself is not "hindered by the sheer

11  number of speakers."[40] Respondents also argue that the allegations about potential manipulation

12  of polling data are speculative and unfounded.[41]

13          The Complaint concludes that the Respondents' alleged noncompliance with the debate

14  sponsorship regulations resulted in corporate contributions to and expenditures on behalf of

15  debate participants in violation of 52 U.S.C. § 30118(a). In addition, the Complaint alleges that

16  because CPD had a "major purpose" of promoting the election of the Democratic and Republican

17  Party nominees in 2012 and made expenditures in excess of $1,000 during the calendar year,

18  CPD qualified as a "political committee" under the Act. Accordingly, the Complaint asserts that

19  CPD violated 52 U.S.C. §§ 30103 and 30104 by failing to register and report with the FEC as a

20  political committee and that CPD, its co-chairs, and ten officers and directors violated 52 U.S.C.

21  § 30116(f) by accepting contributions from corporate sponsors.

---

[38]    6869 CPD Resp. at 9; *see also* Ridings Decl., *supra* note 7, ¶ 9, Tab A.

[39]    Brown Decl., *supra* note 7, ¶ 32; CPD Dir. Resp. at 9-13.

[40]    CPD Resp. at 11.

[41]    CPD Resp. at 7-11; CPD Dir. Resp. at 13-17.

1    Submissions filed by the Green Party of the United States ("Green Party") and the

2  Libertarian National Committee ("LNC") on June 15 and 18, 2015, incorporated the allegations

3  of MUR 6869 into a new matter designated by the Commission as MUR 6942.[42]

4    On July 13, 2015 and December 10, 2015, the Commission voted on MURs 6869 and

5  6942, respectively. Relying on the Commission's dismissal of nine previous similar matters

6  alleging that CPD is partisan and uses subjective participation criteria, the Commission found no

7  reason to believe Respondents had violated the Act's prohibition on corporate contributions or

8  political committee registration and reporting requirements in both matters.[43] The Commission

9  decided each case by a vote of 5-0 (with one commissioner recused), approved nearly identical

10  Factual & Legal Analyses, and closed each file.[44]

11    LPF and the other Complainants challenged the Commission's decisions in federal

12  district court under 52 U.S.C. § 30109(a)(8). The district court concluded that the Commission

13  had acted arbitrarily and capriciously and contrary to law by: (1) failing to articulate the standard

14  it used to determine whether CPD had endorsed, supported, or opposed political candidates or

15  parties under 11 C.F.R. § 110.13(a); (2) not demonstrating its consideration of the evidence

16  before it, particularly that relating to alleged partisanship and political donations by CPD's

17  officers and directors and two expert analyses on polling and fundraising; (3) failing to notify

18  and solicit responses from ten respondents; and (4) concluding that CPD's 15 percent polling

19  criteria is objective under 11 C.F.R. § 110.13(c) without adequately discussing the plaintiffs'

---

[42]    The original Complaint in MUR 6942 was a copy of the Complaint in MUR 6869 and asserted no additional allegations; however, on October 13, 2015, the 6942 Complainants submitted supplemental material on the reliability of polling data, 6942 Supp. Compl., and Respondents were afforded an opportunity to respond, *see* 6942 Supp. CPD Resp.

[43]    First General Counsel's Report, MUR 6869 (June 17, 2015); First General Counsel's Report, MUR 6942 (Dec. 1, 2015).

[44]    Certification, MUR 6869 (July 13, 2015); Certification, MUR 6942 (Dec. 10, 2015).

1    evidence and arguments or providing a legal analysis applying the regulation to the evidence and

2    arguments.[45] On these bases, the court granted the plaintiff's motion for summary judgment and

3    ordered the Commission to reconsider the evidence and allegations and issue a new reason-to-

4    believe decision in these matters within 30 days.[46]

5    **IV.    LEGAL ANALYSIS**

6        **A. CPD Qualifies as a Staging Organization that Does Not Endorse, Support, or**
7            **Oppose Political Candidates or Political Parties**

8        The Act prohibits any corporation from making contributions or expenditures in

9    connection with an election.[47] Likewise, the Act bars political committees from knowingly

10    accepting corporate contributions.[48] "Contribution" includes "any gift, subscription, loan,

11    advance, or deposit of money or anything of value"[49] and "expenditure" includes "any purchase,

12    payment, distribution, loan, advance, deposit, or gift of money or anything of value,"[50] but

13    exempts "nonpartisan activity designed to encourage individuals to vote or to register to vote."[51]

14        Pursuant to this exemption, the Commission has promulgated rules permitting

15    "[n]onprofit organizations described in 26 U.S.C. § 501(c)(3) or 501(c)(4) and which do not

16    endorse, support or oppose political candidates or political parties" to stage candidate debates in

---

[45]    *LPF* at *6, *8, *9, and *11. The court also found that the Commission had acted arbitrarily and capriciously by deciding not to initiate a rulemaking on whether to revise and amend 11 C.F.R. § 110.13(c), which the plaintiffs had challenged at the same time. *Id.* at *13.

[46]    *LPF* at *11. On February 10, 2017, the court granted the Commission an additional 30 days to make a reason to believe determination in these matters. *Level the Playing Field v. FEC*, No. 1:15-cv-01397, slip op. at 3 (Feb. 10, 2017).

[47]    52 U.S.C. § 30118(a).

[48]    *Id.* § 30116(f); 30118(a).

[49]    *Id.* § 30101(8)(A).

[50]    *Id.* § 30101(9)(A)(i).

[51]    *Id.* § 30101(9)(B)(ii).

1    accordance with 11 C.F.R. §§ 110.13 and 114.4(f).[52] The purpose of this rule was to "provide a

2    specific exception so that certain nonprofit organizations and the news media may stage debates,

3    without being deemed to have made prohibited corporate contributions to the candidates taking

4    part in the debate."[53]

5         As noted by the *LPF* court, neither the Act nor Commission regulations define what it

6    means for a debate sponsor to "endorse, support, or oppose" candidates or parties.[54] However,

7    the meaning of this standard is plain on its face.[55] And indeed, in reviewing the Act's use of

8    "support" and "oppose" in another context, the United States Supreme Court found that "[t]hese

9    words provide explicit standards for those who apply them and give the person of ordinary

10   intelligence a reasonable opportunity to know what is prohibited."[56]

11        Therefore, applying the plain meaning of these words, the Commission must evaluate

12   whether Complainants' evidence on the formation and evolution of CPD and on the alleged

13   partisanship of CPD officers and directors either demonstrates directly or supports a reasonable

14   inference that the CPD has endorsed or supported the Democratic and Republican Parties and

15   their respective presidential nominees (or opposed third parties or independent candidates).

