**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEVEL THE PLAYING FIELD, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>FEDERAL ELECTION COMMISSION, )<br><br>Defendant. ) | Case No. 15-cv-1397 (TSC) |

## MEMORANDUM OPINION

This case concerns a highly visible element of our democratic electoral process: the presidential and vice-presidential debates held every four years by the Commission on Presidential Debates ("CPD").

Plaintiffs Level the Playing Field, Peter Ackerman, Green Party of the United States, and Libertarian National Committee, Inc. allege that, following this court's remand, Defendant Federal Election Commission ("FEC") again violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, in dismissing two administrative complaints regarding the CPD, and denying a petition to engage in rulemaking to change the FEC's regulations regarding debate staging organizations. (*See* ECF No. 76 ("Am. Compl.") ¶¶ 76–82.)

Before the court are Plaintiffs' motion for summary judgment (ECF No. 83), Defendant's cross-motion for summary judgment (ECF No. 90), Defendant's motion to strike (ECF No. 92), and Plaintiffs' motion to supplement the record (ECF No. 99). Upon consideration of the pleadings and the Administrative Record (ECF No. 105), Defendant's motion to strike is GRANTED in part and DENIED in part, Plaintiffs' motion to supplement the record is DENIED, Plaintiffs' motion for summary judgment is DENIED, and Defendant's cross-motion for

1

summary judgment is GRANTED.

## I. BACKGROUND

This is the second round of summary judgment briefing in this case. Because this court has already issued a detailed memorandum and opinion (ECF No. 60), for purposes of this ruling, the court will assume the parties' familiarity with the underlying record and recite only what is necessary to resolve the pending motions.

### A. The Court's February 1, 2017 Memorandum and Opinion

On February 1, 2017, this court issued a memorandum and opinion finding that the FEC "acted arbitrarily and capriciously and contrary to law when it dismissed [Plaintiffs'] two administrative complaints" and "fail[ed] to provide a reasoned and coherent explanation" for its denial of Plaintiffs' rulemaking petition. (*Id.* at 28.)

In granting Plaintiffs' motion for summary judgment and denying the FEC's cross-motion for summary judgment, the court issued five main directives to the FEC in reconsidering Plaintiffs' submissions. The court ordered the FEC to: (1) "articulate its analysis in determining whether the CPD endorsed, supported, or opposed political parties or candidates" (*id.* at 14); (2) "demonstrate how it considered the evidence, particularly, but not necessarily limited to, the newly-submitted evidence of partisanship and political donations and the expert analyses regarding fundraising and polling" (*id.* at 18); (3) notify the ten remaining directors, address the allegations made against them, and consider the evidence presented against them (*id.* at 19); (4) demonstrate that it had considered the full scope of Plaintiffs' evidence as well as to explain how and why it rejected the evidence in deciding that CPD's polling requirement is an objective criterion (*id.* at 23); and (5) engage in thorough consideration of the presented evidence and explain its decision regarding Plaintiffs' rulemaking petition (*id.* at 27–28).

### B. Plaintiffs' August 11, 2017 Amended Complaint

On August 11, 2017, Plaintiffs filed an amended complaint alleging that the FEC's post-remand decisions indicate that it failed to comply with any of the court's directives, and asking the court to take the following actions:

> Declare that the FEC's dismissals of Plaintiffs' administrative complaints were arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, and direct the FEC, within 30 days, to find that the CPD has violated 11 C.F.R. § 110.13 by staging candidate debates in a partisan manner and without pre-established, objective criteria; violated 52 U.S.C. § 30118(a) by making prohibited contributions and expenditures; and violated 52 U.S.C. §§ 30103 and 30104 by failing to register as a political committee and by failing to make required reports and disclosures; and

> If the FEC fails to so act, authorize Plaintiffs to bring a civil action against the CPD, its executive director, and the directors who have participated in these violations of federal election law to remedy those violations; and

> Declare the FEC's denial of the petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, and order the FEC to open rulemaking to revise its rules governing presidential debates to ensure that debate sponsors do not unfairly exclude independent and third-party candidates from participating.

(*See* Am. Compl. ¶¶ 3, 9, 21.)

## II. STANDARD

On a motion for summary judgment in a suit seeking APA review, the court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). The plaintiff bears the burden of establishing the invalidity of the agency's action. *Id.*

The court is "not empowered to substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (abrogated on other grounds), but

instead must consider only "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors," *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)). "A reviewing court, however, will accord a somewhat greater degree of scrutiny to an order that arrives at substantially the same conclusion as an order previously remanded by the same court." *Greyhound Corp. v. I.C.C.*, 668 F.2d 1354, 1358 (D.C. Cir. 1981). "The agency's action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result." *Food Mktg. Inst. v. I.C.C.*, 587 F.2d 1285, 1290 (D.C. Cir. 1978).

## III. ANALYSIS

### A. Defendant's Motion to Strike and Plaintiffs' Motion to Supplement

The FEC moves to strike portions of Plaintiffs' memorandum of law, portions of Plaintiffs' counsel's declaration, and one of Plaintiffs' expert affidavits because the materials were not before the agency when it made its determinations and are not part of the administrative record. (*See* ECF 92 ("Def.'s Mot. to Strike") at 1.) The FEC also argues that Plaintiffs' use of a FEC Commissioner's pre-decisional statement is improper. (*See id.*) Plaintiffs oppose the motion to strike and move to supplement the administrative record with the objected to material. (*See* ECF No. 99 ("Pls.' Mot to Supplement") at 1–2.) Because the arguments in the motion to strike and the motion to supplement overlap, the court will assess them simultaneously with respect to each category of objected to material.

1. Extra-record Evidence

When reviewing agency actions such as FEC's decision here, courts review "the whole

record or those parts of it cited by a party." 5 U.S.C. § 706; *Volpe*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision."). This includes "all documents and materials that the agency directly or indirectly considered" before deciding what action to take. *Pac. Shores Subdiv. Cal. Water Dist. v. U.S. Army Corps of Engr's*, 448 F.Supp.2d 1, 4 (D.D.C. 2006) (internal quotation omitted). Judicial review is limited to the record because a court "should have before it neither more nor less information than did the agency when it made its decision." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). Agencies bear the burden of compiling the materials and documents they considered, either directly or indirectly, and the compiled record "is entitled to a strong presumption of regularity." *Marcum v. Salazar*, 751 F.Supp.2d 74, 78 (D.D.C. 2010).

When, as here, a party seeks to add materials to the record that it does not contend the agency actually reviewed, courts have permitted such extra-record evidence in at least three "unusual circumstances." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). These are: (1) when "the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,'" (2) when "background information [is] needed 'to determine whether the agency considered all the relevant factors,'" and (3) when "the 'agency failed to explain administrative action so as to frustrate judicial review.'" *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Am. Wildlands*, 530 F.3d at 1002).

Plaintiffs contend that the extra-record materials identified in their motion for summary judgment can be divided into six categories that are permissible under one of the first two exceptions or for a separate reason. (*See* Pls.' Mot. to Supplement at 2–6.) However, three of the extra-record materials identified in the FEC's appendix—an article regarding a 2018 Senate

bid, a comment made after the 2016 election about the difficulty of selecting moderators, and an article concerning Ross Perot's independent candidacy in 1992—are not encompassed by any of the six categories delineated by Plaintiffs.  For those materials, because Plaintiffs failed to address them, in accord with Local Rule 7(b), the court deems the FEC's motion as conceded, *see Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C.Cir.1997)) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), and strikes those portions from the record.  (*See* ECF No. 83 ("Pls.' Mot. Summ. J.") at 14, n.22; 16, n.30; 44, n.58.)

### i. News Articles Regarding CPD Directors' Participation and Statements

Plaintiffs seek to supplement the record with two news articles that they allege demonstrate noncompliance with CPD's internal policies.  The first article relays CPD Director Olympia Stowe's opinion that President Donald Trump was hurting the Republican brand.  (*See* Pls.' Mot. Summ. J. at 14, n.18.)  The second article states that CPD Director Frank Fahrenkopf co-chaired a fundraiser for Adam Laxalt, who was reportedly considering entering Nevada's gubernatorial race at the time.  (*See id.* at 25, n.35.)  Plaintiffs argue that the articles fall under the first and second *Dania Beach* exceptions, under which extra-record evidence may be considered because an agency has deliberately or negligently excluded adverse documents, and extra-record evidence may be considered as needed background information.  (*See* Pls.' Mot. to Supplement at 2–3.)

Having considered all arguments, the court finds that neither of the first and second *Dania Beach* exceptions apply to these articles.  To prove that the articles fall within the first

*Dania Beach* exception, Plaintiffs needed to make a "strong showing of [agency] bad faith."

*Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 55 (D.C. Cir. 2015) (quoting *James Madison*

*Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C.Cir.1996) (alteration in original).  Here,

Plaintiffs proffered only "conclusory statements," which "'fall short' of that high threshold."  *Id.*

With respect to the second *Dania Beach* exception, Plaintiffs argue that the news articles should

be made part of the record because they show "that the FEC failed to consider all relevant factors

when relying upon the alleged [internal] policies."  (*See* Pls.' Mot. to Supplement at 3.)  But

under *Dania Beach*, it is not enough that Plaintiffs cursorily allege the evidence shows a failure

to consider all relevant factors; Plaintiffs must demonstrate that the evidence is "needed" by the

court to make that determination.  *Dania Beach*, 628 F.3d at 590.  And in light of the FEC's

explanation of the manner in which it relied on CPD's representation that it had two internal

polices, as well as the voluminous record, the court is confident that the two news articles are not

needed.  *See e.g.*, *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 54 (D.D.C. 2015) (finding

supplementation not needed where agency provided cogent explanation).  Therefore,

Defendant's motion to strike the two news articles is GRANTED, and Plaintiffs' motion to

supplement the record with them is DENIED.

### ii.  *News Articles Regarding Media Sources Consulted by Voters*

Plaintiffs next seek to admit four news articles under the first and second *Dania Beach*

exceptions, arguing that the articles rebut the FEC's assertion that an independent candidate can

significantly defray the cost of her campaign by reaching voters through social media.  (*See* Pls.'

Mot. Summ. J. at 30, nn.38–40; 31, n.46; Pls.' Mot to Supplement at 4.)

Here again, the court finds that neither the first nor second *Dania Beach* exceptions

apply.  Plaintiffs proffer no evidence of bad faith, and therefore cannot meet the first exception.

*See Dist. Hosp. Partners, L.P.*, 786 F.3d at 55 (noting that to meet the first exception, plaintiffs must make a strong showing of bad faith on the part of the agency). And the second exception has not been met because the FEC's decision explains how it arrived at its finding that the Douglas Schoen expert report is undermined, in part, because the report did not consider the effect of digital and social media on media exposure avenues available to independent candidates. The proffered news articles are not needed to determine whether the FEC adequately considered all the relevant factors, including the extent to which voters rely on social media to learn about presidential candidates. *See e.g.*, *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 54 (finding supplementation not needed where agency provided cogent explanation). Accordingly, Defendant's motion to strike the four news articles is GRANTED, and Plaintiffs' motion to supplement the record with them is DENIED.

*iii. Articles, Books, Videos, and Websites regarding the 2016 Election*

Of the FEC's two decisions—the initial decision was issued in 2015 and the second decision was issued in 2017—only the 2017 decision references the 2016 election in its analysis. In response to this reference in the 2017 decision, Plaintiffs seek to supplement the administrative record with extra-record evidence concerning the 2016 election. (*See* Pls.' Mot. Summ. J. at 1, n.2; 4, n.6; 13, nn.12–13 & 15–16; 14, nn.17, 19–21, & 23; 15, nn.24–26; 16, n.29; 33, n.49.) Plaintiffs argue that the court should either find that the evidence falls under the second *Dania Beach* exception or, at a minimum, take judicial notice of the evidence for purposes of background. (*See* Pls.' Mot. to Supplement at 5–6.) The court disagrees.

Plaintiffs' characterization of FEC as "conducting [its] own sua sponte analysis of the 2016 race," (*see id.* at 6), is a bit of an overstatement. The FEC's references to the 2016 election are cabined largely to three categories: (1) third party candidates' name recognition, media

8

attention, and financial support; (2) the Democratic and Republican nominees' spending on digital marketing; and (3) a potential candidate's reported interest in running because of his personal wealth and name recognition.  For each category, the FEC provides a cogent explanation of its reliance on the cited materials; thus, supplementation is not needed.  *See e.g.*, *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 54 (finding supplementation not needed where agency provided cogent explanation).  With respect to Plaintiffs' alternative argument, because the content of some of the documents are subject to reasonable dispute and the court's focus at this stage is on the documents that can serve as the foundation for Plaintiffs' claims, the court declines to take judicial notice of the documents for background purposes.  Defendant's motion to strike the articles, books, videos, and websites is GRANTED, and Plaintiffs' motion to supplement the record with them is DENIED.

### iv.   *Name Recognition Polls Not Mentioned in FEC's Decisions*

Plaintiffs also seek to supplement the record with a Gallup and a YouGov poll showing that Libertarian Party candidate Gary Johnson's name recognition was 36 percent and 37 percent respectively.  (*See* Pls.' Mot. Summ. J. at 27, n.37.)  According to Plaintiffs, the polls show that the FEC erred in relying solely on a subsequent YouGov poll, which indicated that Gary Johnson achieved 63 percent name recognition.  (*Id.*)  Plaintiffs argue that the court may take judicial notice of the polls or, in the alternative, find that the two polls fall under the first and second *Dania Beach* exceptions.  (*See* Pls.' Mot. to Supplement at 3–4.)  However, none of these three proposed avenues are appropriate here.

"[J]udicial notice is typically an inadequate mechanism for a court to consider extra-record evidence when reviewing an agency action."  *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 32, n.14 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786

F.3d 46 (D.C. Cir. 2015). This general rule rests on the premise that plaintiffs should not be permitted to exploit the standard for judicial notice to circumvent the strict standard for supplementing the administrative record. *See Banner Health v. Burwell*, 126 F. Supp. 3d 28, 62 (D.D.C. 2015), *aff'd in part, rev'd in part sub nom. Banner Health v. Price*, 867 F.3d 1323 (D.C. Cir. 2017) ("Plaintiffs cannot evade that strict standard by appealing to the standard for judicial notice."). And none of the cases relied upon by Plaintiffs involved an APA case. *See e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 n.21 (2002) (reviewing public opinion polling data in death penalty appeal); *Owens v. Duncan*, 781 F.3d 360, 362 (7th Cir. 2015) (using website to determine when sunset and nautical twilight occurred on certain day in a habeas case). Therefore, in accord with other courts in this district, the court declines to take judicial notice of the two polls because, as discussed below, Plaintiffs have failed to prove that any of the *Dania Beach* exceptions apply. *See Riffin v. Surface Transp. Bd.*, No. 16-1147, 2016 WL 6915552, at *1 (D.C. Cir. Oct. 6, 2016) (unpublished) (rejecting plaintiff's effort to supplement the administrative record through judicial notice and explaining that none of the three exceptions to the rule against supplementation were met); *Silver State Land, LLC v. Beaudreau*, 59 F. Supp. 3d 158, 172 (D.D.C. 2014) (declining to take judicial notice in APA case where proposed document did not "qualify for supplementation of the administrative record or extra-record review"); *see also Dist. Hosp. Partners*, 971 F. Supp. 2d at 32 n.14 ("[J]udicial notice of an adjudicative fact not part of the administrative record generally is irrelevant to the court's analysis of the merits. Instead, a court may only consider an adjudicative fact subject to judicial notice that is not part of the administrative record if it qualifies for supplementation as extra-record evidence.").

With respect to the first *Dania Beach* exception, in addition to their conclusory statement that the two polls undermine the FEC's argument and were deliberately or negligently excluded

by the FEC, Plaintiffs cite to a D.C. Circuit decision permitting supplementation of the administrative record where the agency relied on a single memorandum from another program. *See Kent Cty., Delaware Levy Court v. U.S. E.P.A.*, 963 F.2d 391, 396 (D.C. Cir. 1992). However, in that case*,* the agency looked outside of its own files to support its decision, but neglected to examine its own files, which contained several documents "relat[ing] to the position of the agency's own experts on the question central to th[e] case." *Id.* Thus, the Court found the agency negligent for failing to review any of its internal documents and permitted plaintiff to supplement the administrative record. *Id.* Here, however, the poll relied upon by the FEC and the two polls proffered by Plaintiffs are all external documents. Thus, there is insufficient evidence to find that the FEC was either deliberate or negligent in not including them. Moreover, Plaintiffs seek to introduce a poll that was taken June 2–5, 2016 and another poll taken July 13–17, 2016. And because the YouGov poll in the record was taken over a month later, on August 25–26, 2016, it is not directly contradicted by the polls proffered by Plaintiffs, and it is not clear that the polls are adverse to the FEC's decision.

Lastly, the second *Dania Beach* exception does not apply to the name recognition polls, neither of which provide insight into the FEC's findings nor assist the court in determining whether the FEC adequately considered the relevant factors. *C.f. Rhea Lana, Inc. v. U.S. Dep't of Labor*, No. 14-CV-00017 (CRC), 2016 WL 10932817, at *1 (D.D.C. Dec. 6, 2016) (finding proposed supplement provided needed background information where it included letters "shed[ding] light on the basis for [the agency's] decision"). The two proffered polls do not provide insight into the FEC's decision making because they do not reflect the thoughts or efforts of anyone who participated in the FEC's decision. And the court can consider any arguments about to what extent, if any, the FEC erred in relying only on the August YouGov poll

without considering the two earlier polls that were not before the FEC.  Thus, Defendant's motion to strike the name recognition polls is GRANTED, and Plaintiffs' motion to supplement the record with them is DENIED.