---

[52]    11 C.F.R. § 110.13(a)(1); 1979 E&J, *supra* note 15.

[53]    1995 E&J, *supra* note 15, at 64,261.

[54]    In response to specific allegations that CPD was "controlled by" the two major parties and that the parties "had input in" or were "involved in" CPD's operations and debate decisions, the court in *Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000), concluded that CPD did not "endorse, support, or oppose" candidates or parties, 112 F. Supp. 2d at 71 n.8.; however, such a standard is inapplicable here where no such allegations have been offered. *LPF* at *6 ("[U]nlike in *Buchanan*, there are no control-specific factual allegations here to warrant applying a control standard.").

[55]    *See LPF* at *12, n. 6 ("According to the Oxford Dictionary, 'endorse' means to 'declare one's approval of'; 'support' means 'contributing to the success of or maintaining the value of'; and 'oppose' means to 'set oneself against' or 'stand in the way of.'").

[56]    *McConnell v. FEC*, 540 U.S. 93, n. 64 (2003) (rejecting a challenge to the meaning of the words "promote, attack, support, or oppose" as used in the definition of "federal election activity" in 52 U.S.C. § 30101(20)(A)(iii) (then 2 U.S.C. § 431(20)(A)(iii)); *see also, e.g.,* Factual & Legal Analysis, MUR 6072 at 5 (Northland Regional Chamber of Commerce) (Apr. 27, 2009) (applying "endorse, support, or oppose").

1      1. <u>Documents and Statements from CPD Officers and Directors Allegedly</u>
2         <u>Suggesting that CPD Was Formed as a Partisan Organization</u>

3      Complainants first allege that information from the time of CPD's founding in 1987

4  indicates that CPD had bipartisan (rather than *non*partisan) origins and therefore was formed

5  with the intent to endorse or support the Democratic and Republican Parties and their respective

6  nominees. Among the documents presented in support of this allegation are a 1985

7  Memorandum of Understanding[57] ("1985 MOU") and a 1987 joint press release from the then-

8  chairmen of the Democratic National Committee ("DNC") and Republican National Committee

9  ("RNC"), Frank Fahrenkopf Jr. and Paul Kirk, respectively, who subsequently became the first

10  co-chairs of CPD.[58] The 1985 MOU addresses the necessity of institutionalized debates and

11  describes their "bipartisan view" on the need for "joint appearances" of the presidential and vice-

12  presidential nominees of the "two major political parties."[59] Similarly, the press release, which

13  announces the formation of the CPD, describes the organization as a "bipartisan" entity "formed

14  to implement joint sponsorship of general election presidential and vice presidential debates…by

15  the national Republican and Democratic committees between their respective nominees."[60]

16      The Complaints also submit various past statements from CPD officers and directors

17  reportedly indicating CPD's support for the major parties and opposition to independent

18  candidates,[61] including a news article describing Fahrenkopf's reported sentiment that CPD "was

19  not likely to look with favor on including third-party candidates in the debates" and another from

---

[57]      1985 MOU, *supra* note 23.

[58]      1987 DNC/RNC Press Release, *supra* note 23.

[59]      1985 MOU, *supra* note 23.

[60]      1987 DNC/RNC Press Release, *supra* note 23.

[61]      6869 Compl. at 18-19; *see also LPF* at *7.

1    Kirk that "he personally believed the panel should exclude third-party candidates, [but] could not

2    speak for the commission."[62]

3         As noted by the *LPF* court in its recent decision, this information is "identical to evidence

4    submitted with prior CPD-related complaints, including MURs 4987, 5004, and 5021. Those

5    matters, which pertained to CPD's sponsorship of the 2000 general election presidential debates,

6    were reviewed by the court in *Buchanan [v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000)]."[63] In

7    *Buchanan*, the court upheld the Commission's conclusion that such information does not provide

8    a reason to believe the CPD endorses or supports political candidates or parties.[64] The *Buchanan*

9    court deferred to the Commission, writing "it is apparent from the report that in the absence of

10   any contemporaneous evidence of influence by the major parties over the 2000 debate criteria,"

11   "evidence of possible past influence [was] simply insufficient to justify disbelieving the CPD's

12   sworn statement . . . that the CPD's 2000 debate criteria were neither influenced by the two

13   major parties nor designed to keep minor parties out of the debates."[65] Four years later, in 2004,

14   the Commission further emphasized that the increasing age of these documents and statements

15   undermines their persuasiveness as evidence of current bias.[66] Evaluating the statements in the

16   present matters, we reach a similar conclusion.

---

[62]    6869 Compl. Ex. 25 (*G.O.P. Seeks a City for '88*, N.Y. TIMES (Jan. 26, 1986)); 6942 Compl., Ex. 25 (same).

[63]    *LPF* at *7.

[64]    *Buchanan*, 112 F. Supp. 2d at 72.

[65]    *Id.* at 72-73.

[66]    First General Counsel's Report, MUR 5414 (Dec. 7, 2004) ("Not only did challenges based on Fahrenkopf's and Kirk's leadership of the CPD not carry the day when they were fresh [in MURs 4987, 5004, and 5021], but as neither man has been a party official since 1989, the passage of time has rendered such assertions less persuasive."); *see also* Certification, MUR 5414 (Dec. 13, 2004) (finding no reason to believe CPD violated 52 U.S.C. § 30118(a)—then 2 U.S.C. § 441b(a)—without approving a separate Factual & Legal Analysis, consistent with Commission policy at the time in cases finding no reason to believe a violation occurred).