### v.  2008 Polling Data for President Barack Obama

Plaintiffs also seek to supplement the record with a Real Clear Politics poll, which they allege plainly shows that President Barack Obama's polling received a boost after the 2008 Iowa caucuses.  (*See* Pls.' Mot. Summ. J. at 42, n.55.)  Plaintiffs assert that the court should take judicial notice of the poll, or consider it under the first *Dania Beach* exception, which permits consideration of extra-record adverse evidence when an agency has deliberately or negligently excluded it.  (*See* Pls.' Mot. to Supplement at 5.)

Plaintiffs have again failed to establish that supplementation is warranted.  They submitted this poll because "[f]or the first time in its decisions, the FEC disputed whether President Obama's polling received a boost from the 2008 Iowa caucuses."  (*Id.*)  But the FEC's decision contains no such dispute; it simply notes that a polling expert found that President Obama did not "suddenly burst onto the political scene, polling shows that he was already reasonably well-known to voters in advance of the 2008 primaries."  (A.R. 1934.) [1] Nevertheless, even if the decision did contain the dispute, Plaintiffs have not shown that the FEC deliberately or negligently excluded the poll, and judicial notice is inappropriate where none of the *Dania Beach* exceptions have been met.  Accordingly, the court will not take judicial notice of the Real Clear Politics poll and will not consider it as part of the record in evaluating the cross-motions for summary judgment.  Defendant's motion to strike the Real Clear Politics poll

---

[1] In this opinion, the "A.R." refers to the administrative record.  The entire administrative record is contained in the "Second Joint Appendix," ECF No. 105.

is GRANTED, and Plaintiffs' motion to supplement the record with it is DENIED.

### vi.   *Douglas Schoen Affidavit*

The administrative record in this case includes Douglas Schoen's expert report and a cover letter advising Defendant that Schoen's complete data set could be provided upon request. Plaintiffs now seek to supplement the record with an affidavit from Schoen attaching the data set upon which he relied.  (ECF No. 83-3.)  Plaintiffs argue that the court should consider the affidavit and attachment under the second *Dania Beach* exception, which allows a court to supplement the record with evidence that provides needed background information.  (*See* Pls.' Mot. to Supplement at 5.)

The court does not need the affidavit and the data set to determine whether the FEC considered the relevant factors.  Generally, an administrative record need not be supplemented with underlying source documents where a document in the record provides detailed findings. *See Dist. Hosp. Partners*, 786 F.3d at 55 (finding supplementation unnecessary because source data did not constitute critical background information); *Todd v. Campbell*, 446 F. Supp. 149, 152 (D.D.C. 1978), *aff'd*, 593 F.2d 1372 (D.C. Cir. 1979) ("[T]he Court does not need to examine the raw data in order to determine whether or not the Commission decision was arbitrary and capricious or otherwise not in accordance with law."); *see also James Madison*, 82 F.3d at 1095–96 ("[T]he administrative record included detailed memoranda describing the examiners' findings and recommendations, and [the plaintiff] has given no reason why the district court should have looked beyond those memos.").  This case does not present any reason to depart from this general understanding because the proposed supplement is, as Plaintiffs concede, "in many respects [] identical to what Schoen said in his report."  (Pls.' Mot. to Supplement at 5.)  The duplicative nature of the supplement renders this case inapposite to the

first case—*Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203 (D.D.C. 2005)—upon which Plaintiffs

rely. *Id.* at 217 n.17 (supplementing record with additional information from the creator of a

scientific model because the proposed supplement explained how the agency misapplied the

model). And Plaintiffs' second case is inapplicable because, contrary to Plaintiffs'

representations to the court, the scientist's declaration in that case was stricken from the record.

*See Sw. Ctr. For Biological Diversity v. Norton*, No. 98-CV-934 (RMU/JMF), 2002 WL

1733618, at *8 (D.D.C. July 29, 2002) ("In the end, the addition of Lande's declaration is a

nonstarter, for it cannot be said to taint FWS' final decision.").

Moreover, to the extent Plaintiffs suggest that had the FEC requested the data set, it

would have changed its finding that there is "no evidentiary basis" to credit the figures extracted

from the data set, Plaintiffs are mistaken. The proposed data set—a one-page chart, entitled

"National 18 Week Political Strategy Outline"—does not address any of the three issues

identified in the FEC's rulemaking decision. It does not provide information on the underlying

data or explain the circumstances under which a media firm offered these estimates. And lastly,

it does not address or acknowledge the biases arising from a media firm's financial interest in

estimating or promoting high media buy costs.

Accordingly, Defendant's motion to strike the Schoen Affidavit is GRANTED, and

Plaintiffs' motion to supplement the record with it is DENIED.

2. Eric Olney Declaration

In support of their motion for summary judgment, Plaintiffs submitted a declaration from

Eric Olney, an attorney in this matter. (ECF No. 83-2.) Attached to the declaration are several

exhibits. The FEC does not object to the exhibits, but, in a footnote, it moves to strike the

portions of the Olney declaration that contain "arguments by counsel" because arguments should

be confined to the briefs.  (*See* Def.'s Mot. to Strike at 5, n.2.)  In response, Plaintiffs maintain

that the declaration is "limited to a description of conversations and other acts performed by [the]

law firm that could only be attested to in an attorney declaration."  (*See* Pls.' Mot. to Supplement

at 7.)

In moving to strike the portions of the Olney declaration, the FEC erred in three respects.

It made its motion in a perfunctory manner in a footnote, and instead of identifying all instances

of argument or providing an example of the objectionable argument, the FEC referred to the

objected to material as "Portions of Declaration of Eric S. Olney."  Then, in its reply brief, the

FEC again confined its argument about the declaration to a footnote.  While it is understandable

that the five-page limit on the FEC's reply brief *may* justify relegating the argument to a

footnote, the FEC's opening motion had no such page limitation and should have, at the very

least, provided the court with an example of the objectionable argument.  Accordingly, the court

declines to guess which portions of the declaration contain argument.  *See Hutchins v. District of

Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (stating that the court "need not consider

cursory arguments made only in a footnote"); *Huntington v. U.S. Dep't of Commerce*, 234 F.

Supp. 3d 94, 101 (D.D.C. 2017) (deeming arguments made in footnote as forfeited and

addressing only arguments made in briefs).  Defendant's motion to strike unidentified portions of

the Olney Declaration is DENIED.

3.  Commissioner Ellen Weintraub's Remarks

In July 2015, the FEC held an open meeting during which it discussed Plaintiffs'

rulemaking petition.  Plaintiffs' motion for summary judgment includes remarks made by

Commissioner Ellen Weintraub during the discussion.  (*See* Pls.' Mot. Summ. J. at 8, n.8.)  The

FEC moves to strike Plaintiffs' use of the remarks because they constitute pre-decisional

deliberations and are thus not properly considered part of the administrative record. (*See* Def.'s Mot. to Strike at 8–10.) Plaintiffs contend that the remarks are properly before the court to show institutional bias. (*See* Pls.' Mot. to Supplement at 7.) The court agrees with the FEC.

When reviewing an agency action, the agency's opinion and its pre-decisional deliberations are and should be handled differently. "Agency opinions, like judicial opinions, speak for themselves." *Checkosky v. SEC*, 23 F.3d 452, 489 (D.C.Cir.1994). "Rendered at the conclusion of all the agency's processes and deliberations, they represent the agency's final considered judgment upon matters of policy the Congress has entrusted to it." *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1001 (D.C. Cir. 1999). Accordingly, courts should review the agency's opinion with a view to determining whether the agency acted within the scope of its legal authority, explained its decision, relied on facts with some basis in the record, and considered the relevant factors. *Fulbright*, 67 F. Supp. 3d at 89. In contrast, predecisional deliberations are not final. Until the agency issues its opinion, commissioners are free to change their positions and the bases of their positions. *See Checkosky*, 23 F.3d at 489 ("Up to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions."). Pre-decisional deliberations will not be effective if commissioners are concerned that "any slip of the tongue during an agency's decisionmaking process could be fatal." *PLMRS Narrowband Corp.*, 182 F.3d at 1001. Indeed, if commissioners' remarks were regularly deemed fair game for the administrative record, there could be a chilling effect on "candid and creative exchanges regarding proposed decisions and alternatives," "lead[ing] to an overall decrease in the quality of decisions." *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002). Thus, "[w]here an agency has issued a formal opinion or a written statement of its reasons for acting, transcripts of agency deliberations at Sunshine Act meetings should not routinely be used to

impeach that written opinion." *Kan. State Network v. FCC*, 720 F.2d 185, 191 (D.C. Cir. 1983).