MURs 6869R & 6942R (Commission on Presidential Debates)
Factual and Legal Analysis
Page 15 of 33

1    At the outset, it is not clear that, in context, these documents and past statements

2    constitute an endorsement of, or support for, the Democratic and Republican Parties and their

3    candidates or opposition to independent candidates. In a recently submitted declaration,

4    Fahrenkopf insists that these "cherry-picked quotes" must be understood as reflections on the

5    greater goal of ensuring debates as a permanent part of the political process:

6           When the CPD was formed, the goal was to institutionalize general
7           election televised debates for the good of the public, and the major
8           impediment to achieving that goal was securing the commitment of
9           both major party nominees to debate. References to the CPD as
10          bipartisan at the time of its formation must be understood with
11          reference to this challenge and the huge stride forward that forming
12          the CPD represented.[67]

13   Declarations from others similarly insist that statements attributed to them do not fairly or fully

14   reflect their respective views on the participation of independent candidates in CPD debates.[68]

15   For example, Barbara Vucanovich, a CPD board member between 1987 and 1997 who was

16   quoted as praising CPD's executive director for being "extremely careful to be bi-partisan"

17   clarifies that she "used the word 'bi-partisan,' as many do, to mean not favoring any one party

18   over another."[69] Vucanovich and others have previously affirmed their view that "CPD's debates

19   should include the leading candidates for president and vice-president, regardless of party

20   affiliation" but "should not include candidates who have only marginal national electoral

21   support."[70]

---

[67]    Supp. Fahrenkopf Decl., *supra* note 7, ¶10.

[68]    CPD Dir. Resp. Ex. 3 (re-submitting sworn declarations from current and former CPD board members Alan K. Simpson, Newton Minow, Barbara Vucanovich, John Lewis, and David Norcross previously submitted in MUR 5414) ("MUR 5414 Declarations").

[69]    CPD Dir. Resp. Ex. 3 (Declaration of Barbara Vucanovich).

[70]    MUR 5414 Declarations, *supra* note 68.

1      Assuming *arguendo* that such statements do suggest support for debates exclusively

2      between Republicans and Democrats or opposition to the inclusion of independent candidates,

3      they do not necessarily reflect the organization's perspective at the time it sponsored the 2012

4      presidential debates at issue. Organizations may change over time.[71] And given this, it would be

5      inappropriate to rely on documents and statements that are more than 30 years old to ascertain

6      CPD's present support or opposition to candidates and parties. Indeed, there are significant

7      indications that CPD has made concerted efforts to be independent in recent years and reaffirm

8      its commitment to an educational mission. For example, according to Janet Brown, Executive

9      Director of CPD, the organization conducts a review after every presidential election of issues

10      relating to the debates.[72] After its study of the 1996 debates — which some alleged had

11      arbitrarily excluded independent candidate Ross Perot — CPD adopted new candidate selection

12      criteria and retained a polling consultant to ensure its "careful and thoughtful application."[73]

13      CPD believed the new criteria would be "faithful to the long-stated goal of the CPD's debates —

14      to bring before the American people, in a debate, the leading candidates for the Presidency and

15      Vice Presidency."[74] Brown affirms that these criteria "were not adopted with any partisan (or

16      bipartisan) purpose" or "with the intent to keep any party or candidate from participating...."[75]

17      Declarations from current and recent CPD directors similarly affirm the organization's recent

18      commitment to including "any independent or non-major party candidate if that candidate is

---

[71]    *See Citizens for Responsibility and Ethics in Washington v. FEC*, No. 1:14-cv-01419, slip op. at \*11 (D.D.C. Sept. 19, 2016).

[72]    Brown Decl., *supra* note 7, ¶ 29.

[73]    *Id.* ¶ 30, 34-35.

[74]    *Id.* ¶ 30.

[75]    *Id.* ¶ 31.

MURs 6869R & 6942R (Commission on Presidential Debates)
Factual and Legal Analysis
Page 17 of 33

1    properly considered a leading candidate."[76] In the same sworn affidavits, each director swears

2    that he or she has "never observed any [CPD] Board member ever approach any issue

3    concerning the CPD or its mission from a partisan perspective and the CPD has conducted its

4    business in a strictly nonpartisan fashion."[77] Thus, the early documents and statements are of

5    limited persuasive value in evaluating CPD's recent support for or opposition to political parties

6    or candidates.

7          Finally, even if these written and oral statements did reflect more current sentiments, they

8    are not indicative of CPD's *organizational* endorsement of or support for the Democratic and

9    Republican Parties and their candidates, or CPD's opposition to third party candidates. The 1985

10    MOU and 1987 press release were each executed by the DNC and RNC — not the CPD itself —

11    as expressions of those organizations' commitment to a new custom for presidential debates.

12    Indeed, according to both the Georgetown and Harvard studies on presidential debates, such

13    support was critical to the success of institutionalized debates among the leading candidates for

14    president.[78] Likewise, there is no indication that the statements from officers and directors were

15    made in their official capacity as representatives of CPD.[79] Thus, the historical documents and

16    statements do not indicate the CPD's organizational support for any candidate or party or

17    opposition to others.

---

[76]    CPD Dir. Resp. Ex. 6 (submitting sworn declarations from Michael D. McCurry, Howard G. Buffet, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, Newton Minow, Richard Parsons, and Alan K. Simpson) ("CPD Dir. Declarations").

[77]    *Id.*

[78]    *See* MINOW & LaMAY, *supra* note 7.

[79]    In fact, in his reported statement to the *New York Times* expressing opposition to independent candidates in the debates, Kirk explicitly distinguished between his own feelings and the organization's position, noting that "he *personally* believed the panel should exclude third-party candidates, [but] *could not speak for the commission*." 6869 Compl. Ex. 25 (*G.O.P. Seeks a City for '88*, N.Y. TIMES (Jan. 26, 1986) (emphasis added)); 6942 Compl. Ex. 25 (same). The Commission has repeatedly concluded that individuals may wear "multiple hats" to represent the interests of multiple people or entities at different times. *See, e.g.,* Advisory Op. 2005-02 (Corzine); Advisory Op. 2003-10 (Reid).