In this case, Commissioner Weintraub's remarks were made during pre-decisional deliberations; thus, the presumption is against inclusion in the administrative record. In an attempt to rebut the presumption, Plaintiffs rely on a Third Circuit decision involving the termination of an employee's Employee Retirement Income Security Act benefits. *See Kosiba v. Merck & Co.*, 384 F.3d 58, 67 (3d Cir. 2004). Contrary to Plaintiffs' representations, *Kosiba* is not in any material way comparable to this case. In *Kosiba*, the district court found that the denial of benefits was not arbitrary and capricious. *Id.* at 61. The Third Circuit, when remanding the case, noted that the district court could supplement the record with "evidence of potential biases and conflicts of interest that is not found in the administrator's record" in order to determine whether a standard above the arbitrary and capricious standard should be applied. *Id.* at 67 n.5. The procedural posture and questions presented by the FEC's motion to strike are patently different from those presented in *Kosiba,* and therefore that case provides no basis for the court to supplement the record with Commissioner Weintraub's pre-decisional remarks. Defendant's motion to strike Commissioner Weintraub's remarks is GRANTED, and Plaintiffs' motion to supplement the record with it is DENIED.

## B. Plaintiffs' and Defendant's Cross-Motions for Summary Judgment

Following this court's remand, the FEC reconsidered the allegations in both of Plaintiffs' complaints as well as those in Plaintiffs' petition for rulemaking. The FEC subsequently issued two decisions again finding Plaintiffs' allegations unpersuasive. Plaintiffs now challenge the underpinnings of each decision.

### 1. FEC's Dismissals of Plaintiffs' Administrative Complaints

The FEC's Factual and Legal Analysis opened by explaining that the FEC uses the "plain

meaning" of "endorse, support, and oppose" when determining whether the CPD qualifies as a staging organization that does not endorse, support, or oppose political candidates or political parties. (A.R. 7213.)

The FEC then analyzed evidence that it had previously reviewed in prior actions. In so doing, the FEC first relied on sworn declarations, from the individuals or organizations quoted in Plaintiffs' complaint, in which the individuals affirmed that the "statements attributed to them do not fairly or fully reflect their respective views on the participation of independent candidates in CPD debates." (A.R. 7216.) The FEC further found that even if the quotes in Plaintiffs' complaint were not cherry picked and indeed once represented the organization's perspective, "it would be inappropriate to rely on documents and statements that are more than 30 years old to ascertain CPD's present support or opposition to candidates and parties," because organizations change over time. (A.R. 7217.) And the CPD, in particular, conducts an internal review after every presidential election and has adjusted the process to be inclusive of independent candidates. (*Id.*) The FEC also found that the earlier documents and statements were of limited persuasive value because each current CPD director swore that he or she had never observed a CPD board member conduct CPD business in a partisan fashion. (A.R. 7218.) Finally, the FEC reasoned that even if the earlier declarations reflected more current sentiments, they did not demonstrate that CPD endorsed, supported, or opposed any party or candidate. (*Id.*)

The FEC then addressed the evidence that had not been presented in prior complaints. It found that statements made in an interview by CPD Co-Chair Frank Fahrenkopf in his official capacity did not indicate any categorical support for or opposition to any candidates; they merely asserted the historical fact that, aside from Ross Perot, the debates have consisted of only Democratic and Republican candidates. (A.R. 7219.) The FEC also reviewed all other

statements, financial contributions, and employment-related evidence to determine whether any were attributable to any CPD co-chair or director in his or her official capacity. (A.R. 7221.) The FEC then noted the CPD's recently adopted "Political Activities Policy" and an informal policy limited the risk that financial conflicts of interest could arise as a result of outside employment. (A.R. 7221–22.) Accordingly, the FEC found that the additional evidence failed to demonstrate that the CPD endorsed, supported, or opposed any political party or political candidate.

The FEC's Factual and Legal Analysis then addressed Plaintiffs' claim that the fifteen percent polling threshold is not objective and results in prohibited corporate contributions from CPD to debate participants. First, the FEC noted that, in another case, the court concluded that "third party candidates have proven that they can achieve the level of support required by the CPD." (A.R. 7223–24.) Second, the FEC acknowledged that this case is different because Plaintiffs have presented new information in the form of expert reports.

The FEC took issue with Dr. Clifford Young's report, which found that to meet the 15 percent threshold, a candidate must achieve 60 and perhaps as much as 80 percent name recognition. (A.R. 7224.) The FEC claimed that by focusing solely on name recognition, Young oversimplified the study to the detriment of its usefulness. (AR. 7224–25.) Moreover, the Young report did not and cannot establish that it is impossible for independent candidates to reach the requisite name recognition because 63 percent of registered voters had heard of Libertarian Gary Johnson and 59 percent had heard of Green Party candidate Jill Stein. (AR. 7225–26.)

The FEC then turned to political analyst Douglas Schoen's report, which stated that the cost to an independent candidate of achieving 60 percent name recognition would be over $266

million, including $120 million for paid media content production and dissemination. (A.R. 7224.) The FEC found that the report was flawed in large part because it was built on the Young report's premise that 60 to 80 percent name recognition is necessary to meet the 15 percent threshold. (A.R. 7226.) The FEC criticized the Schoen report for failing to consider that independent candidates can attract earned media (free coverage), that social media provides more economical avenues for messaging, and that independent expenditure-only political committees pay for messaging in support of independent candidates. (A.R. 7226–28.)

Having identified significant limitations undermining the reports' persuasiveness, found that recent elections undermined the reports' findings, noted that independent candidates do not begin at zero percent name recognition, and acknowledged the judicial finding that independent candidates in the past have reached 15 percent in the polls, the FEC concluded that the expert reports did not provide reason to believe that the 15 percent threshold violated the requirement to use objective candidate-selection criteria for staging debates. (A.R. 7228–29.)

The FEC then addressed Plaintiffs' allegations that the CPD manipulates the selection of polls to favor Democratic and Republican candidates, and relies on inaccurate polls. The FEC found no evidence in the record that the CPD has manipulated the dates of the polls to favor any party. (A.R. 7230.) It relied on a sworn declaration from its independent polling expert stating, in part, that he has recommended which polls to use since 2000 based solely upon his professional judgment and without any partisan purpose or pre-determined result in mind. (*Id.*) With regard to Plaintiffs' allegations that polling in three-way races is subject to increased inaccuracy, the FEC gave greater weight to its own expert, finding that Young's conclusions about gubernatorial races were not equally applicable to presidential races and therefore could not support a reasonable inference that the CPD's criteria for selecting debate participants was

not objective.  (A.R. 7231–32.)

Finally, the FEC dismissed Plaintiffs' remaining allegations as being grounded solely in policy and untethered from evidence.  (A.R. 7233.)

In their motion for summary judgment, Plaintiffs assert that the FEC's conclusions were arbitrary, capricious, and contrary to law because the FEC:  (1) applied the incorrect legal standard, (2) failed to properly consider the submitted evidence, and (3) ultimately reached the wrong conclusion regarding the objectivity of the CPD's debate requirement.

### i. Legal Standard Adopted by the FEC

Plaintiffs argue that the FEC failed to articulate the standard it used in determining whether the CPD complied with the regulation prohibiting it from endorsing, supporting, or opposing political candidates or parties.  (*See* Pls.' Mot. Summ. J. at 20.)  They contend that the FEC's conclusory statement that it applied the plain meaning of each term is insufficient and offers no insight into its decision-making.  (*Id.*)  Further, Plaintiffs argue that the FEC applied the "control test" that this court instructed it not to use in *Level the Playing Field v. Fed. Election Comm'n*, 232 F. Supp. 3d 130 (D.D.C. 2017) ("*LPF I*").  (*Id.* at 20–21.)

In response, the FEC argues that not only does its articulation of the standard applied satisfy the court's instruction in *LPF I*, but it is also plainly reasonable and not contrary to law.  (*See* ECF No. 90 ("Def.'s Resp. and Mot. Summ. J.") at 25.)  The FEC notes, as it did in its decision, that the Supreme Court determined in another context that two out of three of the terms—"support" and "oppose"—"provide explicit standards for those who apply them and give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  (*Id.* (quoting *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 170 n.64 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)).)  In addition, the

21

FEC contends that Plaintiffs' assertion that it applied an improper "control test" is belied by the record. (*Id.* at 26.)