1    2.   <u>Recent Statements by Fahrenkopf in His Official Capacity as Co-Chair of</u>
2         <u>CPD</u>

3    In an attempt to buttress its claim that CPD endorses, supports, or opposes candidates or

4    parties, the MUR 6869 Complainants supplemented their submission with excerpts from a 2015

5    interview Fahrenkopf gave to Sky News.[80] In the interview, Fahrenkopf stated that CPD has "a

6    system," "we . . . primarily go with the two leading candidates, it's been the two political party

7    candidates . . . except for 1992 when Ross Perot participated in the debates."[81] The Complainants

8    argue that this is an "admission" from Fahrenkopf, in his official capacity representing CPD, that

9    CPD systematically supports major party candidates over independent candidates.[82]

10   Complainants' interpretation is not dispositive, however. Fahrenkopf's statement

11   indicates no categorical support for Democrats or Republicans or opposition to independent

12   candidates, stating clearly that CPD "*primarily* go[es] with the two *leading* candidates," while

13   immediately indicating the exceptions to that trend. Moreover, as Fahrenkopf averred in a

14   declaration responding to this allegation,[83] the statement appears to be more an assertion of

15   historical fact than an admission that CPD favors candidates from the two major political parties

16   over others.[84] Furthermore, Fahrenkopf makes his statement in the context of a broader point

17   about the impact of multiple candidates (the questioner posited seven) on the educational value

18   of debates.[85] Thus, Fahrenkopf's interview is consistent with Respondents' repeated attestations

---

[80]   Fahrenkopf Interview Transcript, *supra* note 24.

[81]   *Id.*

[82]   6869 Supp. Compl. #2 at 1-2.

[83]   6869 Supp. Resp. Ex. A (Fahrenkopf Decl.) ("Fahrenkopf Decl.").

[84]   Fahrenkopf Decl., *supra* note 84, ¶ 4.

[85]   The Sky News interviewer states ". . .we've ended up with a seven person, a seven party debate. What do you think the prospects for that are?" to which Fahrenkopf responds with a description of the crowded 2012 Republican primary debates stating "people jokingly say it's less of debate than a cattle show, because there's such little time for each candidate to get across in the short period what their views are on issues." Fahrenkopf Interview

MURs 6869R & 6942R (Commission on Presidential Debates)
Factual and Legal Analysis
Page 19 of 33

1    that CPD operates for the purpose of providing meaningful debates for the public benefit.

2    Accordingly, these statements are not persuasive indicators that CPD endorses, supports, or

3    opposes political candidates or parties.

4              3.   Exhibits Regarding Alleged Partisanship and Political Activity of CPD Co-
5                   Chairs and Board Members

6         The Complaints have supplemented the information presented in past matters with new

7    information alleging more recent partisanship and political activity by CPD's co-chairs and

8    directors. Notably, the Complaints identify the recent personal contributions of Fahrenkopf,

9    McCurry, and several other directors to various candidates and political committees.[86] The

10   Complaints also submit a 2011 op-ed by Fahrenkopf indicating a personal allegiance to the

11   Republican Party and information on board members' "ties" to officeholders and political

12   parties, including former employment. Finally, the Complaints attach information on Fahrenkopf

13   and McCurry's work as lobbyists on behalf of various corporations and trade associations that

14   are allegedly "heavily invested in currying favor with the two major political parties."[87]

15        The Complainants urge the Commission to infer that individuals' statements, recent

16   contributions, and outside employment render the CPD itself a partisan organization. As noted

17   above, however, the Commission has previously opined that individuals may wear "multiple

18   hats" to represent multiple interests.[88] It follows then, that an individual's leadership role in a

---

Transcript, *supra* note 24. Fahrenkopf continued, "seven people on the stage at one time is very difficult, it's going to take a very clever moderator to make sure that each candidate gets an opportunity to put forth their view. *Id.*

[86]    *See supra* note 25.

[87]    6869 Compl. at 27-28.

[88]    *See, e.g.*, Advisory Op. 2007-05 (Iverson) (opining that an individual may serve as chairman of a state party committee and solicit, direct, and spend non-federal funds on its behalf while continuing to serve as chief of staff to a member of Congress); Advisory Op. 2005-02 (Corzine) (describing circumstances under which a U.S. Senator may raise non-federal funds for his state gubernatorial campaign and other state candidates and committees); Advisory Op. 2003-10 (Reid) (concluding, *inter alia*, that an individual may, at different times, act in his capacity as an agent on behalf of a state party and in his capacity as an agent on behalf of a U.S. Senator).

MURs 6869R & 6942R (Commission on Presidential Debates)
Factual and Legal Analysis
Page 20 of 33

1  given organization does not restrict his or her ability to speak freely on political issues or make

2  contributions to political committees when he or she does so in his or her personal capacity.[89]

3         Here, there is no indication that Fahrenkopf wrote his op-ed in his official capacity as

4  CPD co-chair, nor does the opinion piece express positions on behalf of CPD. Likewise, the

5  Complaints make no suggestion that any of the contributions by Fahrenkopf, McCurry, or CPD

6  board members originated from CPD resources or any source other than their respective personal

7  assets. Finally, the available information does not show that Fahrenkopf, McCurry, or other CPD

8  officers and directors have acted as agents of CPD in the course of outside employment. At the

9  outset, most of the information presented involves work that preceded — at times significantly

10  — the individual's service for CPD.[90] And, to the extent officers or directors are currently

11  employed by entities with ties to or interests in the success of the Democratic or Republican

12  parties, there is no indication that they act on behalf of CPD in the course of such employment,

13  or alternatively, on behalf of their employer while volunteering for CPD. Moreover, the

14  organization has recently adopted a formal "Political Activities Policy" that is "intended to deter

15  CPD-affiliated persons from participating, even in a personal capacity, in the political process at

16  the presidential level (including the making of campaign contributions) while serving on the

17  Board."[91] Although not part of Respondents' submissions, the policy reportedly builds on a

18  previous "informal policy against Board members serving in any official capacity with a

19  campaign while also serving on the CPD Board" and "reflects CPD's view that a debate staging

---

[89]    *See* Advisory Op. 1984-12 (American College of Allergists) (recognizing the ability of organization leaders, acting in their individual capacities, to establish and govern a separate entity).