The FEC has the better of this argument. Plaintiffs might prevail if the FEC had merely stated that it applied the plain meaning of "endorse," "support," and "oppose" without incorporating the application into its written analysis. But the FEC's discussion regarding its application demonstrates that it reviewed the evidence to determine whether it fell into one of three categories: (1) evidence that the CPD directly engaged in prohibited conduct, (2) evidence that CPD personnel engaged in prohibited conduct in an *official* capacity, and (3) evidence that CPD personnel engaged in prohibited conduct in a *personal* capacity. (A.R. 7213–22.) The FEC examined the evidence in the first two categories to determine whether it was persuasive enough to warrant a finding that the CPD violated the Federal Election Campaign Act ("FECA" or the "Act"). (A.R. 7214–20.) In so doing, the FEC used the plain meaning of the terms "endorse," "support," and "oppose." (A.R. 7213–22.) With respect to evidence in the third category, the FEC determined that it did not violate the Act because an individual is permitted to wear "multiple hats" and "an individual's leadership role in a given organization does not restrict his or her ability to speak freely on political issues or make contributions to political committees when he or she does so in his or her personal capacity." (A.R. 7220–21.)

Moreover, to the extent that the FEC's decision contains a "control test," it is patently different from that in *Buchanan v. Fed. Election Comm'n*, 112 F. Supp. 2d 58, 63 (D.D.C. 2000). In *Buchanan*, the FEC looked for evidence demonstrating that the two major parties controlled the CPD, was involved in the CPD's operations, or had input in the CPD's debate decision. *Id.* at 70–71. The FEC's use of the control standard was deemed permissible to address the "specific contention . . . that the CPD was created to give the two major parties 'control over' the

presidential debates." *Id.* at 70–71 n.8. Heeding *Buchanan*'s narrow holding, in *LPF I* this court advised the FEC that the *Buchanan* control standard was inapplicable to Plaintiffs' allegations because Plaintiffs "do not allege that the Democratic or Republican parties exercised control over the CPD, but instead that the CPD and its directors acted on a partisan basis to support those parties." *LPF I*, 232 F. Supp. 3d at 139. And on remand, the FEC made plain that it was not applying the *Buchanan* control standard, but a standard designed address whether the CPD was liable for its directors' actions. That is, in order for the FEC to address Plaintiffs' allegations that CPD directors were engaging in partisan activity that permeated the CPD and rendered it a partisan organization, the FEC needed to look to the law of agency to assess the merits of Plaintiffs' claims.

The court therefore DENIES Plaintiffs' motion and GRANTS Defendant's cross-motion with respect to the appropriateness of the legal standard applied.

### ii. *FEC's Treatment of the Evidence*

Plaintiffs argue that, for the second time, the FEC failed to adequately consider the evidence it presented in its two administrative complaints. (*See* Pls.' Mot. Summ. J. at 21–32.) In response, the FEC contends that Plaintiffs cannot meet their burden to show that the Commission acted contrary to law or in an arbitrary manner. (*See* Def.'s Resp. and Mot. Summ. J. at 28–41.) The FEC also notes that on remand, it heeded this court's directives and addressed each deficiency identified in *LPF I*. (*See id.* at 24–28.)

In reviewing the FEC's Factual and Legal Analysis, this court must assess whether the FEC considered the "relevant factors" and must "engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" *Ethyl Corp. v. EPA*, 541 F.2d 1, 34–35 (D.C. Cir. 1976) (quoting *Volpe*, 401 U.S. at 415–16). However, in educating itself about "the intricacies of the

problem before the agency," this court must be mindful that it is not a "superagency that can supplant the agency's expert decision-maker." *Id.* at 36. As such, this court must examine the administrative record only for a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Although Plaintiffs mount several challenges to the FEC's treatment of the evidence, for the reasons set forth below, none are availing.

### a. Plaintiffs' disagreement with the FEC's findings regarding partisan evidence

In support of their allegations that the CPD is a partisan organization that has supported, endorsed, or opposed political parties or candidates, Plaintiffs submitted several categories of evidence for the FEC's review, none of which the FEC found persuasive.

### 1. Statements analyzed by FEC in prior matters

As discussed in *LPF I*, there is some overlap between the evidence submitted with Plaintiffs' complaints and evidence submitted with prior CPD-related complaints, including MURs 4987, 5004, and 5021, which were reviewed by the court in *Buchanan*. The court there noted that this evidence of the CPD's alleged partisanship was "not insubstantial" and "[a]n ordinary citizen might easily view the circumstances surrounding the creation of the CPD along with the evidence of major-party influence over the past three debates as giving some 'reason to believe' that the CPD always has supported, and still does support, the two major parties to the detriment of all others." *Buchanan*, 112 F. Supp. 2d at 72. However, it found that plaintiffs lacked "contemporaneous evidence" specifically relating to the CPD's decisions regarding the 2000 election debates at issue in that case. *Id.*

Here, after acknowledging its earlier conclusions that the age of the documents and

statements undermined their persuasiveness as evidence of current bias, the FEC reevaluated the evidence. (A.R. 7215–18.) In so doing, it first compared Plaintiffs' characterization of several statements with declarations submitted by the quoted individuals. (A.R. 7215.) For example, Plaintiffs submitted statements made by the then-chairmen of the Republican and Democratic parties, who entered into a 1985 Memorandum of Agreement that the debates "should be principally and jointly sponsored and conducted by the Republican and Democratic National Committees," and issued a 1987 press release stating that "while the two party committees will be sponsors for all future presidential general election debates between our party nominees, we would expect and encourage" the League of Women's participation as a sponsor. (A.R. 2244, 2249.) Plaintiffs view these statements as "incontestably partisan." (*See* Pls.' Mot. Summ. J. at 22.) However, the FEC credited a declaration from CPD Co-Chair Fahrenkopf that Plaintiffs' "cherry-picked quotes" must be understood from the perspective of two individuals working to procure "buy in" from the two major parties because "securing commitment of both major party nominees" was a "major impediment" to institutionalized debates. (A.R. 7058, 7216.) In another instance, Plaintiffs submitted a statement made by a then-former CPD board member, who in a 2001 interview stated that the then-CPD Executive Director was "extremely careful to be bi-partisan." (A.R. 7216.) Plaintiffs assert that "bi-partisan" refers to an agreement between two major political parties. (*See* Pls.' Mot. Summ. J. at 22.) The FEC, however, credited a declaration from the quoted individual that the word "bi-partisan" was used "to mean not favoring any one party over another." (A.R. 7095, 7216.) These two instances are not anomalous. The FEC deferred to each declarant's attestation that the meaning Plaintiffs ascribed to their statements was inaccurate. (A.R. 7035–7161, 7216.)

The FEC next determined that even if the past statements did "suggest support for

debates exclusively between Republicans and Democrats or opposition to the inclusion of independent candidates," they did not "necessarily reflect the organization's perspective at the time it sponsored the 2012 presidential debates at issue." (A.R. 7217.) The FEC noted that the CPD conducts an internal review after every presidential election, indicating that the CPD may change over time. (*Id.*) And it cited the fact that, following allegations that the 1996 debates arbitrarily excluded Ross Perot, the CPD studied the 1996 debates, adopted new candidate selection criteria, and retained a polling expert to ensure the new criteria were carefully and thoughtfully applied. (*Id.*) The FEC also relied on sworn declarations from every director, attesting that he or she has "never observed any [CPD] Board member ever approach any issue concerning the CPD or its mission from a partisan perspective and the CPD has conducted its business in a strictly nonpartisan fashion." (A.R. 7218.) (alteration in original)

Finally, the FEC reasoned that even if the past statements "did reflect more current sentiments, they are not indicative of CPD's *organizational* endorsement of or support for the Democratic and Republican Parties and their candidates, or CPD's opposition to third party candidates" for two reasons. (*Id.* (emphasis in original).) It noted that two of the documents were not released by the CPD, but the Democratic and Republican National Conventions "as expressions of [their] commitment to a new custom for presidential debates." (*Id.*) There was also no evidence that the statements from the CPD officers and directors were made in their capacity as CPD representatives. (*Id.*)

The court finds the FEC's three-layer assessment sufficient. It "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tex. Neighborhood Servs. v. U.S. Dep't of Health & Human Servs.*, 875 F.3d 1, 6 (D.C. Cir. 2017). The FEC rationally decided, based on evidence

presented to it, that the statements were non-partisan, not representative of the current CPD, or not indicative of CPD's organizational endorsement, support, or opposition. That Plaintiffs or other like-minded individuals may disagree with the FEC's interpretation of these statements is not enough for the court to find that the FEC's decision is arbitrary, capricious, or contrary to law. *See, e.g.*, *New Life Evangelistic Ctr., Inc. v. Sebelius*, 753 F. Supp. 2d 103, 133 (D.D.C. 2010) ("[W]hile New Life may understandably disagree with HHS' determination, mere disagreement cannot discharge its burden of establishing that the determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). Therefore, in light of the FEC's reasoned explanations, this court finds that the FEC's treatment of previously considered evidence was neither arbitrary nor contrary to law.