[90]    For example, the Complaint notes that Brown "is a creature of partisan politics, having served as an aide to top Republicans before taking over her present office [as Executive Director of CPD] in *1987*." 6869 Compl. at 28 (emphasis added). The Complainants likewise note that board member Newton Minow was a "close aide to Adlai Stevenson and a Kennedy appointee to the Federal Communications Commission" and that board member Antonia Hernandez served as counsel to the Senate Judiciary Committee when it was led by the late Ted Kennedy. *Id.*

[91]    Supp. Brown Decl., *supra* note 5, ¶ 7.

organization better serves the public when it not only conducts its operations in a strictly

nonpartisan manner, but when it also adopts and adheres to balanced policies designed to prevent

even the potential for an erroneous appearance of partisanship."[92] The Political Activities Policy

supplements CPD's Conflict of Interest Policy, which would appear to limit financial conflicts of

interest that could arise as a result of outside employment.[93] Complainants' information alleging

partisan political activity on the part of CPD's officers and directors *in their non-CPD capacities*

therefore does not support a reasonable inference that *CPD* endorses supports or opposes

political candidates or parties.  For the reasons stated above, the inference that LPF asks the

Commission to draw is legally baseless and factually unworkable.

The Complaints offer no additional information to demonstrate that CPD itself has

endorsed, supported, or opposed any political party or political candidate. Accordingly, CPD

would appear to be a permissible debate sponsor under 11 C.F.R. § 110.13(a).

**B.  CPD's 15 Percent Threshold Constitutes an Objective Criterion**

Commission regulations require staging organizations like CPD to use "pre-established

objective criteria to determine which candidates may participate in a debate."[94] In adopting this

requirement, the Commission reasoned, "[g]iven that the rules permit corporate funding of

candidate debates, it is appropriate that staging organizations use pre-established objective

criteria to avoid the real or apparent potential for a *quid pro quo*, and to ensure the integrity and

fairness of the process."[95]

---

[92]    *Id.*

[93]    6869 Compl. Ex. 101 (Conflict of Interest Policy, COMM'N. PRESIDENTIAL DEBATES); 6942 Compl. Ex. 101 (same).

[94]    11 C.F.R. § 110.13(c). The Complainants do not question whether the debate criteria is "pre-established," therefore we will not address this requirement further.

[95]    1995 E&J, *supra* note 15, at 64,262.

1    The regulation does not define "objective criteria;" however, the courts have said it does

2    not "mandate[] a single set of objective criteria all staging organization must follow, but rather

3    [gives] the individual organizations leeway to decide what specific criteria to use."[96] The

4    *Buchanan* court concluded that "[t]he authority to determine what the term objective criteria

5    means rests with the agency . . . and to a lesser extent with the courts that review agency

6    action."[97] To that end, the Commission has previously made clear that a requirement of

7    "reasonableness is implied" and stated that "[s]taging organizations must be able to show that

8    their objective criteria were used to pick the participants, and that the criteria were not designed

9    to result in the selection of certain pre-chosen participants."[98]

10    In specifically considering — and upholding — CPD's 15 percent threshold as applied to

11    the 2000 debates, the *Buchanan* court opined that "the objectivity requirement precludes debate

12    sponsors from selecting a level of support so high that only the Democratic and Republican

13    nominees could reasonably achieve it." But the court also noted that several third party

14    candidates *have* achieved over 15 percent support in polls at or around the time that the debates

15    are traditionally held:

16            For instance, by September 1968, George Wallace had achieved a
17            level of support of approximately 20% in the polls. John Anderson
18            was invited by the League of Women Voters to participate in the
19            1980 presidential debates after his support level reached
20            approximately 15%. Finally, in 1992, Ross Perot's standing in the
21            polls was near 40% at some points and he ultimately received
22            18.7% of the popular vote that year.[99]

---

[96]   *Buchanan*, 112 F. Supp. 2d at 73 (citations and internal quotations omitted); *see also* 1995 E&J, *supra* note 15 at 64,262 ("The choice of which objective criteria to use is largely left to the discretion of the staging organization.").

[97]   *Buchanan*, 112 F. Supp. 2d at 73.

[98]   1995 E&J, *supra* note 15, at 64,262.

[99]   *Buchanan*, 112 F. Supp. 2d at 73.

1    Accordingly, the court concluded that "third party candidates have proven that they can achieve

2    the level of support required by the CPD."[100] The Complainants now present new information in

3    support of their contention that the 15 percent threshold is not objective and results in prohibited

4    corporate contributions from CPD to debate participants.

5             1.   Expert Reports on the Purported Impracticability of Independent Candidates
6                 Reaching CPD's 15% Polling Threshold

7         Complainants present two expert reports in support of their argument that the 15 percent

8    threshold is designed to result in the exclusion of all candidates but those nominated by the

9    Democratic and Republican Parties. The first, by Dr. Clifford Young, opines that in order to

10    obtain 15 percent of the vote share, a candidate must achieve name recognition among at least 60

11    percent of the population and perhaps as much as 80 percent.[101] The second, from political

12    analyst Douglas Schoen, estimates that the cost to an independent candidate of achieving 60

13    percent name recognition would be over $266 million, including almost $120 million for paid

14    media content production and dissemination.[102] The Complainants argue that such a sum is

15    prohibitive for independent and third-party candidates, who do not have the benefit of

16    participating in a much-watched primary season or of garnering a minimum vote share in a

17    general election by virtue of being associated with a major party.[103] Thus, Complainants

18    conclude, the 15 percent threshold is systematically out of reach for independent candidates and

19    therefore not "objective" within the meaning of the regulations.

20         The expert reports relied upon by Complainants contain significant limitations that

21    undermine their persuasiveness. Young's analysis is limited in its scope: It correlates polling

---

[100]    *Id.*

[101]    *See generally* Young Report, *supra* note 34.

[102]    *Id.*

[103]    *Id.* at 12-13 (discussing the "party halo effect").