### 2. Statements analyzed by FEC for the first time

Plaintiffs next challenge the FEC's treatment of a 2015 interview that CPD Co-Chair Fahrenkopf gave to SkyNews. In the interview, Fahrenkopf was asked the following question:

> And, this time around, of course, together, the television companies wanting to do the two lead candidates, the three lead candidates, and then a four candidate debate, the conservative leader said he wouldn't do that, and we've ended up with a seven person, a seven party, debate. What do you think the prospects for that are?

(A.R. 3099.) Fahrenkopf responded:

> Well, you know the primary debates here in the United States, we often—and of course the Republicans three years ago, had seven or eight people on the stage and people jokingly say it's less of a debate than a cattle show, because there's such little time for each candidate to get across in the short period what their views are on issues. That's why in the general election debate, we have a system, and we, you know, as you know, primarily go with the two leading candidates, it's been the two political party candidates, save in except for 1992 when Ross Perot participated in the debates. So, seven people on the stage at one time is very difficult, it's going to take a very clever moderator to make sure that each candidate gets an opportunity to put forth their views.

(*Id.*)

Plaintiffs read this exchange to indicate that Fahrenkopf "admit[ted] that the CPD uses its 'system' to ensure that only the 'two leading candidates' can participate in the debates." (A.R. 3094.) Plaintiffs therefore argued that the FEC should view the admission as confirmation of the CPD's bias and respondents' violation of federal law. (A.R. 3093.) Plaintiffs also asked the FEC to not afford significant weight to a portion of CPD Director Janet Brown's declaration that CPD's selection system is designed to be inclusive enough to draw the leading candidates without being so inclusive that leading candidates would refuse to participate, because Plaintiffs viewed it as contradicting Fahrenkopf's admission. (A.R. 3094.)

Upon review, the FEC found "no categorical support for Democrats or Republicans or opposition to independent candidates" because it viewed Fahrenkopf as referring to a trend. (A.R. 7219.) Then, as it had done with the statements discussed above, the FEC looked to Fahrenkopf's declaration, in which he averred that his remarks were not fairly construed by Plaintiffs. (A.R. 3120.) Specifically, the FEC agreed with Fahrenkopf's explanation that in responding to a question about a seven-candidate debate, he simply stated "the historical fact that in the United States, the general election debates usually have been between two candidates, who have been the major party nominees." (A.R. 3119–20.) Lastly, the FEC noted that Fahrenkopf's remarks about the effect a seven-candidate debate would have on the "educational value of debates" is consistent with the CPD's statement that it "operates for the purpose of providing meaningful debates for the public benefit." (A.R. 7219–20.)

In moving for summary judgment on the FEC's treatment of the SkyNews interview, Plaintiffs contend that the FEC improperly accepted Fahrenkopf's "bogus explanation" that he was merely stating a historical fact, because the interviewer's "question on its face was prospective." (*See* Pls.' Mot. Summ. J. at 22.) Plaintiffs note that the statement "we . . .

primarily *go* with" is present tense.  (*See* ECF No. 97 ("Pls. Reply and Opp. Mot. Summ. J.") at 10 (emphasis and ellipsis in original).)  Plaintiffs also accuse the FEC of sharing the CPD's partisan bias because the FEC espouses the "paternalistic view" that multiple candidates have a negative effect on the debates' educational value.  (Pls.' Mot. Summ. J. at 23.)

Plaintiffs contend that because the interviewer posed a prospective question, the FEC should have read Fahrenkopf's entire answer as relating to the future.  This argument goes too far.  In answering a question about the future, it is not unusual to use the past as a frame of reference.  Given Fahrenkopf's answer and declaration, it was reasonable for the FEC to find that a portion of his statement asserted a historical fact—"we . . . primarily go with the two leading candidates, it's been the two political party candidates"—and the other portion of his answer addressed the question about a seven candidate debate in the future—"[s]o, seven people on the stage at one time is very difficult, it's going to take a very clever moderator to make sure that each candidate gets an opportunity to put forth their views."  (A.R. 3099.)  Accordingly, the court finds that the FEC's treatment of Fahrenkopf's 2015 interview was neither arbitrary nor contrary to law.

### 3.   Policies implemented by CPD leadership

As an exhibit to their complaints, Plaintiffs included a document entitled "Commission on Presidential Debates:  Conflict of Interest Policy," created to protect the CPD's interests "when it is contemplating entering into a transaction or arrangement that might benefit the private interests of an officer, director or senior manager of the Organization or might result in a possible excess benefit transaction."  (A.R. 2768–71, 4017.)

On remand, the CPD submitted a declaration from its Executive Director explaining that there are two additional policies.  The first is an "informal policy," which provides that "Board

members are to refrain from serving in any official capacity with a political campaign or party while serving on the Board." (A.R. 7103.) The second is a "formal Political Activities Policy" that expands upon the informal policy and "is intended to deter CPD-affiliated persons from participating, even in a personal capacity, in the political process at the presidential level (including the making of campaign contributions) while serving on the Board, despite the fact no such policy is required by FEC regulations." (A.R. 7103–04.)

The parties' arguments with respect to this evidence are akin to two ships passing in the night. Plaintiffs argue that the FEC erred in relying only on the CPD's description of the two previously undisclosed policies instead of actually reviewing the policies. (*See* Pls.' Mot. Summ. J. at 24–26.) According to Plaintiffs, the CPD's cursory description of the policies demonstrate that they are ineffective at prohibiting partisan activity. (*Id.*) In response, the FEC highlights that Plaintiffs submitted the "Conflict of Interest Policy" for the FEC's review, and the FEC subsequently reasonably determined that the policy "appear[s] to limit financial conflicts of interest that could arise as a result of outside employment." (Def.'s Resp. and Mot. Summ. J. at 34.) This response, focusing solely on the previously disclosed policy, indicates that the FEC may have misunderstood Plaintiffs' contention regarding the two undisclosed policies.

Putting this apparent misunderstanding aside, the FEC's treatment of both undisclosed policies was appropriate given its earlier findings that political statements, contributions, and positions held by CPD leadership solely in their personal capacity were acceptable. Plaintiffs' argument that the FEC erred in considering the two undisclosed policies might have had more traction had the FEC solely or primarily relied on policies it had neither viewed nor questioned. However, the FEC's Factual & Legal Analysis makes clear that its determination did not rise or fall with the policies. Before mentioning the policies, the FEC stated that (1) the statements of

consequence were those that "express the position of the CPD," (2) the contributions of

consequence were those that "originated from CPD resources," and (3) the only positions of

consequence were those where the CPD officer and directors "acted as agents of CPD" in the

course of the outside employment. (A.R. 7221.) The FEC then found that Plaintiffs failed to

adduce any evidence suggesting that specific statements, contributions, or positions fell into any

one of those three categories. (*Id.*) Next, the FEC found that most of the challenged work

preceded the individual's CPD service and thus was not fairly attributable to the CPD. (*Id.*) The

FEC then addressed its reliance on all three policies, and added appropriate caveats to show that

it had accounted for the CPD's failure to provide the Political Activities Policy and the informal

policy. (*See id.* ("Although not part of Respondents' submissions, the policy reportedly . . .").)

Accordingly, the court finds that the FEC's treatment of the policies was neither arbitrary nor

contrary to law.

### b. Plaintiffs' contention that the FEC failed to consider key partisan evidence

Plaintiffs argue that the FEC's Factual and Legal Analysis failed to "specifically address"

the following "evidence demonstrating the CPD's partisan bias." (*See* Pls.' Mot. Summ. J. at

23.)

- Fahrenkopf's 1987 statement that the CPD was "not likely to look with favor on including third-party candidates in the debates" (A.R. 2252);

- Former Senator Alan Simpson's 2002 comment that "Democrats and Republicans on the commission [] are interested in the American people finding out more about the two major candidates—not about independent candidates who mess things up" (A.R. 3136);

- Representative John Lewis' comment that "the two major parties [have] absolute control of the presidential debate process" (A.R. 3095);

- Congressional testimony that the Democratic and Republican parties determine who participates in the debates, *Buchanan*, 112 F. Supp. 2d at 71;

- Fahrenkopf's reference to the Republican Party as "our great party" (A.R. 2382–83);

- Cash contributions from CPD directors to Democratic and Republican campaigns (*see, e.g.*, A.R. 2370, 2373–80, 2403–05, 2407–08); and

- CPD directors' lobbying efforts on behalf of industries that gave money to Democratic and Republican candidates (*see, e.g.*, A.R. 2370, 2385).

(*Id.* at 23–24.)

The first four pieces of evidence are encompassed in the FEC's discussion of evidence that it has previously reviewed in connection with other administrative complaints. (A.R. 7214–18.) As detailed above, the FEC found that all the previously considered evidence was non-partisan, not representative of the current CPD, or not representative of the organization. In *LPF I*, this court stated that it "does not expect the FEC to discuss every single page of evidence in order to demonstrate that it had carefully considered the facts." 232 F. Supp. 3d at 142.