1    results to name recognition alone and draws conclusions regarding hypothetical third-party-

2    candidate performance based on that one factor. But polling results are not merely a function of

3    name recognition — they are a much more complex confluence of factors. Indeed, as Young

4    acknowledges, his report does not take into account a number of other factors that may affect

5    polling results, including "fundraising, candidate positioning, election results, and idiosyncratic

6    events."[104] In so doing, the report minimizes the very salient fact that, no matter how

7    recognizable a candidate is, the candidate may, nonetheless, be unpopular. For example, the

8    report does not take into consideration forces that might decrease the poll numbers of an

9    independent candidate who has become well-recognized — such as policy preferences or

10   political missteps. Conversely, it also does not account for forces that might increase the poll

11   numbers of an otherwise unfamiliar independent candidate — such as high unfavorable ratings

12   among major party candidates. This is a significant limitation that undermines the practical

13   application of the data to our analysis of CPD's debate participation criterion.

14        In addition, the Complaint appears to draw misguided conclusions from the Young

15   Report's data. Notably, neither the Young Report nor the Complaints and their voluminous

16   exhibits ever establish that independent candidates do not or cannot meet 60-80 percent name

17   recognition. To the contrary, during the 2016 presidential election, a YouGov poll taken at the

18   end of August found that 63 percent of registered voters had heard of Libertarian Gary Johnson

19   and 59 percent had heard of Green Party candidate Jill Stein.[105] Thus, there is no information in

---

[104]    *Id.* at 12-13; *see also, e.g.,* Nate Silver, *A Polling Based Forecast of the Republican Primary Field,* FiveThirtyEight Politics (May 11, 2011) (noting that, more than name recognition, "laying the groundwork for a run quite early on," including efforts to "hire staff, cultivate early support, brush up [] media skills" predicts later electoral success).

[105]    *Poll Results: Third Party Candidates,* YouGov (Aug. 25-26, 2016), *available at* https://d25d2506sfb94s.cloudfront.net/cumulus_uploads/document/wc35k48hrs/tabs_HP_Third_Party_Candidates_20160831.pdf.

1    the record to show that 60-80 percent name recognition is a prohibitively high bar for

2    independent candidates to meet or, put another way, that a criteria which purportedly requires

3    achievement of 60-80 percent name recognition is designed to exclude independent candidates.

4            Instead, the Complainants appear to use Young's name recognition threshold as a

5    springboard to another argument: that the cost of achieving 15 percent vote share is prohibitively

6    high for independent candidates. Indeed, the Schoen Report starts from the premise that 60-80

7    percent name recognition is necessary to gain a 15 percent vote share and estimates the amount

8    of money that an independent candidate would need to spend to reach 60-80 percent name

9    recognition. This approach is similarly based on significant assumptions that reduce its value.

10           Notably, the Schoen Report bases its estimation of campaign and media costs on the

11    assumption that independent candidates are unable to attract earned media (*i.e.*, free coverage).

12    Schoen presumes that "the media will not cover an independent candidate until they are certainly

13    in the debates. Thus, they must pay for all their media . . . ."[106] This premise is unfounded.

14    Notably, media coverage from the most recent presidential election demonstrates that the two

15    leading independent candidates — Libertarian Gary Johnson and Green Party candidate Jill Stein

16    — received extensive media coverage.[107]

17           Furthermore, Schoen's supposition is based in part on research published in 1999,[108]

18    which seems entirely inappropriate, given the rise of digital and social media and independent

19    expenditure-only political committees ("IEOPCs") in the years that have followed.

---

[106]    Schoen Report, *supra* note 35, at 3, 5.

[107]    *See, e.g.*, Supp. Brown Decl., *supra* note 5, ¶ 16 (identifying over 60 appearances by Johnson and Stein in media outlets including ABC, CBS, CNN, Fox, MSNBC, CNBC, PBS, C-SPAN, *USA Today*, *Time*, *People*, the *New York Times*, and others).

[108]    Schoen Report, *supra* note 35, at 4 (citing Paul Herrnson & Rob Faucheux, *Outside Looking In: Views of Third Party and Independent Candidates*, CAMPAIGNS & ELECTIONS (Aug. 1999)).

1       Digital and social media have provided more economical avenues for candidates'

2    messages, while social media has also enabled the ubiquitous sharing of those messages among

3    vast global networks.[109] The most recent election especially highlighted the impact of changing

4    media. In the final months of the 2016 election, Hillary Clinton spent more than $200 million on

5    television ads; Donald Trump spent less than half of that, by focusing his spending on digital

6    platforms like Facebook and Twitter.[110] Digital and social media not only served as a cheaper

7    avenue for paid media, but also generated earned media when more traditional news outlets

8    covered noteworthy tweets and posts.[111] In addition, digital media reportedly replaced field

9    offices for the Trump campaign, thereby reducing another traditional campaign cost.[112] This

10    change in traditional campaign strategies — a phenomena that intensified in 2016, but began in

11    earnest in the 2008 election cycle[113] — dramatically undermines Schoen's assumptions about the

12    avenues of media exposure available to independent candidates and their associated costs.

13       Furthermore, with the rise of IEOPCs — several of which supported Libertarian

14    candidate Gary Johnson in 2016[114] — paid media in support of a particular candidate may be

15    created and distributed by entities other than the candidate and his or her principal campaign

---

[109]    6869 Resp. n.4 (citing Clair Cain Miller, *How Obama's Internet Campaign Changed Politics,* N.Y. TIMES (Nov. 7, 2008); Derek Prall, *The Social Soapbox: How Social Media and Data Analytics are Helping Grassroots Candidates Gain Legitimacy*, AM. CITY & COUNTY (Oct. 22, 2014)); 6942 Resp. n.4 (same).

[110]    *See* Issie Lapowsky, *Here's How Facebook Actually Won Trump the Presidency*, WIRED (Nov. 15, 2016), https://www.wired.com/2016/11/facebook-won-trump-election-not-just-fake-news/.

[111]    *Id.*

[112]    Matthew Tyson, *How Digital Marketing Helped Donald Trump Win*, HUFFINGTON POST (Dec. 19, 2016), http://www.huffingtonpost.com/matthew-tyson/how-digital-marketing-hel_b_13721224.html.

[113]    Claire Cain Miller, *How Obama's Internet Campaign Changed Politics*, N.Y. TIMES (Nov. 7, 2008), https://bits.blogs.nytimes.com/2008/11/07/how-obamas-internet-campaign-changed-politics/?_r=0; Sarah Lai Stirland, *Propelled by Internet, Barack Obama Wins Presidency*, WIRED (Nov. 4, 2008), https://www.wired.com/2008/11/propelled-by-in/.