The last three pieces of evidence are encompassed in the FEC's discussion of more recent partisan evidence that it had not previously considered. (A.R. 7219–22.) As noted above, the FEC reviewed that evidence to determine whether it amounted to evidence that (1) the CPD directly engaged in prohibited conduct, (2) CPD personnel engaged in prohibited conduct in an *official* capacity, and (3) CPD personnel engaged in prohibited conduct in a *personal* capacity. (A.R. 7213–22.) Categorizing the evidence in this manner was a critical step in the FEC's analysis because prohibited conduct done solely in a personal capacity was deemed benign. The FEC found that each of the last three pieces of evidence fell within the benign category. Beginning with Fahrenkopf's article in which he referred to the Republican Party as "our great party," the FEC found that "there is no indication that Fahrenkopf wrote his op-ed in his official capacity as CPD co-chair, nor does the opinion piece express positions on behalf of CPD." (A.R. 7221.) With respect to the cash contributions made by CPD personnel to Democratic and

Republican campaigns, the FEC found "no suggestion that any of the contributions . . . originated from CPD resources or any source other than their respective personal assets." (*Id.*) Lastly, with respect to the lobbying efforts, the FEC found no information that the CPD directors acted "as agents of CPD in the course of outside employment," "on behalf of the CPD" in the course of lobbying efforts, or "on behalf of their employer while volunteering for CPD." (*Id.*)

Because the FEC did in fact address each piece of evidence identified by Plaintiffs, Plaintiffs' contention is reduced to a simple disagreement with the FEC's decision (as opposed to their representation that the FEC ignored a mountain of evidence), and such a disagreement does not discharge Plaintiffs of their burden to establish that the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, this court finds in favor of the FEC.

### c. Plaintiffs' contention that the FEC and CPD Directors failed to give sufficient consideration to evidence that CPD Directors were participants in a "partisan scheme"

In *LPF I*, this court ordered that on remand, the FEC must notify the named directors that Plaintiffs' complaint alleged that the directors had committed a violation of the FECA, give the directors the opportunity to address the allegations, and consider the evidence against the directors. 232 F. Supp. 3d at 143. In accordance with this court's order, the FEC notified the directors and provided them with an opportunity to respond. Nine of the directors submitted sworn declarations containing nearly identical paragraphs. (A.R. 7143–61.)

Plaintiffs contend that the directors' responses demonstrate that neither they nor the FEC gave "any sufficient thought to the substantial evidence." Specifically, they contend that the declarations are meaningless because they are virtually identical and summarily deny the allegations. (*See* Pls.' Mot. Summ. J. at 32.) Plaintiffs also assert, using Alan Simpson's

declaration as an example, that the declarations are flawed because they do not confirm that the directors reviewed the complaint or supporting evidence. (*Id.* at 32–33.) Plaintiffs therefore conclude that the FEC should have questioned their validity. (*Id.* at 33.)

The FEC responds that it was reasonable for it to give greater weight to the declarations because Plaintiffs' "cherry-picked quotes from CPD's directors were not made under oath and the quoted statements do not necessarily contradict respondents' declarations." (Def.'s Resp. and Mot. Summ. J. at 35.) The FEC uses Simpson's declaration to demonstrate that he did in fact directly address the statement that Plaintiffs accused him of ignoring. (*Id.*) As to Plaintiffs' argument that the FEC should have questioned the validity of the declarations, the FEC states that the Factual and Legal Analysis' robust discussion regarding the evidence's age, history, context, and legal significance demonstrates that it did not blindly accept the declarations. (ECF No. 104 ("Def.'s Reply") at 12–13.) In addition, the FEC argues that in the absence of the declarations, it would have reached the same conclusion because all the evidence—except for the remarks made in Fahrenkopf's 2015 interview—was "too old and/or only pertained to CPD directors' non-official capacity and thus likely would not establish CPD liability." (*Id.* at 13.) Lastly, the FEC cites Circuit case law stating that it is not a valid objection that conflicts in the evidence might have been resolved differently or other inferences may have been drawn from the same record. (*Id.*)

The FEC determined that out of all of Plaintiffs' evidence, only one statement—Fahrenkopf's 2015 interview—was both recent and given in an official capacity. The FEC engaged in an in-depth analysis of that statement before finding that it did not evince partisan bias. For the remaining statements, the FEC deemed them benign because they were outdated or made in the individual's personal capacity, and therefore it was not unreasonable for the FEC to

award greater weight to the more recent declarations. In addition, to the extent the FEC may have erred in relying on the declarations, such error was not prejudicial given that the FEC also separately identified critical imperfections in the statements. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'"). The court therefore finds that Plaintiffs have not met their burden in establishing that the FEC's treatment of the nine declarations was arbitrary, capricious, or otherwise contrary to law.

### d. Plaintiffs' disagreement with the weight afforded to their experts

Plaintiffs submitted two supporting expert reports, one of which was prepared by Clifford Young, and in which report he opined that "on average, an independent candidate must achieve a minimum of 60% name recognition, and likely 80%, in order to obtain 15% vote share." (A.R. 2493.) Young arrived at this conclusion after noting, among other things, that there is a positive correlation between name recognition and vote share. (*Id.*) He also stated that three-way races are more error prone than two-way races, which could lead to an independent candidate's improper exclusion from the debate. (A.R. 2519.) The other expert report was authored by Douglas Schoen. Building on Young's finding that 60 percent name recognition is required to meet the 15 percent polling threshold, Schoen opined that an independent candidate should expect to spend $266,059,803 to run a campaign capable of meeting the 15 percent polling threshold, and that this level of financing is impossible for all but the major-party candidates. (A.R. 2555–56.) Schoen also declared that with respect to polling error, elections with more than two candidates are prone to distinct volatility that limits the predictive power of pre-election polling data. (A.R. 2556.) According to Plaintiffs, the two expert reports work in tandem to

support their argument that the 15 percent threshold is not an objective criterion.

Because the FEC addressed the two expert reports at length in its Factual & Legal Analysis, Plaintiffs do not and cannot contend that the FEC did not take the expert reports into account. Instead, they argue that the FEC erred in determining how much evidentiary weight to give the expert reports. But the fact that Plaintiffs disagree with how the FEC treated the evidence is not actionable because the FEC provided a sound and reasoned basis for discounting both expert opinions.

With respect to Young's expert report, the FEC found that (1) the analysis was limited in its scope because it considers one factor—name recognition—to the exclusion of other key factors, such as fundraising, candidate positioning, election results, idiosyncratic events, policy preferences, and political missteps; (2) the report did not establish that independent candidates do not and cannot acquire 60 percent name recognition; (3) Young's metric for polling error—the difference between the poll and the actual result on election—was not useful because the CPD is concerned only with a candidate's support at a given moment; and (4) Young's reliance on three-way gubernatorial election polling was not useful in the presidential election polling context because presidential election polling is inherently more reliable than polling in low turn-out elections, such as gubernatorial races. (A.R. 7224–25, 7231–32.)

The FEC found that Schoen's report (1) was flawed because it built upon the Young report's flawed findings; (2) presumed that all independent candidates must pay for all of their media; a presumption which was unfounded because candidates are able to attract earned media; (3) failed to address the fact that digital and social media has enabled the sharing of campaign messaging at a much lower cost than more traditional news outlets; (4) did not account for the fact that independent expenditure-only political committees are on the rise and are able pay for

messaging, which reduces the amount the candidate must spend in order to reach 60 percent name recognition; and (5) incorrectly presumed that independent candidates begin with 0 percent name recognition and funding.  (A.R. 7226–29.)

Each of the FEC's evidentiary findings was informed and reasonable given the facts presented to it and the flaws identified by the FEC.  That Plaintiffs would have come to a different conclusion regarding the weight afforded to the reports does not render the FEC's findings arbitrary, capricious, or contrary to law.  Moreover, the FEC was permitted to afford more weight to its expert, Gallup's Editor-in-Chief Frank Newport.  *See Wis. Valley Improvement v. F.E.R.C.*, 236 F.3d 738, 746–47 (D.C. Cir. 2001) ("Given the presence of disputing expert witnesses," the court "'must defer to 'the informed discretion of the responsible federal agencies.'").