[114]    *See* Independent Expenditures in Support or Opposition to Gary Johnson, 2016 Cycle, OPEN SECRETS, https://www.opensecrets.org/pres16/outside-spending?id=N00033226 (last visited March 8, 2017) (listing six IEOPCs that reported independent expenditures supporting Johnson in 2016, including two that spent over $1 million).

1   committee. Such independent support likely increases a candidate's name recognition at no cost

2   to the candidate, thereby reducing the total sum that the candidate must spend to achieve 60-80

3   percent name recognition. In addition, IEOPCs may raise unlimited funds from individuals and

4   from sources, like corporations, otherwise prohibited under the Act. Thus, the existence of

5   IEOPCs also undermines the dated Schoen Report's conclusions about the number of individual

6   donations needed to reach Young's 60-80 percent name recognition threshold.[115]

7        The most recent elections demonstrate how Complainants' failure to consider recent

8   developments undermines their conclusions. As noted above, Libertarian candidate Gary

9   Johnson achieved 63 percent name recognition shortly before Labor Day 2016. This was a

10   significant increase from just 34 percent three months earlier.[116] Yet to reach 63 percent name

11   recognition, Johnson raised only $7.9 million and spent only $5.4 million,[117] a mere *2-3 percent*

12   of the $266 million that Schoen estimates an independent candidate would need to achieve 60-80

13   percent name recognition.

14        Finally, it is worth noting that independent candidates frequently do not start from zero in

15   terms of either name recognition or fundraising. Notably, Gary Johnson and George Wallace,

16   who ran as an independent candidate in 1968, were both governors before running for president

17   and presumably enjoyed at least regional recognition. Similarly, several independent candidates

18   — including Ross Perot — have been independently wealthy and able to fund significant

---

[115]     Schoen Report, *supra* note 35, at 24-25 (estimating independent candidate's "hypothetical average donation").

[116]     *Poll Results: Gary Johnson*, YouGov (May 25-26, 2016), *available at* https://today.yougov.com/news/2016/08/31/poll-results-third-party-candidates/.

[117]     February Monthly Rpt. of Gary Johnson 2016, FEC (Feb. 20, 2016); Amended Mar. Monthly Rpt. of Gary Johnson 2016, FEC (June 20, 2016); Amended Apr. Monthly Rpt. of Gary Johnson 2016, FEC (June 20, 2016); Amended May Monthly Rpt. of Gary Johnson 2016, FEC (June 20, 2016); June Monthly Rpt. of Gary Johnson 2016, FEC (June 20, 2016); Amended July Monthly Rpt. of Gary Johnson 2016, FEC (Aug. 20, 2016); Aug. Monthly Rpt. of Gary Johnson 2016, FEC (Aug. 20, 2016); Sept. Monthly Rpt. of Gary Johnson 2016, FEC (Sept. 20, 2016).

1    portions of their own campaigns. And indeed, former New York mayor Michael Bloomberg's

2    preexisting name recognition[118] and significant personal wealth were among the qualities that

3    drew him significant attention as a potential independent candidate in 2016.[119] That candidates

4    may start with some name recognition or financial resources further belies the Complaints'

5    critique about the onerous fundraising required to reach 60-80 percent name recognition and the

6    15 percent polling threshold.

7          In sum, the reports by Young and Schoen do not provide a sufficient basis to conclude

8    that CPD's 15 percent participation threshold is a level of support so high that only the

9    Democratic and Republican nominees could reasonably achieve it. Taken together with the

10   Commission's judicially upheld determinations that independent candidates of the past *have*

11   reached 15 percent in the polls,[120] the Complainants' reports do not provide reason to believe

12   that CPD's 15 percent criteria violated the requirement to use objective candidate-selection

13   criteria for staging debates.

14              2.  Evidence on Purported Unreliability of Polling Data

15         Finally, Complainants allege that CPD's 15 percent threshold is not objective because the

16   fact that CPD selects both the cutoff date for the application of its debate criteria and the polls to

17   consider allows CPD to manipulate the criteria favor of Democratic and Republican interests.[121]

18   Citing the Young Report, Complainants also contend that polling in races with more than two

---

[118]    *See* Michelle Hackman, *Bloomberg Wants to Save Everyone from Trump. But a Lot of People Don't Know Who He Is,* VOX (Jan. 23, 2016), http://www.vox.com/2016/1/21/10810624/michael-bloomberg-third-party-bid (reporting on a poll finding that, contrary to the title's characterization, roughly 57 percent of voters had an opinion on Bloomberg).

[119]    *See* Alexander Burns and Maggie Haberman, *Bloomberg, Sensing an Opening, Revisits a Potential White House Run,* N.Y. TIMES (Jan. 23, 2016), https://www.nytimes.com/2016/01/24/nyregion/bloomberg-sensing-an-opening-revisits-a-potential-white-house-run.html.

[120]    *Buchanan*, 112 F. Supp. 2d at 73.

[121]    6869 Compl. at 41-45.

1   candidates is subject to increased inaccuracy.[122] As to the first allegation, there is no information

2   in the Complaint suggesting that CPD has manipulated the dates on which it applies its criteria to

3   reach a particular result. Likewise, there is no information in the record to indicate that any

4   candidates have been excluded by virtue of the polling deadline or that past independent

5   candidates would have been admitted to a debate had CPD relied on different polling sources.

6         With regard to the selection of polls, CPD's independent polling expert, Frank M.

7   Newport, Editor-in-Chief of Gallup Organization, affirms in a sworn declaration that he has

8   recommended which polls CPD should use in every election since 2000, based on, "the quality

9   of the methodology employed, the reputation of the polling organizations and the frequency of

10   the polling conducted."[123] Newport states that he made the recommendations based solely "upon

11   my professional judgement and without any partisan purpose or pre-determined result in mind"

12   and that CPD has always adopted his recommendations.[124] The Newport declaration further lists

13   the polls selected in each cycle between 2000 and 2012, and indicates that, with few exceptions,

14   CPD relied on the same five polling organizations, thus lending a relative degree of predictability

15   to the polling used. Newport also affirms that "it is neither feasible nor appropriate to include

16   every candidate's name in a public opinion poll," but that based on his experience, "it is

17   extraordinarily unlikely that a poll would fail to identify and include among the candidates listed

18   in polling questions a candidate whose level of support is anywhere near 15 percent of the

---

[122]   *Id.* at 41-42.

[123]   6869 Resp. Ex. 2 (Declaration of Frank M. Newport) ("Newport Decl."). Among the polls used between 2000 and 2012 were those conducted by ABC News and the *Washington Post*, NBC News and the *Wall Street Journal*, CBS News and the *New York Times*, Fox News and Opinion Dynamic, and CNN, *USA Today* and Gallup. *Id.* According to Newport, "these organizations' polls would be conducted in a responsible and professional manner that meets the industry standards and reflects the then-current advances in polling methodology." *Id.*

[124]   *Id.*

1   national electorate."[125] The Complaint's speculation about the possibility of an independent

2   candidate being excluded by CPD's selection of polls is unpersuasive in the face of Newport's

3   sworn attestations.

4         Lastly, relying on the Young Report, the Complaints suggest that polling in three-way

5   races is subject to increased inaccuracy, as compared to polling in two-way races.[126] In

6   particular, the Young Report concludes that sampling (*i.e.,* sample size) and non-sampling (*e.g.,*

7   coverage bias, election salience, and strategic voting) errors are greater in three-way

8   gubernatorial races studied[127] and that the error rates are especially high for candidates on the

9   cusp of CPD's 15 percent threshold.[128]

10        Reliance on this conclusion is problematic for several reasons. First, Young's metric for

11   polling error appears to be based on the difference between the poll and the actual results on

12   Election Day.[129] However, CPD does not purport to use the polls as predictors of what will occur

13   on Election Day, but as a reliable measure of candidates' support at a given moment in

14   September. Indeed, as the Newport Declaration notes, "[p]olls are estimates and imperfect

15   predictors of future events" but, according to Newport, "there is no doubt that properly

16   conducted polls remain the best measure of public support for a candidate . . . at the time the

17   polls are conducted."[130]

---

[125]   *Id.*

[126]   6869 Compl. at 42.

[127]   Young Report, *supra* note 34, at 18-28.

[128]   *Id.* at 18.

[129]   *Id.* at 25-26. Young uses as his metric the "average absolute difference" ("AAD") — a measure of the average difference between each candidate's actual result on Election Day and his or her polled vote share in a given poll.

[130]   Newport Decl., *supra* note 123, ¶ 21.

1    Newport further disagrees with the Young Report's reliance on three-way gubernatorial

2    election polling to draw conclusions about the effect of sampling error on independent

3    presidential candidates on the cusp of CPD's 15 percent threshold. Specifically, Newport states

4    that presidential election polling is "inherently more reliable than is polling in low turn-out

5    elections," as polls in mid-term state elections are "generally more subject to sampling and non-

6    sampling errors than national polls which are used by CPD in presidential elections."[131] Newport

7    further asserts that "nothing about support for a significant third party-candidate [sic] [] makes it

8    more difficult to measure."[132]

9    Having carefully weighed and considered the analyses of the parties' respective experts,

10   we do not believe the available information is sufficient to conclude that the polling data

11   employed by CPD are not an objective means of measuring public support for presidential

12   candidates at a moment in time. In particular, we note that all candidates must abide by the same

13   polls, and thus equally endure whatever errors may be present. Moreover, as the court noted in

14   *Buchanan,* such error may just as likely result in over inclusion of candidates shy of the 15

15   percent threshold.[133] And although the Complainants present information suggesting that

16   independent gubernatorial candidates may be disproportionately impacted by polling errors, it is

17   not clear that independent presidential candidates are similarly impacted.

18   In conclusion, the new information presented to the Commission asserting the

19   impracticability of the 15 percent threshold for independent candidates and on the unreliability of

20   polling are not sufficient to support a reasonable inference that the CPD's criteria for selecting its

21   debate participants are not objective within the meaning of 11 C.F.R. § 110.13(c).

---

[131]   *Id.* ¶ 19.

[132]   *Id.* ¶ 21.

[133]   *Buchanan*, 112 F. Supp. 2d at 75.

1            3.   <u>Complainants' Policy Arguments</u>

2            Much of the remaining information included with the Complaints pertains to policy

3 arguments about the particular challenges that independent candidates face in the two-party

4 dominant system, the reasons why independent candidates should be included in debates, or the

5 benefits of alternative selection criteria. However, these points, no matter how compelling, do

6 not bear on the Commission's consideration of whether or not the 15 percent threshold is an

7 objective criterion and, most fundamentally, whether CPD's use of such a criteria results in

8 prohibited in-kind corporate contributions from CPD to debate participants.

9            As the Commission has previously explained in related rulemaking proceedings, "the rule

10 at section 110.13(c) . . . is not intended to maximize the number of debate participants; it is

11 intended to ensure that staging organizations do not select participants in such a way that the

12 costs of a debate constitute corporate contributions to the candidates taking part."[134] Thus, the

13 relevant inquiry is not whether CPD's 15 percent threshold "den[ies] voters a viable alternative

14 to the Republican and Democratic parties that Americans increasingly feel have failed the

15 nation,"[135] as Complainants urge, but whether that threshold is objective and thereby "avoids the

16 real or apparent potential for a *quid pro quo*"[136] between a corporate debate sponsor and a party

17 or candidate. As described above, there is insufficient information to support a reasonable

18 inference that CPD's criteria are not objective, which ends the Commission's inquiry in this

19 allegation.

---

[134]     *Candidate Debates,* 80 Fed. Reg. 72,616, 72,617 (Nov. 20, 2015).

[135]     6869 Compl. at 2.

[136]     1995 E&J, *supra* note 15, at 64,262.

1    **V.    CONCLUSION**

2          For the reasons stated above, the Commission finds no reason to believe CPD,

3    Fahrenkopf, and Ridings as co-chairs, and the ten named officers and board members violated

4    52 U.S.C. §§ 30116(f) or 30118(a) by making prohibited contributions and expenditures and

5    accepting prohibited contributions, and no reason to believe that CPD violated 52 U.S.C.

6    §§ 30103 or 30104 by failing to register and report as a political committee.