### iii.  FEC's Determination Regarding CPD's Polling Criterion

Finally, Plaintiffs argue that the FEC's dismissals were arbitrary and capricious because the agency "ignored or misconstrued the evidence that the CPD's polling criteria is not 'objective' and instead favors the major party nominees."  (*See* Pls.' Mot. Summ. J. at 33.)  The FEC regulations require that staging organizations such as the CPD "use pre-established objective criteria to determine which candidates may participate in a debate," but does not define "objective criteria." 11 C.F.R. § 100.13(c); *see also Perot v. FEC*, 97 F.3d 553, 559–60 (D.C. Cir. 1996) (stating that regulation "does not spell out precisely what the phrase 'objective criteria' means," giving "the individual organizations leeway to decide what specific criteria to use").  In *Buchanan*, however, the court noted that "the objectivity requirement precludes debate sponsors from selecting a level of support so high that only the Democratic and Republican nominees could reasonably achieve it."  112 F. Supp. 2d at 74.

Here, Plaintiffs bring two challenges. First, they take issue with the FEC's failure to dispute that if an independent candidate did reach 15 percent support, there is nothing to prevent the CPD from manipulating the selection of polls to exclude the independent candidate. (*See* Pls.' Mot. Summ. J. at 34.) Second, Plaintiffs contend that the FEC failed to address the fact that no independent candidate has satisfied the 15 percent criterion since it was instituted by the CPD. (*See id.*)

Plaintiffs' first challenge is based in conjecture, requiring the occurrence of two separate events: first, that an independent candidate reaches the 15 percent threshold, and second, that the CPD manipulates the selection of polls to exclude the independent candidate. Faced with such hypothetical scenarios, the FEC relied on its independent polling expert's sworn declaration that he recommends polls based on the quality of the methodology employed, the reputation of the polling organizations, and how often the polling is conducted. (A.R. 3045.) The expert further averred that he makes recommendations based solely upon his professional judgment and without any partisan purpose or pre-determined result in mind, and that the CPD has always adopted his recommendations. (*Id.*) In light of this declaration, the FEC's decision to discount Plaintiffs' hypothetical misconduct cannot be construed as arbitrary.

With regard to Plaintiffs' second challenge, once the FEC determined that the Schoen and Young reports contained flaws that undermined their persuasive value, the FEC relied on a judicially-upheld finding that independent candidates have reached the 15 percent threshold in the past. Indeed, the *Buchanan* court stated:

> In view of the substantial deference I must accord to the FEC's interpretation of its own regulations, I cannot conclude that it was plainly erroneous or inconsistent with the regulation for the FEC to find that the 15% support level set by the CPD is "objective" for the purposes of 11 C.F.R. § 110.13(c). As Brown indicated in her declaration, several third party candidates have in the past achieved over 15% support in the polls taken at or around the time that the debates are traditionally

held. For instance, by September of 1968, George Wallace had achieved a level of support of approximately 20% in the polls. John Anderson was invited by the League of Women Voters to participate in the 1980 presidential debates after his support level reached approximately 15%. Finally, in 1992, Ross Perot's standing in the polls was near 40% at some points and he ultimately received 18.7% of the popular vote that year. (Brown Decl. at ¶ 35.) Thus, third party candidates have proven that they can achieve the level of support required by the CPD. While a lower threshold of support might be preferable to many, such a reading is neither compelled by the regulation's text nor by the drafters' intent at the time the regulation was promulgated. Accordingly, deference to the FEC's interpretation is warranted.

112 F. Supp. 2d at 74. And because the FEC first discounted all newly submitted evidence purporting to show that the criterion was not objective, all that remained was the evidence that was considered in *Buchannan,* and thus the FEC's reliance on *Buchanan*'s findings that it was possible for a third party candidate to reach the polling threshold was reasonable.

Accordingly, the court concludes that the FEC's determination regarding the polling criterion was neither arbitrary nor capricious. The court therefore DENIES Plaintiffs' motion and GRANTS Defendant's cross-motion with respect to the FEC's determination regarding the polling criterion.

### 2. FEC's Decision to Not Engage in Rulemaking

Plaintiffs also move for summary judgment on its claim that the FEC's decision not to initiate rulemaking was arbitrary and capricious in violation of the APA. The court's review of an agency's decision not to engage in rulemaking is very limited, and that decision "is at the high end of the range of levels of deference we give to agency action under our 'arbitrary and capricious' review." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (internal quotation omitted). The proper inquiry is "whether the agency employed reasoned decision-making in rejecting the petition." *Id.* In making this assessment, the court "must examine 'the petition for rulemaking, comments pro and con . . . and the agency's explanation of its decision

to reject the petition." *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5 (D.C. Cir. 1987)

(quoting *WWHT, Inc. v. FCC*, 656 F.2d 807, 817–18 (D.C. Cir. 1981)). An order overturning the

agency's decision and requiring promulgation of a rule is reserved for only "the rarest and most

compelling of circumstances." *WWHT*, 656 F.2d at 818. However, if the agency fails to provide

a reasonable explanation for its decision, an appropriate remedy may be a remand to the agency

for reconsideration and publication of a new decision or the commencement of rulemaking if the

agency so decides. *See, e.g.*, *Shays v. FEC*, 424 F. Supp. 2d 100, 116–17 (D.D.C. 2006).

> In its Petition for rulemaking, Plaintiffs requested the following:

> The FEC should conduct a rulemaking to revise and amend 11 C.F.R. § 110.13(c),
> the regulation governing the criteria for candidate selection that corporations and
> broadcasters must use in order to sponsor candidate debates. The amendment
> should (A) preclude sponsors of general election presidential and vice-presidential
> debates from requiring that a candidate meet a polling threshold in order to be
> admitted to the debates; and (B) require that any sponsor of general election
> presidential and vice-presidential debates have a set of objective, unbiased criteria
> for debate admission that do not require candidates to satisfy a polling threshold
> to participate in debates.

(A.R. 0009–10.) In support of this request, Plaintiffs presented much of the same evidence,

including the Young and Schoen reports, as they presented in support of their administrative

complaint. Plaintiffs' basic argument is that the use of a single polling criterion to determine

admission to candidate debates is particularly susceptible to excluding candidates and confining

support to the two major party candidates, creating an appearance of corruption or unlawful

conduct. Plaintiffs therefore argue that in the unique context of presidential and vice-presidential

debates, which are run solely by the CPD, the FEC should continue permitting the CPD or future

debate staging organizations to craft their own objective criteria but disallow the use of polling

thresholds. (A.R. 0032.) The FEC received 1,264 comments, and only one—from the CPD—

opposed the Petition. (A.R. 1903.)

When it remanded this case, this court identified several problems with the FEC's reasoning. For example, the FEC acknowledged that polling thresholds could be used to advance one candidate over another, and summarily stated that other mechanisms would detect the issue without explaining why alternative processes would be preferable. (A.R. 1905.) And the FEC assessed a nationwide prohibition on polling thresholds for every debate as opposed to Plaintiffs' requested prohibition on polling thresholds for only presidential and vice president debates. (*Id.*) The court therefore directed the FEC to reconsider the rulemaking petition and issue an opinion addressing the court's concerns. *LPF I*, 232 F. Supp. 3d at 148.

Following the remand, the FEC again denied Plaintiffs' petition for rulemaking. Plaintiffs now move for summary judgment based on the FEC's treatment of its two expert reports. (*See* Pls.' Mot. Summ. J. at 36–43.) As Plaintiffs aptly note, the reasoning in the Supplemental Notice of Disposition "largely mirrors the arguments in the Factual and Legal Analysis" and adds a "handful of additional arguments." (*Id.* at 36.) And given this court's finding that the FEC's treatment of the Young and Schoen report were neither arbitrary nor contrary to law, there is no need to assess whether the FEC's additional reasons for discounting the expert reports are sufficient. However, the court notes that the flaws identified by the FEC included: (1) Young's decision to measure name recognition at an early stage in each model may have amplified polling errors, which are higher earlier in the election cycle; (2) Young's analysis does not account for the fact that the September candidate field is smaller than the earlier stage that his analysis uses; (3) Young's report does not establish any causative effect between name recognition and vote share; (4) Young's report fails to provide any evidence that polling error is biased in a manner specific to party affiliation; (5) Schoen's report builds its conclusion through an extensive series of unsupported suppositions and assertions; (6) Schoen's

report failed to explain the circumstances under which the leading corporate and political media buying firm offered its estimate that an independent candidate would need $100 million for a media buy; and (7) Schoen's report does not account for any inherent biases held by the buying firm. (A.R. 1932–37.) These flaws vary in magnitude, but as discussed above, the other flaws were sufficient for the FEC to discount Plaintiffs' two proffered experts and rely on its own independent expert. Thus, Plaintiffs have presented no basis upon which this court may find that the FEC's decision not to engage in rulemaking was arbitrary, capricious, or otherwise contrary to law. The court therefore DENIES Plaintiffs' motion and GRANTS Defendant's cross-motion with respect to the FEC's decision not to engage in rulemaking.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to strike is GRANTED, in part and DENIED, in part, Plaintiffs' motion to supplement is DENIED, Plaintiffs' motion for summary judgment is DENIED, and Defendant's cross-motion is GRANTED.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 31, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge